20173vokpacf

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x
    UNITED STATES OF AMERICA
3

4              v.                        17 MJ 1972

5                                        BAIL HEARING

6
    CHUKWUEMEKA OKPARAEKE,
7   also known as Emeka,

8              Defendant.
    ------------------------------------x
9

10                                       United States Courthouse
                                         White Plains, N.Y.
11                                       March 31, 2017

12

13

14

    Before:  THE HONORABLE LISA MARGARET SMITH,
15
                                         Magistrate Judge
16

17
                         APPEARANCES
18
    JOON H. KIM
19       Acting United States Attorney for
         the Southern District of New York
20  OLGA ZVEROVICH
    PERRY CARBONE
21       Assistant United States Attorneys

22
    FEDERAL DEFENDERS OF NEW YORK, INC.
23       Attorneys for Defendant
    SUSANNE BRODY
24

25  *Proceeding recorded via digital recording device.

                CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                          (914)390-4103

20173vokpacf

1          THE DEPUTY CLERK:  In the matter of the United States
2     of America v. Chukwuemeka Okparaeke.
3          Counsel, please note your appearance for the record.
4          MS. ZVEROVICH:  Good morning, your Honor.  Olga
5     Zverovich and Perry Carbone for the government, and we're
6     joined by Postal Inspector Brad Ruggieri.
7          THE COURT:  Good morning.
8          MR. CARBONE:  Good morning.
9          MS. BRODY:  Susanne Brody with Mr. Okparaeke.  Good
10    morning, Judge.
11          THE COURT:  Good morning, Ms. Brody.
12          MS. BRODY:  We thank the Court for hearing us on such
13    short notice.
14          My client has requested a bail hearing, which,
15    obviously, he is entitled to.  And we were in front of the
16    Court, in front of this Court, on March 20th, a week and a half
17    ago.
18          Before we proceed with the bail hearing, Judge, and
19    I've already spoken to the government, when we were here on our
20    initial appearance, we had not waived 'till the 30th.  I have
21    been in touch with the government over the past week and have
22    discussed rolling the case 'till the 30th day.  So that's what
23    we would like to do.  We would like to roll the case over to
24    the 30th day.
25          THE COURT:  All right.

20173vokpacf

1            MS. BRODY:  From the 20th.

2            THE COURT:  Sorry.  Say it again.

3            MS. BRODY:  March 20th.

4            THE COURT:  March 20th.  So that takes you to April

5    the 19th.

6            MS. BRODY:  We thank the Court for that.

7            THE COURT:  The matter is adjourned to April 19th.

8            And Ms. Zverovich, I think I had expressly suggested

9    that you put the matter on for the Court's calendar I believe

10   it was this coming Wednesday, so make sure that that gets moved

11   to April 19th --

12           MS. ZVEROVICH:  Okay.  I will do so.

13           THE COURT:  -- on your internal calendars.

14           MS. ZVEROVICH:  Yes, I think it was Ms. Grossman

15   covering the presentment, but I'll make sure that that happens.

16           MS. BRODY:  I believe it was the 3rd, Judge.  April

17   3rd it was on the calendar.

18           THE COURT:  All right.  Good.

19           MS. BRODY:  April 3rd at 9:30, as a matter of fact.

20   Okay.

21           THE COURT:  All right.  So the matter is now adjourned

22   to April 19th.

23           MS. BRODY:  We thank the Court.

24           THE COURT:  With regard to the matter of bail,

25   Ms. Zverovich, would you give me the government's position and

20173vokpacf

1    the basis for that position.

2              MS. ZVEROVICH:  Your Honor, the government's position

3    is that this defendant must be detained, and he must be

4    detained based on both very significant risk of flight as well

5    as grave danger to the community.

6              As your Honor knows, this is a presumption case.

7    There is a presumption of detention under 18 U.S.C. 3142(e)(3),

8    but that presumption in this particular case is just the tip of

9    the iceberg.

10             Let me start with the risk of flight.  This defendant

11   is facing an extremely, extremely serious charge and a very

12   lengthy sentence.  He is charged with a (b)(1)(A) weight

13   conspiracy, which means he's facing a mandatory minimum of ten

14   years in prison.  Given the substances and the quantities of

15   those substances that he was trafficking in, his guidelines

16   range is likely to be much higher than that.  This is a very,

17   very long prison sentence for anybody, but particularly for a

18   person like the defendant, a young person who has never spent a

19   day of his life in jail.  He has a very strong incentive to

20   flee, and no conditions will assure that he doesn't do so.

21             In fact, we have evidence, your Honor, that this

22   defendant already has an escape plan ready to go.  We have a

23   number of posts from him on websites, particularly Reddit, and

24   one particular post that I would like to highlight, which was

25   approximately four or five months ago.  In that post, the

20173vokpacf

1   defendant outlined instructions for what to do "if your fear is

2   really being incarcerated."  I'm going to read this post

3   because it's telling.

4           MS. BRODY:  Your Honor, respectfully, if we could get

5   a copy of that.

6           MS. ZVEROVICH:  Yes, your Honor, I apologize.  I do

7   have a copy of that.  It's on page 3.

8           MS. BRODY:  Could we have just two minutes here,

9   Judge --

10          THE COURT:  Sure.

11          MS. BRODY:  -- for me to look at what they're -- I

12  have no idea what this is.

13          THE COURT:  Of course.

14          (Pause)

15          MS. ZVEROVICH:  I'm sorry.  I should have brought

16  copies.

17          THE COURT:  Do you need copies?

18          MS. ZVEROVICH:  Yes, I would.

19          MS. BRODY:  Is this a posting that you're going to be

20  quoting from where?  Because I have no idea what you're even

21  looking at.

22          MS. ZVEROVICH:  Hold on one second.

23          (Pause)

24          THE COURT:  If you can't make copies, then you can't

25  refer to it.

20173vokpacf

1             MS. ZVEROVICH:  I apologize, your Honor.

2             THE COURT:  Very simple.  And I'm going to completely

3    disregard what you've said if you can't share copies of what

4    you're relying on with Ms. Brody.

5             MS. ZVEROVICH:  I understand, your Honor.  This is

6    completely my fault.  If your Honor could give me just five

7    minutes, I can go downstairs and make copies.

8             THE COURT:  We can make copies for you.

9             MS. ZVEROVICH:  I understand.  It's just that the

10   posts are embedded in the agent's work product, and so I would

11   need to isolate them in a separate document.

12            THE COURT:  I'll just bet you you can't do it in five

13   minutes, but I'll give you a brief recess.

14            MS. ZVEROVICH:  Thank you.

15            (Recess)

16            THE COURT:  Ms. Brody, do you need more time?

17            MS. BRODY:  Your Honor, the government, in their

18   complaint, alleges that my client posted these things.  In this

19   very-hard-to-read copy that they gave he me, my client says

20   that he did not post these things.  We've not seen the

21   computer.  My client is telling me he didn't post these things.

22   The government's relying on their allegation that he posted

23   these things.  My client says he didn't post these things.  I

24   have no knowledge, having not seen the computer, of the IP

25   address or where these come from, so I am somewhat at a loss on

20173vokpacf

1  the weight of this allegation and what they believe my client

2  posted.  I don't know what to do with this.  I don't know what

3  this is.  I mean, I see it, I can read it, it's in English, but

4  I have no idea where this comes from, and my client says these

5  are not his postings.  So there we have it.

6       MS. ZVEROVICH:  Your Honor, again, I apologize for my

7  oversight earlier.  As to the posts, the complaint indicates

8  and specifically paragraph 23 explains the basis for believing

9  that these posts were written by the defendant.  In addition,

10  an additional fact that the complaint does not mention is that

11  when law enforcement seized the defendant's phone pursuant to a

12  search warrant, which was back in February, he had a browser

13  open, and there was a page -- a Reddit page open with the

14  darknet market short story that's referenced in paragraph 23(a)

15  right there on his phone.

16       THE COURT:  Well, but clearly you and the agents

17  weren't terribly worried about him fleeing then because you

18  didn't arrest him then.  How can you tell me now --

19       Mr. Carbone, really.  She has to listen to me in order

20  to be able to respond to me.  If you are speaking when I am

21  speaking, I'm pretty sure she won't listen to me, and that's

22  bad form, and you know better.

23       MS. ZVEROVICH:  Your Honor, a couple of responses.

24       THE COURT:  How can you argue that this is so

25  dangerous that he's so likely to flee, but you didn't think so

20173vokpacf

1    back in whenever it was that he was interviewed, when he

2    clearly knew law enforcement was looking at him --

3               MS. ZVEROVICH:  Right.

4               THE COURT:  -- and this information came up?

5               MS. ZVEROVICH:  Your Honor, during that postarrest

6    interview on February 1st, the defendant lied with a straight

7    face when questioned by investigators.  He told investigators

8    that he had no idea what was inside those packages.  He said he

9    was merely acting as a middleman.  Now, your Honor, the

10   investigation was ongoing.  He was closely monitored by law

11   enforcement agents after that point, and we have very strong

12   evidence now that he did, in fact, know exactly what was in

13   those packages and that he was receiving kilogram quantities of

14   fentanyl.

15              THE COURT:  Okay, but that still doesn't tell me why

16   you weren't at all worried by these Reddit posts that you now

17   rely on as being such incredibly strong evidence of his risk of

18   flight.

19              MS. ZVEROVICH:  Just one second, your Honor.

20              (Pause)

21              MS. ZVEROVICH:  Your Honor, so when the defendant was

22   interviewed on February 1st, these Reddit posts did not come to

23   law enforcement's attention.  It was only after the search

24   warrant was issued and they looked at the browser and they saw

25   the short story on the defendant's phone, at that point, they

20173vokpacf

1    began investigating and acquired these Reddit posts.

2               THE COURT:  And didn't arrest him until the middle of

3    March.

4               MS. ZVEROVICH:  Your Honor, I mean --

5               THE COURT:  And he knew he was being looked at, and he

6    didn't go anywhere.

7               MS. ZVEROVICH:  He didn't go anywhere, but he

8    continued engaging in the same conduct, which is --

9               THE COURT:  That's a different issue.  That's a

10   different issue.  You were talking about risk of flight.

11              MS. ZVEROVICH:  Right.

12              THE COURT:  And I'm exceedingly unpersuaded by your

13   argument with regard to risk of flight.

14              MS. ZVEROVICH:  Your Honor, the defendant was in a

15   very different situation then than the predicament he is in

16   now.  Back then, he thought that he could escape law

17   enforcement's detection and never get caught.  He thought the

18   mechanisms he had in place --

19              THE COURT:  How could you possibly say that he thought

20   that when law enforcement had already interviewed him?

21              MS. ZVEROVICH:  Because, your Honor, he had all of

22   these protections in place to avoid capture.  Now that he is

23   facing this charge, he's facing a ten-year mandatory minimum

24   sentence, probably a guidelines sentence of double that because

25   these quantities that he was dealing in were kilogram

20173vokpacf

1    quantities of fentanyl analogues, your Honor.  So I think his

2    incentives now are even stronger, much stronger, than they were

3    before to flee.

4            THE COURT:  And if your Honor may -- and I, again,

5    very much apologize for not presenting copies of these posts to

6    defense counsel and to your Honor, but if you --

7            MS. BRODY:  Your Honor, before you even begin, I

8    object to the introduction or the reliance on this.  In

9    paragraph 23 -- and I'll address the other issues when it is my

10   turn, but specifically paragraph 23, page 11 of the complaint

11   says, "For the reasons set forth below, I believe that

12   bmoreproduct1" it says "is likely."  I don't think that likely

13   in a complaint that's sworn to by an agent and submitted by the

14   government is likely that we cross the river into this is

15   definitely my client.  Likelihood is one thing; a positive

16   identification is another.  When the government, in their

17   language, says is likely, I don't think that takes us where we

18   have to go for an authentication of a document that my client

19   says is not his.

20           And one more thing before I go ahead.  The

21   government's talking about the interview where my client lied.

22   I haven't seen this interview.  I don't know what this

23   interview is.  Again, they're referring to information and

24   they're referring to, if you will, discovery that I haven't

25   seen, and that's problematic, Judge.  I don't know --

20173vokpacf

1          THE COURT:  Ms. Zverovich.

2          MS. ZVEROVICH:  Your Honor, if I may respond.

3          THE COURT:  Maybe this is an opportunity where we

4    shouldn't rely on a proffer and you should put the agent on the

5    stand if you want to rely on this information.

6          MS. ZVEROVICH:  That's fine, your Honor.  May I just

7    respond briefly to what Ms. Brody said?

8          THE COURT:  I suspect you probably ought to confer

9    with Mr. Carbone before you agree to put the agent on the

10   stand.

11         (Pause)

12         MS. BRODY:  If you're going to put the agent on the

13   stand, why --

14         THE COURT:  Ms. Brody, you can't talk while they're

15   conferring.  That's not fair.

16         (Pause)

17         MS. ZVEROVICH:  Just a couple of points, which is we

18   are not at a point yet where the government is obligated to

19   produce discovery.  We will produce the defendant's postarrest

20   statement when the time comes, as we always do and as Ms. Brody

21   knows and your Honor knows.

22         THE COURT:  But for purposes of this hearing, I'm

23   entitled to direct you to produce things that you're relying

24   on.  And I believe, for this purpose, Ms. Brody is entitled to

25   have that information or you don't rely on it.  It's that

20173vokpacf

 1   simple.

 2              MS. ZVEROVICH:  You mean the Reddit posts?

 3              THE COURT:  The Reddit posts, the postarrest

 4   interview.

 5              MR. CARBONE:  Judge, I know this is Ms. Zverovich's

 6   show, but may I be heard briefly?

 7              THE COURT:  Yes.

 8              MR. CARBONE:  Ms. Brody just said she has no knowledge

 9   about this interview, but the complaint, at paragraph 16, lays

10   out that Mr. Okparaeke was interviewed on a particular date and

11   it lays out in three separate paragraphs, particularly

12   subparagraph 16(a), that he stated that he didn't know the

13   contents of package 1 and 2.  And, Judge, the agents were

14   there.

15              THE COURT:  Mr. Carbone, Mr. Carbone, three

16   subparagraphs of two and three lines each is hardly a full

17   reflection of the entire interview that was conducted even if

18   it was only five or ten minutes long and does not provide a

19   basis for Ms. Brody to be able to challenge -- because these

20   are summaries.  These are also based on the agents' and the

21   assistants' packaging of the information.  It doesn't include

22   everything, I'm pretty sure.

23              MR. CARBONE:  Judge, can I make one point?  When the

24   agents interviewed Mr. Okparaeke on that day, if they had

25   probable cause to arrest him, they would have done so.  He

20173vokpacf

1    denied it.  He lied.  This was the beginning of an

2    investigation that, after that interview, blossomed into some

3    very substantial evidence that included undercover buys from

4    Virginia State investigators of fentanyl, and all that was

5    learned after the interview.  But one thing that's clear,

6    contrary to what Ms. Brody said, the complaint does lay out

7    that he was interviewed and lied.  And I just don't see the

8    reason or why we would have to have an agent get on the stand

9    and be placed under oath and testify to that which he's already

10   said under oath, which is we interviewed him and he denies the

11   knowledge of the contents of the packages.

12            THE COURT:  That's because you don't want him to be

13   cross-examined.

14            MR. CARBONE:  But, Judge, we're permitted to proceed

15   by proffer.

16            THE COURT:  No.  Actually, the rule doesn't say that.

17   It says defense counsel can proceed by proffer at a bail

18   hearing.  It does not say the government can.

19            MR. CARBONE:  Judge --

20            THE COURT:  The tradition in this district is that

21   almost always, but not always, the government is permitted to

22   proceed by proffer, but it's not in the rule.

23            MR. CARBONE:  Judge, my understanding is and I think

24   it's the LaFontaine case from the Second Circuit has said that

25   the government can proceed --

20173vokpacf

1        THE COURT:  That it can happen that way.  It doesn't

2   mean that the Court has to accept it.

3        MR. CARBONE:  But, Judge, I have never seen a case

4   where you have a sworn affidavit from an agent that lays out a

5   noncontroversial fact that Ms. Brody's not even disputing --

6   she's not saying that her client went into that interview --

7        THE COURT:  She doesn't have a basis for knowing that.

8   She hasn't seen all of the discovery yet, as she shouldn't at

9   this stage.  Nevertheless, for purposes of bail, if you, you or

10  Ms. Zverovich or the combination of you, are relying on the

11  strength of the case to prove this defendant's dangerousness,

12  then I'm entitled to have something more than just the

13  complaint as the basis.  But you're welcome to limit your

14  production to whatever you think is appropriate.

15       MR. CARBONE:  Judge, we rely on the complaint, the

16  sworn allegations of a very detailed -- this is not a cursory

17  complaint.  It's a very detailed complaint that lays out the

18  factual bases for the agent's view there's probable cause that

19  this defendant was a large-scale fentanyl trafficker on the

20  dark web.  And we respectfully decline to put the agent on.  If

21  your Honor doesn't want to consider the complaint, then that's

22  your --

23       THE COURT:  Of course I will consider the complaint,

24  but it has limits, Mr. Carbone.

25       MR. CARBONE:  Understood.

20173vokpacf

1          THE COURT:  And I think you know that.

2          MR. CARBONE:  I do know that.  Understood.

3          THE COURT:  What else, Ms. Zverovich?

4          MS. ZVEROVICH:  Your Honor, so may I proceed with what

5     I planned to proffer?

6          THE COURT:  Yes.

7          MS. ZVEROVICH:  So, as I already said, this defendant

8     is facing a very, very, very lengthy sentence, and the Reddit

9     posts that I belatedly produced show that, in fact, he already

10    has an escape plan ready to go.  I think the most salient post

11    is the first one on that sheet in which the defendant describes

12    what to do if your fear is really being incarcerated, and I'm

13    just going to read that post aloud, and it says, "If your fear

14    is really being incarcerated, then you should keep your money

15    in Bitcoin.  You can easily turn Bitcoin to fiat in less than

16    24 hours with Coinbase.  What do you need to turn the Bitcoin

17    into fiat for?  Leave America and go to Singapore, Cote

18    d'Ivoire, Ghana, Hong Kong, Macau, et cetera to open up bank

19    accounts.  They're great places to spend four or five days

20    opening up accounts.  With my experiences in West Africa, you

21    can open up a bank account without any I.D. and have access to

22    all the things you would expect in the USA banking sector (wire

23    transfers, forex, et cetera)."

24          And not only does the defendant clearly have a plan of

25    how it's possible to get away, we also know he has the means to

20173vokpacf

1  do that.  And if you look at the very next post, which is also

2  a Reddit post from a few months ago by that same user, it says,

3  "I'm not looking for employment, so I won't be explaining

4  myself to anyone.  I keep all my money in Bitcoin, literally

5  hundreds of thousands of dollars of Bitcoin on USB drives

6  backed up and encrypted.  I can send it wherever and have it

7  turned into fiat currency within 48 hours."

8            Your Honor, there's a grave risk that if the defendant

9  is bailed, knowing that he is facing, you know, maybe 20 years

10  in prison, minimum of ten years in prison, that he will do just

11  that.  He will take whatever Bitcoins he has and flee to West

12  Africa, to Ghana, wherever, never to be found again.

13            And in fact, we know that this defendant has

14  connections to foreign countries.  In the Pretrial Services

15  report, he said that he had traveled to Nigeria, to Europe, to

16  Canada, to Ghana in the past.  He traveled to Ghana in 2010.

17  He told investigators during the postarrest statement that he

18  had been to Ghana.  He also posted about that on various online

19  accounts, including Facebook and Reddit.  In the first post

20  that I read aloud, he said that he has experiences in West

21  Africa and how easy it is to open up bank accounts without

22  having any identification.

23            In other words, your Honor, this is somebody who has

24  the smarts, the means and all of the incentive in the world to

25  leave this country now, cash out his Bitcoins and never face

20173vokpacf

1   the very serious charge that he's facing now.  He already, in

2   the past, has devoted significant time and effort to evading

3   law enforcement.  He operated his fentanyl business on a

4   darknet website that masks users' identities.  He had all kinds

5   of encryption software on his cell phone.  This is somebody who

6   is calculating, planning, and now that he's facing ten years

7   minimum in prison, there's just no assurance that any

8   conditions can ensure his appearance in this court.

9          So that's, your Honor, as to the risk of flight.

10          The government also submits that this defendant must

11   be detained on dangerousness grounds.  As I already alluded to,

12   he was in the business of trafficking kilogram quantities of

13   fentanyl and fentanyl analogues that he was receiving from

14   abroad.  Two packages that are mentioned in the complaint came

15   from Hong Kong.  And then he was distributing through this

16   darknet market across the United States.  I think it was going

17   to over 2,000 locations across the United States through this

18   online marketplace.

19          Fentanyl analogues, your Honor, are extremely potent,

20   extremely addictive and deadly substances.  They are a major

21   cause of overdose fatalities in the United States.  They are so

22   dangerous that Congress, in Title 21, decided that selling 100

23   grams of a fentanyl analogue warrants a sentence, a minimum

24   sentence, of ten years in prison.  One hundred grams.  Here,

25   we're talking kilograms of these substances that the defendant

20173vokpacf

1    was shipping all across the United States.

2           And what's worse, if it could get any worse, is that

3    this defendant knew how harmful these substances were.  He is a

4    medical student, and his online posts show that he has detailed

5    knowledge about the effects of fentanyl and the fact that

6    they're a major contributor to overdose deaths.

7           THE COURT:  Have you provided those online posts to

8    Ms. Brody?

9           MS. ZVEROVICH:  So I have just one on the sheet that I

10   just provided recently, which is the very last post on the

11   page, which says, "One fully grown, fit man could easily die of

12   a cerebral aneurysm, especially after concussive blows.  But

13   you are right, two men dying so close to one another speaks of

14   heroin overdose almost certainly spiked with fentanyl or

15   carfentanil."  And of course, fentanyl is exactly what he was

16   selling to people, this medical student, a doctor in training,

17   selling kilograms of fentanyl all across the United States.

18          We know that once he was interviewed by law

19   enforcement, he was on notice.  They told him these packages

20   that you were getting had extremely dangerous substances.  What

21   did he do?  He continued receiving them.  Another package came

22   in with a kilogram of fentanyl-like substances after that

23   postarrest interview.  There is just no assurance whatsoever --

24          THE COURT:  Postarrest interview?

25          MS. ZVEROVICH:  Oh, I'm sorry.  Not postarrest.  His

20173vokpacf

1   interview in February.

2         There's just no assurance whatsoever that, if he

3   leaves, he won't continue engaging in this conduct just like he

4   did before, your Honor.  So the government submits that he must

5   be detained based on both risk of flight and dangerousness.

6         THE COURT:  Ms. Brody.

7         MS. BRODY:  The government got a search warrant for my

8   client's phone on January 23rd, so prior to January 23rd, they

9   were tracking my client.

10        THE COURT:  Not only that, but in order to get a

11  search warrant, there must have been probable cause, which

12  Ms. Zverovich has indicated they didn't have at that point.

13        MS. BRODY:  I was getting there.

14        In order to get the search warrant --

15        THE COURT:  Ms. Zverovich, I really recommend that you

16  should listen to Ms. Brody --

17        MS. ZVEROVICH:  I apologize, your Honor.

18        THE COURT:  -- if you want to be able to respond to

19  her.

20        MS. ZVEROVICH:  I apologize, your Honor.

21        MS. BRODY:  In order to get the search warrant, there

22  had to be a couple of things.  There had to be an affidavit

23  from not only the agent, but the government alleging the

24  probable cause.  So back in January, two months ago, there had

25  to have been allegations of probable cause.

20173vokpacf

```
 1          My client did speak to the agents in early February.
 2    I know what the government -- I mean, I know that he spoke to
 3    the agents.  I don't disavow knowledge that there was an
 4    interview.  What I'm suggesting is, having not seen the
 5    interview, which I am not entitled to at this point in time, I
 6    understand that, I don't know the details.  I don't know what
 7    was said.  I don't know what went on.  Subsequently -- and the
 8    government says he lied, he lied, he lied.  I don't know what
 9    happened there.  I don't know who was there.  I don't know what
10    was said.  That's number one.
11          Number two, to get a warrant, you have to make
12    probable cause allegations.  But he's not dangerous yet.
13    Although there was probable cause and the government is saying
14    that, you know, this is so dangerous and people are dying, they
15    had no problem letting my client go about his daily business,
16    didn't arrest him, didn't do anything at that point in time.
17          Additionally, the government just mentioned the ratio
18    of fentanyl analogue.  Well, the government said there were
19    three substances; that some of the things are fentanyl
20    analogue, some of the things are fentanyl, and she said -- her
21    words -- fentanyl-like substances.  I don't know what a
22    fentanyl-like substance is.  I, obviously, at this point, am
23    not entitled to and have not seen the lab report.
24          So, at this point in time, to allege that it is
25    specifically a mandatory minimum ten because they charged it,
```

20173vokpacf

1   without having the lab reports of all that they say my client

2   was involved in and sent -- and obviously, as challenging in

3   sending it out, just this week I was informed by the government

4   that a client of mine -- in the complaint alleges he sold

5   methamphetamine.  The lab report came back and it's like

6   Tylenol something, it's not methamphetamines.  But it was sworn

7   to in the complaint, sworn to by an agent.  I mean, the fact

8   that something's in the complaint, it's a complaint.  That's

9   all it is.

10          Now, as far as these statements, without looking in

11   the computer -- my client says these are not his and he didn't

12   post them.  Additionally, when they say a fully grown man could

13   easily die of cerebral aneurysm, well, that's true.  And the

14   fact that people could die from fentanyl in heroin, that's also

15   true.  And you could read it in any newspaper.  You don't have

16   to be a supplier to know these things.

17          If my client was so very dangerous, he should have

18   been arrested when he first spoke to them or subsequently, when

19   they went through his phone.  And additionally, your Honor, and

20   more importantly, the fact that my client -- and I don't know

21   what he was posting because I haven't seen all of these things

22   online.  As we know, you can post anything you want online.

23   And I'm not saying these are his posts, but we know that you

24   can post such things as President Obama was taping President

25   Trump.  You can post whatever you want online today.  And we

20173vokpacf

1    deal in a world where every thought they have and every meal

2    they have appears on Facebook and Snapchat and everything else.

3    I don't know what these are and, respectfully, I ask the Court

4    not to even consider this.

5            Now, Pretrial has recommended that there are ways to

6    secure my client's safety in the community.  Now, I would

7    actually add things.  Number one, obviously, there's pretrial

8    supervision.  His travel has to be restricted.  Surrender of

9    passports, which may have already been -- may not have been

10   seized or may have been seized.  I haven't seen the return on

11   any warrant yet.  Obviously, drug testing and drug treatment.

12           Now, who is this young man?  This is a young man who

13   graduated Tufts, who comes from a well-educated, stable family,

14   who has significant ties here, whose family is here, who is an

15   American citizen, who was born here -- he was born in Newark --

16   who grew up here and is not going anywhere.

17           What I would submit to the Court -- and my client --

18   if the government's relying on these things, well, the

19   government interviewed him.  A week later they seized his

20   phone.  If he was going to go anywhere -- and the government

21   will say because he's a Tufts student and because he's in med

22   school, he knows, he's smarter, he's smarter, he's smarter.

23   Well, if he was so smart, after they spoke to him and they took

24   his phone, if he was so smart and he had such access to all of

25   this money and connections, you know, all over the world and

20173vokpacf

1    knew how to do this, the day they came and got his phone, I
2    submit to the Court, he would have gotten and a plane and
3    gotten out of dodge, which he did not do.  Which he did not do.
4    He continued in his residency program.  He's at Touro Med
5    School.  He's getting a DO, which is an alternative medical
6    degree which I don't quite understand, but it is, nonetheless,
7    a medical degree.
8           Now, what I am proposing, Judge, I am proposing a
9    hundred-thousand-dollar personal recognizance bond to be
10   secured by $50,000 in cash or property with two financially
11   responsible cosigners, electronic monitoring and no access to a
12   computer that is not monitored by Pretrial.  This will allow
13   him to continue his degree.  Because he stands innocent before
14   the Court, and before this all plays out -- I don't know where
15   this case is going -- it would allow him to continue working in
16   his residency with no access to a computer that's not
17   monitored, only for schoolwork.
18          The hundred-thousand-dollar bond.  I've spoken to his
19   sister a number of times.  I've spoken to his father.  He is
20   not going to leave these people in the lurch.  They are a very
21   close-knit family.  They are a very tight family.  They are a
22   professional family.  And that would seem to assure his
23   presence in the community and the risk of flight.
24          As far as danger, well, I submit he's not going to be
25   a danger anymore, Judge, because, admitting nothing, and these

20173vokpacf

1    are mere allegations, if my client had been in some kind of

2    nefarious business before, it is unlikely he would continue to

3    be in any nefarious business while on strict pretrial, on home

4    detention, on a leg monitor, having the computer monitored.

5              THE COURT:   What about use of the telephone,

6    Ms. Brody?

7              MS. BRODY:   How about just a flip phone, Judge, with

8    no internet access?  I think they still sell them.  Do they

9    still sell those phones?  Yes, a flip phone with no internet

10   access.

11             THE COURT:   Anything else, Ms. Brody?

12             MS. BRODY:   Well, Pretrial says drug testing and

13   treatment.  We would have no problem with that, obviously.  And

14   if the government can inform me where his passport is and if

15   they, in fact, have his passport, whether or not he's bailed,

16   if the passport could be turned over to Pretrial.

17   Unfortunately what happens in a number of these cases when

18   passports get seized, Judge, they disappear, and then we never

19   find them again.  I don't know who has the passport.  And it

20   may, in fact, be at my client's residence.  If that is the case

21   and he were released on a home monitor, I would get the

22   passport and turn it over.

23             And I would submit, Judge, that all these conditions

24   would have to be met before my client is released.

25             MS. ZVEROVICH:   Your Honor, Pretrial has the passport.

20173vokpacf

1          MS. BRODY:  We thank the Court, the government.

2          THE COURT:  Thank you very much.

3          Ms. Zverovich, there's something I'm confused about in

4    the complaint.  In paragraph 20 --

5          MS. ZVEROVICH:  Yes.

6          THE COURT:  -- with regard to the cell phone search

7    warrant --

8          MS. ZVEROVICH:  Yes, your Honor.

9          THE COURT:  -- it specifically says that the postal

10   inspector --

11         MS. ZVEROVICH:  Your Honor, there's a typo in that

12   paragraph.

13         THE COURT:  It doesn't say that he's a postal

14   inspector on the complaint, but I assume he is.  Here it does.

15   That the postal inspector saw the phone in Mr. Okparaeke's

16   possession on or about February 1st, but the search warrant was

17   issued January 23rd.

18         MS. ZVEROVICH:  Right, your Honor.

19         THE COURT:  So what connection did it have to this

20   defendant?

21         MS. ZVEROVICH:  It's the government's mistake again.

22   There is a typo in paragraph 20 of the complaint.  The search

23   warrant was actually obtained on February 3rd, 2017.

24         THE COURT:  That's not a typo.  That's a terrible

25   mistake.

20173vokpacf

1        MS. ZVEROVICH:  It's a mistake.

2        THE COURT:  And it means that the agent wasn't paying

3   attention when he read the complaint and signed it and swore to

4   its truth.  February 3rd is very different than January 23rd.

5        MS. ZVEROVICH:  And so the search warrant was

6   obtained -- they could only obtain it, in fact, after viewing

7   the phone.

8        THE COURT:  I see.

9        MS. ZVEROVICH:  Yes.

10       Just a couple of brief points in response.

11       With respect to the fentanyl issue, your Honor, that

12   issue cannot be fully resolved, you know, at a bail setting.

13   If this case proceeds to trial, there will likely be experts

14   testifying about these substances.  But just a couple of things

15   that I would like to point out, which is we have a chart from

16   the lab.

17       MS. BRODY:  I haven't seen that, Judge.

18       MS. ZVEROVICH:  So, your Honor, from all of the

19   substances that were either seized coming from abroad to the

20   defendant or seized -- there were kilograms of substances

21   seized from his house during the search warrant.  Among those

22   substances were kilogram quantities of acrylfentanyl.

23       THE COURT:  Of what?

24       MS. ZVEROVICH:  Acrylfentanyl.  A-C-R-Y-L fentanyl.

25       THE COURT:  Have you provided a copy of the return on

20173vokpacf

1    the warrant to Ms. Brody so that she knows what was seized?

2    It's not in the complaint.

3              MS. ZVEROVICH:  Your Honor, in that case, I will not

4    rely on that for purposes of this bail hearing.  But there is a

5    basis to believe that these were kilogram quantities of

6    fentanyl analogues and, obviously, at a bail setting, we cannot

7    resolve that issue beyond a reasonable doubt, nor are we

8    required to.

9              MS. BRODY:  Your Honor, I would just add that, in

10   general, the family would be here today, but because we

11   scheduled this quickly at my request, and we thank the

12   government and the Court for seeing us so expeditiously, his

13   parents are both professional working people and were not able

14   to rearrange their schedule to be here today, but I know from

15   talking to the family that they are very supportive.

16             (Pause)

17             MS. BRODY:  Your Honor, I would also suggest that home

18   detention be at his parents' home so they can keep an eye on

19   him and offer moral suasion and keep a very tight leash on him.

20             THE COURT:  Which is where?

21             MS. BRODY:  Jackson, New Jersey.

22             THE COURT:  Do we have an address?

23             MS. BRODY:  8 Meher Court, Jackson, New Jersey.

24             THE COURT:  Ms. Brody, have you had any conversation

25   with the family with regard to the need to lock away computers?

20173vokpacf

1        MS. BRODY:  I haven't discussed that with the family,

2    but certainly it would be no different than if, God forbid,

3    this was a child pornography internet case where the family

4    would have to lock away computers, and certainly we would

5    consent to that.  And we would also alert the family that any

6    phones that have internet access would have to be protected and

7    he wouldn't be allowed to use them.

8        I've spoken to his father.  Might I say the family's a

9    little confused on how such a young man going to medical school

10   got involved in this.  His father would be very strict with

11   following any directives this Court were to impose.  He's not

12   happy right now, to say the least.  They are a well-respected

13   family of professional people who have worked very, very hard

14   in their lives to buy a beautiful home, to have a respectable

15   life, and they're a little bit upset with their young man right

16   now, so I'm pretty confident that any restrictions that this

17   Court were to put on what Mr. Okparaeke were allowed to do, his

18   father would follow them.  He seems to be a very strict person.

19       THE COURT:  How does your client feel about having to

20   notify both the school he's attending and his employer where

21   he's in -- I couldn't tell if it was a residency or an

22   internship.

23       MS. BRODY:  They would obviously have to be alerted,

24   Judge.

25       My understanding of the DO, and I really have very

20173vokpacf

1    little understanding of it, is that it's an alternative type of

2    medicine which relies more on holistic approaches and --

3              THE COURT:  It's osteopathic medicine.

4         MS. BRODY:  Osteopathic.

5         THE COURT:  Yes.

6         MS. BRODY:  There we go.  Yes.  So I don't know that

7    he has any access to scheduled drugs.

8              And obviously he would have to notify his employer the

9    same way a fraud client would have to notify an employer about

10   any potential risk and what he's allowed to do and what he's

11   not allowed to do.  He's actually working with a doctor now as

12   part of his residency, so the doctor would have to be alerted.

13   And certainly the school would have to be alerted that he would

14   not be allowed near any controlled substances.  In fact, the

15   school may suspend him, I don't know, but certainly they would

16   have to be notified.  He believes expelled would be the correct

17   word for the school.

18             And it would seem, your Honor, since it's going to be

19   some time until the government gets all the lab reports, we get

20   them, send them to our forensic, get them tested -- and again,

21   we ask that everything be preserved in the event that we also

22   have to test these substances.  What these substances are is

23   going to be a critical issue.  And I know certain substances

24   didn't hit the scheduled list until I believe November, Judge,

25   so we're a long way from Tipperary here.

20173vokpacf

1          (Pause)

2          THE COURT:  Although this is a presumption case, the

3    government, of course, always carries the ultimate burden of

4    establishing that there are no conditions or combinations of

5    conditions which can assure both the defendant's return to

6    Court and the safety of the community.  I am satisfied that

7    there are conditions which can assure the defendant's return to

8    court.  To the degree that the presumption is necessary to be

9    rebutted by the defendant, I find that that rebuttal has

10   successfully been interposed.

11          The issue of safety of the community is far more

12   difficult.  It is the type of case involving distribution of

13   controlled substances to members of the community that carries

14   with it danger simply by the very nature of the activity.  But

15   because of the methods utilized and detailed in the

16   complaint -- and I do, by the way, note that, while I'm not

17   particularly persuaded by the Reddit posts that Ms. Zverovich

18   has provided, it does seem to me that the information that is

19   set forth in paragraphs 22, et sequentia do provide substantial

20   circumstantial links between the Reddit posts and the defendant

21   such that those paragraphs of the complaint certainly support

22   the government's position.  Nevertheless, I believe there are

23   conditions and combinations of conditions which can also assure

24   the safety of the community in this particular case.  It is a

25   very particular case, and the conditions that I believe are

20173vokpacf

1    appropriate are based predominantly on the allegations of how

2    this scheme was carried out.

3            I will, therefore, release the defendant on a $250,000

4    personal recognizance bond to be secured by $50,000 cash or

5    property.  If it's cash or partially cash, the government, of

6    course, has an opportunity to evaluate and investigate the

7    source of that cash.  If it's property, the appropriate and

8    necessary documentation with regard to documents that need to

9    be filed with both the local county clerk and with this Court

10   would have to be provided.  And I'm going to require four

11   financially responsible cosigners.

12           Upon release, which will not occur until all

13   conditions have been met, the defendant is to reside with his

14   parents at 8 Meher, M-E-H-E-R, Court, Jackson, New Jersey.

15           Ms. Brody, do you know if property is the likely --

16   just a reminder that any property that would be posted cannot

17   be located in a state that has a homestead exemption.  I don't

18   know if New Jersey does, but I know Florida does, for example.

19   So something that you would need to follow up on.

20           Defendant may be subject to GPS monitoring home

21   detention to be released from home detention only and solely

22   for work, for school, for medical and dental appointments.

23           Does he attend religious services?

24           MS. BRODY:  No, Judge.

25           THE COURT:  He is required to alert his employer and

20173vokpacf

1    the school about the pending charge, and I'm going to require

2    Pretrial Services to confirm that he has done so.

3           After his release, he is prohibited from having access

4    to his Post Office account which is referenced in the

5    complaint.  He is prohibited from entering or being near any

6    Post Office or mailing locations.  He is prohibited from having

7    access to computers unless the computers -- and I suggest one

8    single computer -- could be monitored by Pretrial Services.  It

9    is to be used for schoolwork only.  He is permitted to have one

10   single flip phone without internet access.  He's prohibited

11   from having access to any other phones or computers which have

12   internet access or modems.  This means that, at school or at

13   work, he would not be permitted to use any computers that have

14   internet access.

15          If the government chooses to appeal, that's obviously

16   appropriate.  I'm not going to stay it because I think it's

17   going to take a few days to get everything in place anyway, but

18   in the event that the conditions are met before noon on

19   Tuesday, I'll stay it until noon on Tuesday so that the

20   government can appeal if they choose to do so.

21          MS. BRODY:  Your Honor?

22          THE COURT:  Yes, ma'am.

23          Oh, and also the other conditions identified in the

24   Pretrial Services report, Pretrial Services supervision

25   obviously with home detention and GPS monitoring.  That will be

20173vokpacf

1    intensive.   Travel is restricted to the Southern and Eastern

2    Districts of New York and the District of New Jersey.

3    Defendant's passport is already surrendered.   He's prohibited

4    from making any application for new travel documents.   And he

5    will be subject to drug testing and drug treatment as directed

6    by the Pretrial Services Office.

7              Yes, Ms. Brody.

8              MS. BRODY:   We thank the Court.

9              Two things.

10             Number one, he's only allowed out for work, school and

11    medical appointments.   I would respectfully ask that the Court

12    also put in to meet with Pretrial and his counsel.

13             THE COURT:   Oh, yes.   For court appearances, meetings

14    with Pretrial and counsel.   I'm sorry.   My mistake.

15             MS. BRODY:   And if we could get a copy of that so that

16    I can review that with the family so they understand all the

17    implications, Judge.

18             THE COURT:   Mr. Inkeles will get a copy to Ms. Brody

19    once I sign it.

20             Mr. Okparaeke, stand up.

21             During the period of your release, you will be subject

22    to supervision of a Pretrial Services officer, and it's going

23    to be several days before you go anywhere even if you do go

24    anywhere.   You should understand that when the Pretrial

25    Services officer tells you to do something, you must do as

20173vokpacf

1   you're told.  The Pretrial Services officer is acting as an arm

2   of the Court.  If the Pretrial Services officer tells you to do

3   something, that's the same as if I were telling you to do that

4   same thing.  So if the officer tells you to come to his or her

5   office at a particular time on a particular day, you must put

6   all other businesses aside and follow the Pretrial Services

7   officer's instructions.  If the officer tells to you telephone

8   at a particular time on a particular day, you must do that.

9          If you fail to follow the officer's instructions, you

10  will be violating your bail conditions.  That will be reported

11  to me, and I will not hesitate to revoke your bail.

12         If you think that the Pretrial Services officer is

13  asking you to do something that's inappropriate or unnecessary,

14  you may not simply refuse to follow the instructions.  In that

15  case, you should contact Ms. Brody, Ms. Brody will contact me,

16  and I will decide whether you should follow the instructions.

17  Is that clear to you?

18         THE DEFENDANT:  Yes, your Honor.  Thank you, your

19  Honor.

20         THE COURT:  I take it that the Pretrial Services

21  officer supervising will be from the New Jersey office.

22         MS. ZVEROVICH:  Yes, your Honor, that's correct.

23         THE COURT:  All right.  If you would make sure to

24  communicate that I want to be notified about any violation

25  whatsoever.  I know sometimes they'll consider certain things

20173vokpacf

1    to be less important than others, but I want to be notified if

2    there's any violation, so please communicate that.

3             This is a setting of bail.  This means that, upon your

4    release, you must refrain from committing any violations of law

5    whatsoever, including federal, state and local crimes.  If you

6    commit a felony while you are on release for this charge, you

7    may be subject to an additional prison term of up to ten years.

8    That's in addition to what you're facing on this charge and in

9    addition to what you may be facing on the new charge.  If you

10   commit a misdemeanor while you are on release, the additional

11   prison term would be up to one year.

12            You must also inform the supervising Pretrial Services

13   officer if you are accused of committing a crime, whether it is

14   by arrest, interview or in any other fashion.

15            During the period of your release, your travel is

16   restricted to the Southern and Eastern Districts of New York

17   and the District of New Jersey, and you must obtain the Court's

18   permission before you may travel outside those areas for any

19   reason.  Do you understand that?

20            THE DEFENDANT:  Yes, your Honor.

21            THE COURT:  If you violate any of the conditions of

22   your release, your bail may be immediately revoked and you may

23   be detained pending trial.  In addition, you may be prosecuted

24   for contempt of Court.

25            If you fail to appear in court when you are required

20173vokpacf

1    to do so, you may be committing the crime of bail jumping,

2    which would subject you to an additional punishment separate

3    and apart from the charges you're facing here.  The punishment

4    for bail jumping in this case is up to ten years and a $250,000

5    fine.  Do you understand that?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Anything further, Ms. Zverovich?

8              MS. ZVEROVICH:  Nothing from the government, your

9    Honor.  Thank you.

10             THE COURT:  Ms. Brody?

11             MS. BRODY:  We thank the Court.

12

13                         - - - -

14

15

16

17

18

19

20

21

22

23

24

25