UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/5/2018

UNITED STATES OF AMERICA,

    -against-

CHUKWUEMEKA OKPARAEKA,

            Defendant.

No. 17-CR-225 (NSR)
ORDER AND OPINION

NELSON S. ROMÁN, United States District Judge

    Defendant Chukwuemeka Okparaeka ("Defendant") is charged in a five-count Superseding Indictment with: (1) conspiracy to distribute, and to possess with intent to distribute, controlled substances in violation of 21 U.S.C. §§ 813, 841(a)(1), 841(b)(1)(A), 841(b)(1)(C) and 846; (2) attempted importation of 100 grams and more of mixtures and substances containing acrylfenanyl in violation of 21 U.S.C. §§ 813, 952(a), 960(a)(1), 960(b)(1)(F) and 963; (3) attempted distribution of, and possession with intent to distribute, 100 grams and more of mixtures containing a detectable amount of acrylfenanly in violation of 21 U.S.C. §§ 813, 841(a)(1), 841(b)(1)(A), and 846; (4) distribution of, and possession with intent to distribute, furanly fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (5) importing U-4770, a Schedule I controlled substance, into the United States in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(3). (*See generally* Superseding Indictment, ECF No. 41.) Before the Court is Defendant's motion to suppress. (ECF No. 45.) For the following reasons, Defendant's motion is DENIED in part.

## A. BACKGROUND

    The Government formally commenced judicial proceedings against Defendant Chukwuemeka Okparaeka on March 17, 2017 by filing a criminal Complaint. (ECF No. 2). Law enforcement arrested the Defendant three days later, on March 20, 2017. Following a bail

hearing before Magistrate Judge Lisa M. Smith, the Defendant consented to detention without prejudice on April 4, 2017. (ECF Nos. 5, 9.) The Government then filed an Indictment on April 12, 2017. (ECF No. 15.)

Defendant first filed a motion to suppress on December 27, 2017. (ECF No. 28.) The Government filed its opposition in a timely manner, and Defendant's Reply followed. (ECF No. 35, 37.) A grand jury then returned a Superseding Indictment on March 5, 2018. (ECF No. 41.) In light of the Superseding Indictment, and Defendant's representation that he wished to address the new charges in his suppression motion, this Court denied Defendant's suppression motion without prejudice, and set a briefing schedule for Defendant's renewed motion. (ECF No. 44.) Accordingly, the motion to suppress filed on April 13, 2018, is presently before the Court. (ECF No. 45.)

## I. The Underlying Investigation

This case stems from the merger of two independent investigations: one by the Fairfax County Police Department, and another by law enforcement officers with the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and the U.S. Postal Inspection Service ("USPIS"). (Gov't Mem. of Law in Opp. to Def. Mot. to Suppress Evid. ("Gov't Opp.") 2–3, ECF No. 49.)

In or about January 2017, a Customs and Border Protection ("CBP") agent at John F. Kennedy Airport intercepted two packages during a random screening. (Gov't Opp., Exh. C, Aff. in Supp. of Application for Search and Seizure Warrant ("Ruggieri Cellphone Warrant Aff.") ¶¶ 8–9(a), ECF No. 49.) Those two packages, addressed to "Emeka Okparaeke" at a United Parcel Service ("UPS") store located in Middletown, New York, originated from Hong Kong and contained a substance that tested positive for traces of fentanyl. (*Id.* ¶¶ 9(a)–(d).)

In an attempt to ascertain the package's recipient, United States Postal Inspector Brad Ruggieri ("Ruggieri"), who had been informed of the interception, arranged for the United States Postal Service ("USPS") tracking information for the package to indicate that the package had arrived at the post office in Middletown, New York. (*Id.* ¶¶ 1, 9–10.) On January 31, 2017, a person by the last name "Okparaeke" called the Post Office and inquired about the status of one of the intercepted packages. (*Id.* ¶ 11.) Okparaeke provided a call number for his cell phone at which he could be reached. (*See id.*) Ruggieri then created a duplicate package with a filler ("Package-2") and placed it in the Middletown Post office. (*Id.* ¶¶ 11–12.) The Defendant visited the Middletown Post Office on February 1, 2017, attempted to pick up the intercepted package, but an undercover USPIS agent handed him Package-2 instead (*Id.* ¶ 13.) As Defendant exited the Post office, Ruggieri and other law enforcement officers detained and transported him to the Middletown police station. (*Id.* ¶ 14.)

At the police station, agents read Defendant his *Miranda* warnings and Defendant proceeded to detail how he knew to expect the intercepted package. Defendant explained that he used an internet-based messaging service called Privnote that allows users to send encrypted messages which self-destruct upon reading. (*Id.* ¶ 15(a).) Defendant received a message through Privnote noting that the package arrived at the post office. (See i*d.*) Defendant then told the officers that although he had never met the person who arranged for the shipment of the package in question, the person had arranged the shipment of other packages to the Defendant in the past. (*Id.* ¶ 15(b).) Before requesting that the interview be discontinued, Defendant informed the officers that upon receiving similar packages, he sends them to a man named Xavier Johnson in Ohio. (*Id.* ¶ 15(c).)

State officials also investigated the Defendant prior to the merger of the investigations by, *inter alia*, setting up controlled buys through Defendant's suspected online alias, "Fentmaster." On or about March 5, 2017, a detective with the Fairfax County Police Department made an undercover purchase of approximately 100 grams of U-4770, a Schedule I synthetic opioid, from Fentmaster through a dark web site known as AlphaBay Marketplace. (*See* Gov't Opp., Exh. A, Exh. C, Aff. in Supp. of Application for Search and Seizure Warrant ("Ruggieri Package Warrant Aff.") ¶ 20(a).) While conducting surveillance on March 7, 2017, the detective observed Defendant's vehicle parked near a town house in Kearny, New Jersey. (*Id.* ¶¶ 20(b)–(c).) Defendant walked towards the vehicle with two white plastic bags in his hands, placing them in separate trash receptacles. (*Id.* ¶ 20(c).) The contents of the bags in the receptacles would test positive for U-47700. (*Id.* ¶ 21.) The detective then observed Defendant exit the Kearny town house holding two large USPS plastic bins with parcels inside. (*Id.* ¶ 20(d).)

Soon thereafter, the detective drove to the post office located in Harrison, New Jersey, where a USPS employee revealed that someone recently turned in a large amount of mail—seventy-nine packages in total— in two bins that were the same size and shape as those he had seen Defendant carrying earlier that day. (*Id.* ¶ 20(f).) All seventy-nine packages had the same New Jersey return address[1] and the detective further observed that one of the packages was addressed to the name and address that the detective provided to Fentmaster when he made the aforementioned purchase on AlphaBay Marketplace. (*Id.* ¶ 20(g)–(h).) The package the detective

---

[1] The trash bag also contained backing for mailing labels, two sets of used rubber gloves, a mailing label attached to a glove with the same New Jersey return address as the seventy-nine packages, digital scales, and backing from stamps. (*See* Ruggieri Package Warrant Aff. ¶ 20(m).)

purchased contained approximately 101 grams of a powder that tested positive for U-47700—the controlled substance ordered from Fentmaster. (*Id.* ¶ 20(k).) [2]

On March 17, 2017, a federal magistrate judge signed a criminal Complaint charging Defendant with one count of conspiracy to distribute analogues of fentanyl, and issued a warrant for his arrest. (*Id.* ¶ 26.) Ruggieri and other law enforcement officers arrested Defendant and conducted a search of his home in Middletwon, New York. (*Id.*) Law enforcement also conducted a search, pursuant to a warrant issued by Judge Mannion in the District of New Jersey, of the vehicle and room rented by Defendant in Kearny, New Jersey. (*Id.*) From the search of the Defendant's New Jersey room, law enforcement recovered packages with several kilograms of mixtures and substances containing U-47700, mixtures and substances containing over a kilogram of acrylfentanyl, an analogue of fentanyl, and several other controlled substances. (*Id.* ¶ 27.) Law enforcement agents also recovered eighty-two mailing envelopes, five of which contained substances that tested positive for quantities of acrylfentanyl and U-47700. (*Id.*) One of the packages recovered from the room featured a Hong Kong return address and contained a substance that tested positive for U-47700. (*Id.* ¶ 28.)

## II.     Defendant's Cellphone

Law enforcement agents became interested in Defendant's cellphone during the course of the investigation. Prior to the February 1, 2017 interview, the Defendant used his cellphone to call the post office on two separate occasions to inquire of his package. During the February 1,

---

[2] About a month prior, on February 24th, 2017, M.A. Nikolas, a Fairfax County detective, applied for, and a trial court judge issued, a GPS warrant for the real-time cellphone location data concerning Defendant's cellphone. (*See* Mem. of Law in Reply to Gov't Response in Opp. ("Def. Reply") 3, ECF No. 53; Gov't Sur-Reply to Def. Reply Mem. of Law ("Gov't Sur-Reply") 2, ECF No. 55.) The data from the GPS warrant allegedly revealed Defendant's location in New Jersey where Nikolas surveilled the Defendant, found the trash bags, and investigated packages that were dropped off at the post office in Harrison, New Jersey. (Def. Reply 3.)

2017 interview by federal agents, law enforcement agents became more interested in the cellphone. As Ruggieri noted, the Defendant kept his device on or near his person at all times and identified the device's the model and call number. (Ruggieri Cell Phone Warrant Aff. ¶ 17.) As Ruggieri further explained in his Affidavit, based on his training and experience, individuals engaged in narcotics trafficking store records relating to that activity on electronic devices such as cell phones. (*Id.* ¶ 19.) Some of those records include logs of online chats, emails, and contact information. (*Id.*) Ruggieri submitted to the Court that there is probable cause to believe that Okparaeke is engaged in the subject offenses and that evidence is likely found on the device in question. (*Id.* ¶ 21.)

The Government eventually obtained a warrant and searched Defendant's phone. The warrant permitted the search and seizure of Electronically Stored Information ("ESI") falling within four categories: (1) "Evidence concerning the identity of the owner(s) or user(s) of the Subject Device;" (2) "Evidence concerning the identity or location of, and communications with, co-conspirators;" (3) "Records (including financial and postal records), calendar, and scheduling information related to the Subject Offenses; and" (4) "Photographs and videos related to the Subject Offenses." (Gov't Opp., Exh. C, Search and Seizure Warrant, Attachment A ("Cellphone Attachment A"), ECF No. 49; Def. Mot. 12.) Most relevant here is that while the Government searched Defendant's cellphone internet browsing history, they found potentially incriminating posts purportedly made by Defendant on the website Reddit.com.

### III.    Seized Packages

The Government also seized a total of nine packages without a warrant. Four of these packages were shipped from Hong Kong to a UPS store box in the Defendant's name located in Wappingers Falls, New York. (Gov't Opp. 6; Def. Mot. 5; Ruggieri Packages Warrant Aff. ¶¶

6(a)–(d).) Of these four packages, three of them were seized from the Wappingers falls UPS

Store on March 24, 2017, March 30, 2017, and March 31, 2017 respectively. (Gov't Opp 6;

Package Warrant Aff. ¶¶ 6(b)–(d).) A U.S. Postal Inspector who was not involved in the federal

investigation flagged the fourth package as suspicious. That inspector removed the package from

the Wappingers Falls post office and transferred it to the U.S. Postal Inspection Service's

Manhattan office in March of 2017. (Gov't Opp. 6; Package Warrant Aff. ¶ 6(a).)

Law enforcement effected a warrantless seizure of the remaining five packages on

March 24, 2017. Law enforcement removed four of these packages from outside Defendant's

Middletown, New York residence. (Gov't Opp. 7; Package Warrant Aff. ¶¶ 6(f)–(i).) Law

enforcement retrieved the fifth package from the Middletown post office prior to its delivery to

Defendant's residence. (Gov't Opp. 7; Package Warrant Aff. ¶ 6(e).)

Law enforcement eventually obtained a search warrant for all nine packages on April 12,

2017. (*See* Gov't Opp., Exh. A, Exh. C, Search and Seizure Warrant ("Package Search

Warrant").)  Four of the packages contained a controlled substance and five packages contained

supplies that Defendant allegedly used in his narcotics distribution conspiracy including

envelopes and stamps en masse. (*See* Gov't Opp. 6–7.)

Defendant seeks to suppress the evidence derived from the warrantless seizure of the nine

packages as well as the search of his cellular device.

## B.  DISCUSSION

The Fourth Amendment to the United States Constitution protects citizens' "persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

The general contours of a search and seizure under the Fourth Amendment are well-defined. A

search occurs when "'the government violates a subjective expectation of privacy that society

recognizes as reasonable.'" *United States v. Lambis*, 197 F. Supp. 3d 606, 609 (S.D.N.Y. 2016) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)). A seizure occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012) (citation and internal quotations omitted); *Harrell v. City of New York*, 138 F. Supp. 3d 479, 488 (S.D.N.Y. 2015) ("It is settled law that [a] seizure of property occurs when there is some meaningful interference with an individual's possessory interest in that property") (citation and internal quotations omitted). The "ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (citation and internal quotations omitted). The reasonableness standard invokes a "'careful balancing of governmental and private interests.'" *Harrell*, 138 F. Supp. 3d at 488 (quoting *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 71 (1992)).

Defendant first argues that the seizure of Defendant's packages tainted the evidence derived from the April 12, 2017 search warrant. (Def. Mot. 6.) Defendant next argues for the suppression of the internet browsing history reviewed during the search of Defendant's phone pursuant to a warrant. (Def. Mot. 12.) The Court takes these arguments in turn.

## I.    The Nine Packages

Defendant challenges the warrantless seizure and eventual search of a total of nine packages. Defendant argues that the warrantless seizure was unconstitutional, and that the allegedly illegal seizure tainted the evidence derived from the April 12, 2017 search warrant. (Def. Mot. 5–7.)

Warrantless seizures are *per se* unreasonable under the Fourth Amendment. *Untied States v. Rudaj*, 390 F. Supp. 2d 395, 402 (S.D.N.Y. 2005). A warrantless seizure, however, may nonetheless be reasonable and valid if it meets "one of the recognized exceptions to the [F]ourth

[A]mendment's warrant requirement." *Harrell*, 138 F. Supp. 3d at 488 (quoting *United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015)). Indeed, "'[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the [Supreme] Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.'" *United States v. Martin*, 157 F.3d 46, 53 (2d Cir. 1998) (citing *United States v. Place*, 462 U.S. 696, 701 (1983)).

Although definitions of probable cause vary, "'[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that [the] belief of guilt must be particularized with respect to the person [or property] to be searched or seized.'" *Dinler v. City of New York*, No. 04 Civ. 7921(RJS)(JCF), 2012 WL 4513352, at *3 (S.D.N.Y. Sept. 30, 2012) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Generally, probable cause is established when the "'totality-of-the-circumstances indicate a probability of criminal activity.'" *United States v. Urena*, No. 15cr0140 (DLC), 2015 WL 5729724, at *2 (S.D.N.Y. Sept. 30, 2015) (quoting *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999)). Probable cause for seizure of property exists when "'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime.'" *United States v. Herron*, 18 F. Supp. 3d 214, 224 (E.D.N.Y. 2014) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

Where, as here, a warrantless seizure is followed by a delay in securing a search warrant, Court's must conclude whether such delay is constitutionally unreasonable. When determining the reasonableness of a delay in seeking and attaining a valid search warrant following a

warrantless seizure, a Court must look at various factors "including the length of time for which the individual was deprived of her or his property, any diminished interest in the property that the individual may have had, and whether the seizure affected the individual's liberty interests." *United States v. Howe*, 545 F. App'x 64, 65–66 (2d Cir. 2013) (summ. order); *United States v. Mathews*, 18-CR-124 (JPO), 2018 WL 2277839, at *3 (S.D.N.Y. May 17, 2018).

a. Probable Cause for Seizure of the Packages

The Defendant contends that the warrantless seizure of the nine packages was unconstitutional and that "[t]his illegal seizure tainted the evidence derived from the April 12, 2017 search warrant." (Def. Mot. 5–6.) The Government contends that law enforcement agents had sufficient probable cause to seize the nine packages and attained a search warrant in a reasonable time period. (Gov. Mot. 9–11.)

The Government had probable cause to seize the items without a warrant because the totality of the circumstances indicated a probability of criminal activity. *See Urena*, 2015 WL 5729724, at *2. Law enforcement amassed evidence indicating that Defendant was sending and receiving controlled substances in the mail. First, federal law enforcement previously intercepted a package shipped to the Defendant from Hong Kong containing a controlled substance. (Gov't Opp. 9; Gov't Opp., Exh. A, Exh. A, Complaint ("Compl.") ¶ 15.) Second, Defendant told law enforcement agents on February 1, 2017, that he received packages in the mail from Hong Kong and then sent them to a third party in Ohio. (Ruggieri Cellphone Warrant Aff. ¶¶ 9(b), 15 (b)–(c).) Third, following Defendant's arrest on March 20, 2017, law enforcement recovered a parcel from Defendant's apartment containing U-47700 and bearing the same Hong Kong return address as featured on three other packages seized between March 24, 2017 and March 31, 2017. (Gov. Mot. 9; Ruggieri Packages Warrant Aff. ¶ 29.) Taken together, these facts would warrant

an agent of reasonable caution to believe that Defendant was receiving controlled substances in packages from a Hong Kong return address and sending packages containing controlled substances in the mail, thus, sanctioning the warrantless seizure of the packages. *See Herron*, 18 F. Supp. 3d at 224.

Further, there was a reasonable probability that the Defendant received materials that he then used to send controlled substances through the mail. Of the nine packages seized, five of them were marked on their exteriors or originated from USPS. Two of these packages came from the USPS Stamp Fulfillment Center. One other package was marked on the outside of the parcel as containing printer ink, and the other two other packages were marker as containing 300 priority mail envelopes. (Gov. Mot. 10; Ruggieri Packages Warrant Aff. ¶¶ 6(e)–(i).) Law enforcement then confirmed Defendant's purchase of stamps and zip-lock bags in large quantities. (*Id.* ¶¶ 30(a)–(b), 31.)

Specifically, law enforcement believed that the Defendant purchased thousands of dollars' worth of stamps in order to mail controlled substances to his customers and that he used priority mail envelopes to send drugs, and that he had created his own mailing labels to place on his shipments to customers. (Ruggieri Packages Warrant Aff. ¶¶ 20(m), 30–32.) Two facts further substantiated law enforcement's belief. First, Ruggieri noted that based on his conversations with other law enforcement officers, including USPIS Inspectors, and a review of records maintained by the USPS, Defendant ordered thousands of dollars' worth of stamps and at least one-thousand zip-lock bags. (*Id.* ¶¶ 30–31.) Based on these observations, Ruggieri believed that Defendant was creating mailing labels and using USPS priority mail envelopes to package and ship controlled substances. (*Id.* ¶ 32.) Second, as previously mentioned, in March of 2017 a detective with the Fairfax County Police Department made an undercover purchase of U-47700,

a controlled substance, from someone on the darkweb through a portal known as AlphaBay marketplace. (*Id.* ¶ 20(a).) A few days later, the detective observed the Defendant's vehicle parked in Kearny, New Jersey, where the detective observed Defendant walk toward the vehicle with two plastic bags in his hands, placing one in a trash receptacle and placing the second one in another receptacle. (*Id.* ¶ 20(b)–(c).) Those bags would later test positive for controlled substances. (*Id.* ¶ 21.) The detective later drove to the post office in Harrison, New Jersey where he observed seventy-nine packages which had been dropped off by a man who matched the Defendant's description—one package which mailing addressed matched the one the detective provided the online supplier. (*Id.* ¶ 20(f)–(g).) These observations, coupled with the previously intercepted packages containing controlled substances, gave law enforcement further probable cause to seize the packages in question without a warrant.

b.   Recognized Exception to the Warrant Requirement

Having established probable cause for the warrantless seizure of the packages, the Government must next demonstrate how the exigencies of the circumstances demanded the warrantless seizure, or how some other recognized exception to the warrant requirement was present. *Martin*, 157 F.3d at 53. Here, the Government argues that exigent circumstances justified the warrantless seizure of the packages because they feared for their destruction. Specifically, the Government argues that there was an intolerable risk that evidence would be lost because the incarcerated Defendant may have directed a third party to collect the packages for him. (Gov't Opp. 10.)

It is well settled that "'the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay.'" *United States v. Moreno*, 701 F.3d 64, 72–73 (2d Cir. 2012) (quoting *United States v.*

*Gordils*, 982 F.2d 64, 69 (2d Cir. 1992)). "'Exigent circumstances refer generally to those situations in which law enforcement officers will be unable or unlikely to effectuate an arrest, search or seizure for which probable cause exists, unless they act swiftly, even though they have not obtained prior judicial authorization.'" *United States v. Lee*, 07 Cr. 003 (BSJ), 2010 WL 11489009, at *3 (S.D.N.Y. Jan 12, 2010) (quoting *United States v. Gallo–Roman*, 816 F.2d 76, 79 (2d Cir. 1987)). The Court must look at a given situation objectively and base any findings on the totality of the circumstances. *Lee*, 2010 WL 11489009, at *3.

Here, it was reasonable for law enforcement agents to seize the packages for fear of their destruction or disappearance. As previously discussed, by the time the first seizure occurred, law enforcement agents had probable cause to believe that the Defendant distributed controlled substances through the mail. Further, law enforcement agents had probable cause to believe that the packages in question contained controlled substances or instrumentalities of the suspected conspiracy. Allowing these packages to reach their final destination, in these circumstances, "would have risked the 'loss or destruction of suspected contraband.'" *Martin*, 157 F.3d at 53 (quoting *United States v. Jacobsen*, 466 U.S. 109, 114 (1984)). First, there was a risk of the packages' destruction or loss while en route to their destination. Not only could the packages have been lost or destroyed en route, but the security of the packages once delivered was also in question. Second, Defendant told law enforcement officers that he was paid by an anonymous individual to receive packages and then forwarded them to a third party. (Package Aff. ¶ 18(b).) Accordingly, law enforcement also feared that Defendant would contact a third party to destroy or take the packages. [3] Therefore, the totality of the circumstances suggested an intolerable risk

---

[3] It bears noting that the Defendant was in federal custody at the time of the seizure.

of loss or destruction of suspected contraband, and the exigencies of the circumstances warranted seizure of the packages. *Martin*, 157 F.3d at 53.

### c. Reasonableness of the Delay

Defendant next argues that the Government's delay in obtaining a search warrant for the seized packages was unreasonable. (Def. Mot. 6–7.) This Court disagrees. When determining if the period following seizure and leading up to the issuance of the search warrant was constitutionally unreasonably, a court looks to various factors "including the length of time for which the individual was deprived of her or his property, any diminished interest in the property that the individual may have had, and whether the seizure affected the individual's liberty interests." *Howe*, 545 F. App'x at 65–66 (citing *Martin*, 157 F.3d at 54). Courts then analyze the government's interest in seizing the property in question and balances the competing interests. *Howe*, 545 F. App'x at 65–66 (citing *Martin*, 157 F.3d at 54; *Illinois v. McArthur*, 531 U.S. 326 (2001)).

In this case, law enforcement began seizing the packages in question on March 24, 2017 and acquired a search warrant on April 12, 2017. Focusing on the earliest seizure, law enforcement waited a total of nineteen days before obtaining the search warrant. (Gov. Mot. 11.) In these circumstances, the nineteen-day delay was a "relatively short amount of time" that was reasonable under the circumstances. *See Mathews*, 2018 WL 2277839, at *3 (characterizing a delay of fifteen to seventeen days as a "relatively short amount of time"). This period is especially short because it included three weekends as well as the Passover holiday. *See id; Martin*, 157 F.3d at 54 (noting that the delay in obtaining a search warrant "included two weekends and the Christmas holiday, which could explain the difficulty in promptly obtaining the warrant") Further, this is not a case where the government's delay was due to a lack of

diligence in pursuing a search warrant. *See Howe*, 545 F. App'x at 66. Quite the contrary, the delay here was due, in part, to law enforcement's diligence in further investigating the case and procuring information to substantiate their requests for the search warrant. (Gov. Mot. 12–13.) During the nineteen-day delay, the Government continued their investigation, created a twenty-eight page warrant affidavit, and arranged the laboratory testing of controlled substances recovered from the Defendant's property pursuant to a search warrant. (Gov. Mot. at 13.) Law enforcement also tracked down and seized the remainder of the nine packages at issue in this case. (*Id.*)

The Defendant certainly had a property interest in the packages sent to his address during the pendency of the delay.[4] The government's interest in seizing the property in question, however, outweighs Defendant's interest in the property and the delay in obtaining a search warrant. The Government had probable cause to believe that the packages contained controlled substances as well as instrumentalities of the subject offenses. Further, unlike cases where seizure of property constrains movement, *United States v. Place*, 462 U.S. 696, 708 (1983) (noting that "in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary"); *Mathews*, 2018 WL 2277839, at *3, the seizure of the subject packages did not affect Defendants liberty. Considering the relevant factors and the appropriate balancing, a nineteen-day delay in obtaining a search warrant for the packages was not unreasonable under these circumstances.

_____

[4] Although the Government suggests that Defendant's property interest was significantly reduced because of his incarceration, this Court is not prepared to make that determination at this time. (Gov't Opp. 12.)

### d. Validity of the GPS Warrant

Defendant next argues, for the first time in his Reply, that the seizure of the nine

packages was the fruit of an illegal GPS warrant obtained by the Fairfax County Police

Department. (Mem. of Law in Reply to Gov't Response in Opp. ("Def. Reply") 3, ECF No. 53.)

Fairfax County detective M.A. Nikolas applied for, and a state trial court judge issued, a

GPS warrant on February 24th, 2017. (Def. First Mot. to Suppress, Exh. 2 ("GPS Warrant"), ECF

Doc. 28.) The GPS warrant allowed for the tracking of real-time cellphone location data

pertaining to Defendant's cellphone. (*Id*; *see* Def. Reply 3; Gov't Sur-Reply to Def. Reply Mem.

of Law ('Gov't Sur-Reply") 2, ECF No. 55.) Most relevant here, the data from the GPS warrant

revealed Defendant's location in New Jersey, where Detective Nikolas surveilled the Defendant,

found the trash bags containing controlled substances, and investigated packages that were

dropped off at the post office in Harrison, New Jersey. (Def. Reply 3.) Defendant posits that in

absence of the GPS warrant, law enforcement agents would not have observed Defendant's trash

pull, investigated the packages dropped off at the New Jersey post office, nor would the federal

agents seized the packages in question without a warrant. (*Id.*)

Defendant suggests that the warrant affidavit was "clearly bare-bones" and that detective

Nikolas lied about the purported drug purchase with Defendant and communications between

them. (*Id.*) The Government disagrees. (Gov't Sur-Reply 2–3.)

A bare bones affidavit is one that is "totally devoid of factual circumstances to support

conclusory allegations." *United States v. Clark*, 638 F.3d 89, 103 (2d Cir. 2011). Indeed,

suppression is warranted "where probable cause is 'based on an affidavit so lacking in indicia of

probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 465 (S.D.N.Y. 2013) (quoting *Leon*, 468 U.S. at 923).

Defendant's motion is denied because the GPS warrant affidavit is not totally devoid of factual circumstances to support the allegations therein. Here, the GPS warrant details the basis for probable cause. Detective Nikolas described that he worked in an undercover capacity during the Months of October 2016 through January 2017 in an attempt to identify drug distributors within Fairfax County. (GPS Warrant, Aff. in Supp. of a Search Warrant ("Nikolas Aff.") 4.) Nikolas detailed that the made contact with the Defendant through the internet and that he made multiple purchases of schedule I drugs from Defendant. (*Id.*) Nikolas received multiple packages with affixed labels displaying "unique characteristics." (*Id.*) The detective eventually compared Defendant's "known handwriting" samples to the labels on the packages he believed he received from the Defendant. (*Id.*) The detective then concluded that the handwriting on the known samples was consistent with the "unique handwriting" from the labels. (*Id.*) The detective also confirmed that the Defendant lived and worked in the geographic area from which the drug packages were sent. (*Id.*) Further, detective Nikolas confirmed that Defendant purchased "thousands of Dollars in stamps" during the period in which the detective purchased drugs from the Defendant. (*Id.*) In "many cases" Defendant's purchased stamps matched the stamps received by the detective. (*Id.*)

Although the GPS warrant is not replete with factual support, it is certainly not "totally devoid of factual circumstances to support conclusory allegations." *Clark*, 638 F.3d 89, 103 (2d Cir. 2011). The detective described the undercover operation and described how he was able to compare the Defendant's handwriting with another known handwriting sample. (Nikolas Aff. 4.) The consistency of the two handwriting samples, coupled with Defendant's confirmed purchases

of thousands of dollars' worth of stamps and the detective's conclusion that the Defendant was the person from whom he purchased controlled substances, created sufficient probable cause to believe the Defendant was involved in distribution of narcotics.[5]

Alternatively, the Court finds that law enforcement relied on the GPS warrant in good faith. The good faith exception "recognizes that if the officer is acting as a reasonable officer would and should act in similar circumstances, excluding the evidence would serve little deterrent purpose." *United States v. Bershchansky*, 788 F.3d 102, 113 (2d Cir. 2015) (internal quotations and citation omitted). The relevant inquiry "'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'" *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009)). Under these facts, a reasonably well trained officer would not have known that the tracking of real-time cellphone location data pertaining to Defendant's cellphone was illegal despite the judge's authorization. Consequently, even if the search warrant was devoid of factual circumstances substantiating probable cause, the good faith exception to the exclusionary rule applies.

## II.    Search of the Cellular Device

Defendant argues that all evidence derived from the search of his cellular telephone must be suppressed because the warrant affidavit failed to establish probable cause to believe that

---

[5] Defendant argues that detective Nikolas lied "by saying Okparaeke communicated with him and that he bought drugs from Okparaeke." (Def. Reply 3.) Defendant again fails to make the substantial preliminary showing that "(1) the claimed inaccuracies or omissions [in the affidavit] are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *Mandell*, 710 F. Supp. 2d at 372 (citation and internal quotations omitted). Here, Defendant argues that Nikolas "had no way of knowing who was on the other end" and does not offer any factual arguments supporting a conclusion that that the claimed inaccuracy was the result of a deliberate falsehood or reckless disregard for the truth.

Defendant was distributing narcotics and there was no nexus between Defendant's phone and the alleged narcotics trafficking. (Def. Mot. 7, 9.) The Court disagrees.

a. Probable cause for the Search Warrant

The Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. "The Supreme Court has explained that 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). When evaluating whether probable cause exists in a case, a judge must "'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (quoting *Falso*, 544 F.3d at 117).

Given the initial subjective standard, "a reviewing court generally accords substantial deference to the finding of an issuing judicial office that probable cause exists, limiting [the] inquiry to whether the office had a substantial basis for his [or her] determination." *United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (citation and internal quotations omitted). That deference, however, is limited, and it is within the reviewing court's purview to "'decide whether the magistrate performed his [or her] neutral and detached function on the facts before [them], and did not merely serve as a rubber stamp for conclusions drawn by the police.'" *United States v. Cardona*, No. 14–CR–314 (RA), 2015 WL 769577, *4 (S.D.N.Y. Feb. 24, 2015) (quoting *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)). The essential "'task of a

reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate a substantial basis for making the requisite probable cause determination.'" *United States v. Lustyik*, 57 F. Supp. 3d 213, 224 (S.D.N.Y 2014) (quoting *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011)).

In the present case, the totality of the circumstances afforded the federal magistrate a substantial basis for making the determination that there was probable cause to believe that the Defendant was involved in a conspiracy to distribute controlled substances. First, as previously mentioned, Ruggieri stated in his Affidavit that CBP intercepted two packages at John F. Kennedy Airport during a routine, random screening. (Ruggieri Cell Phone Warrant Aff.") ¶ 8, ECF No. 49.) Further, a mobile laboratory test revealed that one of the packages originating from Hong Kong and shipped to a person with the name "Emeka Okparaeke" contained a substance with traces of fentanyl (*Id.* ¶¶ 9(b)–(d).) Following the interception and laboratory tests, Ruggieri created a duplicate package ("Package 2"), mimicking the label and weight of the original package and prompted the Defendant to appear at the Middletown Post Office to pick up the package. (*Id.* ¶¶ 10–14.) Most notably, following his arrest, Defendant stated that although he never met the individual who arranged for the shipment of the package, that same individual arranged for the shipment of other packages to Defendant in the past, and that upon receiving them, Defendant sent those packages to an individual in Ohio. (*Id.* ¶ 15(b)–(c).) Here, the totality of the circumstances provided a substantial basis to conclude that Defendant was engaged in a conspiracy in which he received controlled substances in the mail, and had an agreement to then send those controlled substances to another person.

Similarly, the totality of the circumstances afforded the magistrate judge a substantial basis for making the determination that Defendant's cellphone would contain evidence, fruits,

and instrumentalities of a narcotics conspiracy. Initially, Defendant used his phone to communicate with the post office when attempting to track the intercepted package. Defendant called the Post Office on both January 31, 2017 and February 1, 2017 to inquire of the status of the package and to inform the post office that he would retrieve the same. (*Id.* ¶¶ 11–13.) Further, during his interview with police officers, Defendant noted that he tracked the package through Privnote, an internet-based messaging service. (*See id.* ¶ 15(a).) As previously mentioned, Ruggieri affirmed that Defendant uses a phone which based on his experience and training has the capability of accessing and operating Privnote. (*Id.* ¶¶ 17–18.)  Further based on Ruggieri's experience, individuals involved in narcotics trafficking typically store records relating to their activity and to persons involved with them on their phones. (*Id.* ¶ 19.) Ruggieri affirmed that cellphones typically contain records such as logs of chats with any co-conspirators, email correspondence, contact information of co-conspirators, and identifiers for instant messaging and social media accounts. (*Id.*) Given that Defendant used the phone to make calls to the post office related to the packages, and that Ruggieri affirmed that Defendants involved in narcotics trafficking typically store relevant information on their phones, the magistrate had a substantial basis to make a finding of probable cause related to the use of the cell phone in the alleged narcotics conspiracy. *See United States v. Gatto*, 17–cr–0686 (LAK), 2018 WL 2465379, at *5 (S.D.N.Y. June 1, 2018) (finding that "the magistrate judge was entitled to infer from the fact that the defendant used a cell phone to make calls and send text messages related to the alleged scheme that other communications and evidence pertaining to that scheme also would have been made on that cell phone"); *see United States v. Brown*, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009) ("[A] Government agent's expert opinion is an important factor to be

considered by the judge when making a probable cause determination.) (citation and internal quotations omitted).[6]

b. Internet Browsing History

Defendant next argues that the law enforcement agents exceeded the scope of the cellphone search warrant. Specifically Defendant seeks to suppress the fruits of the search of the internet browsing history from his Samsung Galaxy S5 seized on February 7, 2017. (Def. Mot. 12.)

The procedures for obtaining search warrants are not mere formalities, but rather, protect against "'indiscriminate searches and seizures.'" *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (quoting *Payton v. New York*, 445 U.S. 573, 583 (1980)). In assessing the permissible scope of a search warrant, "we must look to the place that the magistrate judge who issued the warrant intended to be searched, not to the place that the police intended to search

---

[6] To the extent that Defendant argues that the Cellphone Affidavit was not supported by probable cause because Ruggieri made false statements in the Cellphone Affidavit, that motion is denied. (Def. Reply. 4–6 (suggesting that "the court should conclude that the government[']s representation that the defendant left the phone number after calling the post office was false").) It is well settled that there is a presumption of validity with respect to affidavits supporting a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In limited circumstances, "'a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the resulting search or seizure.'" *United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) (quoting *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005)). "One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). In order to trigger an evidentiary hearing concerning the alleged deliberate or reckless false or misleading information, a Defendant "must make a substantial preliminary showing that: (1) the claimed inaccuracies or omissions [in the affidavit] are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *Mandell*, 710 F. Supp. 2d at 372 (citation and internal quotations omitted). Here, Defendant merely argues that Ruggieri did not offer sufficient factual support for his conclusions. This argument falls well below the necessary "substantial preliminary showing" that the alleged inaccuracy was the result of Ruggieri's deliberate falsehood or reckless disregard for the truth. *Id.*

when they applied for the warrant." *United States v. Voustianiouk*, 685 F.3d 206, 211 (2d Cir. 2012). Indeed, if "the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990). In scrutinizing search warrants for electronically stored data, the Court must remain cognizant of "the special problems associated with searches of computers which . . . can be particularly intrusive." *United States v. Ulbricht*, 858 F.3d 71, 101 (2d Cir. 2017). With this in mind, "[w]e look directly to the text of the search warrant to determine the permissible scope of an authorized search." *Bershchansky*, 788 F.3d at 111.

In this case, the cellphone search warrant incorporated an attachment (Attachment A) which delineated the scope of the search. The scope of the warrant was limited to Electronically Stored Information ("ESI")[7] in four categories: (1) "Evidence concerning the identity of the owner(s) or user(s) of the Subject Device;" (2) "Evidence concerning the identity or location of, and communications with, co-conspirators;" (3) "Records (including financial and postal records), calendar, and scheduling information related to the Subject Offenses; and" (4) "Photographs and videos related to the Subject Offenses." (Cellphone Search Warrant, Attachment A; Def. Mot. 12.)

 Defendant argues that law enforcements search of the phone's internet browsing history, leading to posts purportedly made by Defendant on the website Reddit.com ("Reddit") fell outside the enumerated categories of the warrant, and therefore, must be suppressed. (*See* Def.

---

[7] The search warrant Affidavit defines ESI as including "data or data compilations stored in any medium from which information can be obtained, including all types of computer-based information as may be developed over time." (Rugieri Cell Phone Aff. ¶ 7.)

Mot. 12–13.) The Government posits that the search of the Defendant's browsing history fell within category one and three. (Gov't Opp. 27.)

Here, law enforcement agents did not exceed the scope of the search warrant insofar as they opened and reviewed Defendant's internet web browser history and any already opened webpages. The search warrant sanctioned law enforcement's review of any ESI on the device concerning the identity of the owners or users of the subject device and review of records related to the subject offenses. (Cell Phone Search Warrant, Attachment A.) ESI concerning the identity of the owners or users of the subject device would certainly be present in the internet browsing history of a cellphone or an open browser page. For example, the browsing history may convey the user's name, or the name of anyone who used the subject device. Similarly, browsing history could reveal records such as social media platforms operated by, or connected with, the device's users. It is also likely that information related to the subject offense would be available in the browsing history. Information concerning financial and postal records, for example, are easily retrievable if a person visited their bank's website or the website of their carrier of choice and left a page open on the browser. *C.f. United States v. Swinton*, 251 F. Supp. 3d 544, 551–52 (W.D.N.Y. 2017) (holding that although not expressly referenced in the search warrant, text messages on a cellphone fell within the scope of any "records" contained in a cellular telephone).[8]

_____

[8] The Court notes that search warrants for digital data pose unique threats and challenges to Fourth Amendment jurisprudence. As the Second Circuit commented, the nature of digital search warrants pose a "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *Galpin*, 720 F.3d at 447; *United States v. Alston*, No. 15 Cr. 435 (CM), 2016 WL 2609521, at *6 (noting that the extraction of information from a phone without regard for its particular relevance is in line with "overwhelming authority" permitting such a procedure in the context of electronic devices). This unique threat presents itself because digital search warrants typically require agents to parse through data that may or may not fall within the scope of the search warrant in order to

Here, Magistrate Judge Davison sanctioned the search of ESI on the subject device, and the Government agents searched for the types of ESI permitted by the search warrant. Looking directly to the text of the search warrant, *Bershchansky*, 788 F.3d at 111, review of the cellphone's internet browsing history and any already opened webpages was squarely within the scope of the warrant. Internet browsing history and any opened webpages are electronically stored information that is readily available within the subject device and could reveal evidence concerning the identity of the owners or users of the subject device or any records related to the subject offense. Further, his is not an instance of "exploratory rummaging," *Bershchansky*, 788 F.3d at 111, where law enforcement agents wandered aimlessly through Defendant's cellphone, but rather, we are presented with a focused search seeking particularized information within the confines of a cellular device. *C.f. Romain*, 2014 WL 6765831, at *9 (noting that a "search to identify items relevant to the Warrant" when "adequately limited by the parameters articulated in the Application and its supporting documents" is reasonable under the Fourth Amendment) Therefore, the search of Defendant's internet browser history, and any already opened webpages, was not outside of the scope of the Search Warrant.

Even if the agents exceeded the scope of the warrant, the good faith exception to the exclusionary rule applies. *See United States v. Leon*, 468 U.S. 897, 925 (1984). The good faith exception "recognizes that if the officer is acting as a reasonable officer would and should act in similar circumstances, excluding the evidence would serve little deterrent purpose." *Bershchansky*, 788 F.3d at 113 (internal quotations and citation omitted). The relevant inquiry

---

determine what data is relevant. *See Galpin*, 720 F.3d at 446–47; *Ganias*, 824 F.3d at 212–14. Although "the Court recognizes that settled Fourth Amendment precedent may apply differently—or not at all—in the context of digital searches," *Lustyik*, 57 F. Supp. 3d at 229 n.12, this Court must nonetheless "look directly to the text of the search warrant to determine the permissible scope of an authorized search." *Bershchansky*, 788 F.3d at 111.

"'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'" *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009)). Here, a reasonably well trained officer would have not have known that the search was outside of the scope of the search warrant. It is reasonable for a police officer to believe that evidence concerning the identity of the owners or users of the subject device as well as any records concerning the subject offense would be present in the internet browsing history.

Finally, it is unclear from the motion papers whether or not law enforcement agents accessed any webpages not already opened on the browser from Defendant's internet browsing history. If so, the Court is presented with the additional question of whether access to webpages not already opened on Defendant's cellphone, but present in the internet browsing history, constituted a search of Electronically Stored Information. In many instances, searches for relevant ESI involves a cell phone and a search confined to data present within a given device. *See Galpin*, 720 F.3d at 446–47. In this case, however, law enforcement agents may have accessed portions of Defendant's Reddit posts not already opened on the subject device. The Supreme Court of the United States alluded to distinctions between information contained in a cellphone and information accessed through a cellphone in *Riley v. California*, 134 S. Ct. 2473, 2489 (2014). In the context of searches incident to arrest, the Court cautioned that "when a cell phone is used to access data located elsewhere, at the tap of a screen . . . [s]uch a search would be like finding a key in a suspect's pocket and arguing that it allowed law enforcement to unlock and search a house." *Id.* at 2491. Similarly, here, it is unclear if by accessing websites through Defendant's device, law enforcement agents "unlocked" and searched areas outside of the scope of the warrant.

Therefore, if law enforcement agents visited portions of Defendant's Reddit posts that were not already open on the subject device, the parties are directed to prepare to discuss the possibility of further briefing on one question: whether accessing unopened Reddit posts through Defendant's phone constituted a search of ESI within the scope of the search warrant.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to suppress evidence is DENIED in part. The Clerk of Court is respectfully directed to terminate the motions at ECF No. 45. The parties are directed to appear at the previously scheduled case management conference on July 6, 2018 at 12:00 p.m.

Dated:   July 5, 2018
         White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge