UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

CHUKWUEMEKA OKPARAEKE,

                Defendant.

No. 17-CR-225 (NSR)
ORDER AND OPINION

NELSON S. ROMÁN, United States District Judge

      Defendant Chukwuemeka Okparaeke ("Defendant") is charged in a five-count

Superseding Indictment with: (1) conspiracy to distribute, and to possess with intent to distribute,

controlled substances in violation of 21 U.S.C. §§ 813, 841(a)(1), 841(b)(1)(A), 841(b)(1)(C)

and 846; (2) attempted importation of 100 grams and more of mixtures and substances

containing acrylfenanyl in violation of 21 U.S.C. §§ 813, 952(a), 960(a)(1), 960(b)(1)(F) and

963; (3) attempted distribution of, and possession with intent to distribute, 100 grams and more

of mixtures containing a detectable amount of acrylfenanly in violation of 21 U.S.C. §§ 813,

841(a)(1), 841(b)(1)(A), and 846; (4) distribution of, and possession with intent to distribute,

furanly fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (5) importing U-

4770, a Schedule I controlled substance, into the United States in violation of 21 U.S.C. §§

952(a), 960(a)(1) and 960(b)(3). (*See generally* Superseding Indictment, ECF No. 41.) Before

the Court is Defendant's third motion to suppress. (ECF No. 58.) For the following reasons,

Defendant's motion is DENIED in part and GRANTED to the limited extent of setting this

matter down for a hearing. The parties are directed to appear for a suppression hearing on

Wednesday, October 10, 2018 at 10:30 a.m.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8 21 2018

1

# I.    BACKGROUND

The Court assumes familiarity with the facts of this case. *See United States v. Okparaeka*, No. 17-CR-225 (NSR), 2018 WL 3323822, (S.D.N.Y. July 5, 2018).

The Government formally commenced judicial proceedings against Defendant Chukwuemeka Okparaeka on March 17, 2017 by filing a criminal Complaint. (ECF No. 2). The Government then filed an Indictment on April 12, 2017. (ECF No. 15.)

Defendant first filed a motion to suppress on December 27, 2017. (ECF No. 28.)  The Government filed its opposition in a timely manner, and Defendant's Reply followed. (ECF No. 35, 37.)  A grand jury then returned a Superseding Indictment on March 5, 2018. (ECF No. 41.) In light of the Superseding Indictment, and Defendant's representation that he wished to address the new charges in his suppression motion, this Court denied Defendant's suppression motion without prejudice, and set a briefing schedule for Defendant's renewed motion. (ECF No. 44.)

Defendant filed a motion to suppress on April 13, 2018. (ECF No. 45.) The Court denied the motion in part on July 5, 2018. (ECF No. 56.) At the July 6, 2018 status conference, Defendant's counsel represented that he mistakenly did not include a number arguments from his first motion to suppress in the April 13 motion. This Court granted Defendant leave to file a third motion to suppress addressing the omitted arguments.

## A.  The Underlying Investigation

This case arises from two independent investigations: one by the Fairfax County, Virginia, Police Department and the other by federal investigators.

In or about January 2017, a Customs and Border Protection ("CBP") agent at John F. Kennedy Airport intercepted packages during a random screening. (Aff. of Tony Mirvis ("Mirvis

Aff."), Exh. 2, Aff. in Supp. of Application for Search and Seizure Warrant ("Cellphone Warrant Aff.") ¶¶ 8–9(a), ECF No. 59; Gov't Mem. of Law in Opp. to Def. Motion to Suppress Evid. ("Gov't Opp."), Ex. C, Aff. in Supp. of Application for Search and Seizure Warrant ("Residence Aff.") ¶¶ 13(a), ECF No. 62.) The packages, addressed to "Emeka Okparaeke" at a United Parcel Service ("UPS") store located in Middletown, New York, originated from Hong Kong and contained a substance that tested positive for an anologue of fentanyl. (Residence Aff. ¶ 13(a)–(c); Cellphone Aff. 9(a)–(d).)

In an attempt to ascertain the packages' recipient, United States Postal Inspector Brad Ruggieri ("Ruggieri"), who had been informed of the interception, arranged for the United States Postal Service ("USPS") tracking information for the packages to indicate that they had arrived at the post office in Middletown, New York. (Cellphone Aff. ¶¶ 1, 9–10.) On January 31, 2017, a person by the last name "Okparaeke" called the Post Office and inquired about the status of one of the intercepted packages. (*Id.* ¶ 11.) Okparaeke provided a call number for his cell phone at which he could be reached. (*See id.*) Ruggieri then created a duplicate package with a filler ("Package-2") and placed it in the Middletown Post office. (*See id.* ¶¶ 11–12.) The Defendant visited the Middletown Post Office on February 1, 2017, attempted to pick up the intercepted package, but an undercover USPIS agent handed him Package-2 instead (*Id.* ¶ 13.) As Defendant exited the post office, Ruggieri and other law enforcement officers arrested and transported him to the Middletown police station. (*Id.* ¶ 14.)

At the police station, Ruggieri, along with a Homeland Security Investigations ("HSI") agent, interviewed Defendant after taking away his cellphone, wallet, and car keys. During the interview, Ruggieri purportedly communicated to Plaintiff that he was "not under arrest" but rather was "being detained." (*See id.* ¶ 15; Mem. of Law in Supp. of Def. Pre-Trial Motions

("Def. Mot.") 4, ECF No. 61.) An HSI agent asked Defendant for his phone number, which he provided. The agents then read Defendant his *Miranda* warnings. (*See* Cellphone Warrant Aff. ¶ 15; Def. Mot. 4.) After Defendant signed and initialed the *Miranda* warnings, he stated that "Invariably I have to ask for an attorney." (Def. Mot. 4.) Ruggieri again responded by noting that he was not under arrest, but instead was detained. (*Id.*) The HSI agent then asked Defendant for his phone number a second time, which Defendant provided. The HSI agent returned Defendant's cellphone, wallet, and car keys. Ruggieri then asked Defendant if they could search his phone, to which Defendant agreed. Defendant identified his phone as a Galaxy S5. Defendant then provided the phone number a third time. After Defendant consented to a search of his cellphone he again asked to speak to an attorney. (*Id.* at 5.)

State officials in Virginia also investigated the Defendant prior to the merger of the investigations by, *inter alia*, setting up controlled buys through Defendant's suspected online alias, "Fentmaster." On or about March 5, 2017, a detective with the Fairfax County Police Department made an undercover purchase of approximately 100 grams of U-4770, a Schedule I synthetic opioid, from Fentmaster through a dark web site known as AlphaBay Marketplace. (*See* Gov't Opp., Ex. D, Aff. in Supp. of Application for Search and Seizure Warrant ("Packages Warrant Aff.") ¶ 20(a).) While conducting surveillance on March 7, 2017, the detective observed Defendant's vehicle parked near a town house in Kearny, New Jersey. (*Id.* ¶¶ 20(b)–(c).) Defendant walked towards the vehicle with two white plastic bags in his hands, placing them in separate trash receptacles. (*Id.* ¶ 20(c).) The contents of the bags in the receptacles would test positive for U-47700. (*Id.* ¶ 21.) The detective then observed Defendant exit the Kearny town house holding two large USPS plastic bins with parcels inside. (*Id.* ¶ 20(d).)

On March 17, 2017, a federal magistrate judge signed a criminal Complaint charging Defendant with one count of conspiracy to distribute analogues of fentanyl, and issued a warrant for his arrest. (*Id.* ¶ 26.) Ruggieri and other law enforcement officers arrested Defendant and conducted a search of his home in Middletown, New York. (*Id.*) Law enforcement also conducted a search, pursuant to a warrant issued by Judge Mannion in the District of New Jersey, of the vehicle and room rented by Defendant in Kearny, New Jersey. (*Id.*) From the search of the Defendant's New Jersey room, law enforcement recovered packages with several kilograms of mixtures and substances containing U-47700, mixtures and substances containing over a kilogram of acrylfentanyl, an analogue of fentanyl, and several other controlled substances. (*Id.* ¶ 27.) Law enforcement agents also recovered eighty-two mailing envelopes, five of which contained substances that tested positive for quantities of acrylfentanyl and U-47700. (*Id.*) One of the packages recovered from the room featured a Hong Kong return address and contained a substance that tested positive for U-47700. (*Id.* ¶ 28.)

## B. Defendant's Cellphone

Law enforcement agents became interested in Defendant's cellphone during the course of the investigation. Prior to the February 1, 2017 interview, the Defendant used his cellphone to call the post office on two separate occasions to inquire of his package. During the February 1, 2017 interview by federal agents, law enforcement agents became more interested in the cellphone. As Ruggieri noted, the Defendant kept his device on or near his person at all times and identified the device's model and call number. (Cell Phone Warrant Aff. ¶ 17.) As Ruggieri further explained in his Affidavit, based on his training and experience, individuals engaged in narcotics trafficking typically store records relating to that activity on electronic devices such as cell phones. (*Id.* ¶ 19.) Some of those records include logs of online chats, emails, and contact

information. (*Id.*) Ruggieri submitted to the Court that there is probable cause to believe that Okparaeke is engaged in the subject offenses and that evidence is likely found on the device in question. (*Id.* ¶ 21.)

The Government eventually obtained a warrant and searched Defendant's phone. In the application for the search warrant, Ruggieri used the phone number and the physical description of the phone he received from Defendant during the course of the February 1 interview. (*Id.* ¶ 17.)

State officials also had an interest in Defendant's phone. Their interest, however, focused on the phone's tracking capabilities. On February 24, 2017, Judge Azcarate, a Virginia state trial judge, signed a search warrant for real-time location data pertaining to the Defendant's cellphone, which was served on the cellphone provider, Sprint. The search warrant also allowed for the collection of the phone's subscriber information, call detail records, Electronic Serial Number ("ESN"), International Mobile Subscriber Identity ("IMSI"), and Mobile Station Identification Number ("MSID") data. (Gov't Opp, Ex. A, Search Warrant for Real-Time Location Data ("GPS Warrant"), Search Warrant Addendum 1; Gov't Opp. 22.)

### C. Seized Envelopes

During the course of the investigation, federal agents seized 43 envelopes without a warrant. In early November, 2016, Defendant dropped off 43 USPS envelopes at the New Hampton, New York Post Office. (*See* Packages Warrant Aff. ¶ 15(a).) The packages had different destinations, but all had the same return address of Middletown Sweets, 100 Crystal Run Road, Middletown, New York. (*Id.* ¶ 15(b).) In November, 2016, a USPS employee contacted the United States Postal Inspection Service ("USPIS") to report the Defendant as a suspicious customer. (*See id.* ¶ 12.) Various USPS employees had observed the Defendant

purchasing bulk quantities of priority mail stamps and depositing large volumes of envelopes while wearing latex-dipped gloves. (*Id.* ¶¶ 12(b)–12(d).)  On November 9, 2016, Postal Inspector Claudel Chery purportedly instructed the New Hampton post office to keep the 43 packages segregated until they had been screened and confirmed as safe to enter the mail stream. Following an investigation by USPIS Inspectors, the Postal Inspection Service purportedly determined that the 43 packages should be segregated from the mail stream and designated for destruction because they were "non-mailable." (Gov't Opp. 60–61.)

On March 1, 2017, Inspector Chery informed Inspector Ruggieri that the 43 packages may be related to his investigation of the Defendant. Inspector Ruggieri obtained a search and seizure warrant for the 43 packages on April 12, 2017. (Gov't Opp. 61.)

## II.    DISCUSSION[1]

Defendant makes several arguments for the suppression of all the evidence derived from the federal and local investigations. Specifically, he seeks: (1) suppression of all evidence derived from the seizure, detention and arrest of Defendant on February 1, 2017; (2) suppression of all evidence derived from the search of Defendant's cellular telephone; (3) suppression of all evidence derived from the detention, seizure, and search of 43 postal packages by USPIS; and (4) suppression of geolocation, cell-cite information and all evidence obtained as a result of the execution of a GPS real time location data warrant issued in Fairfax County, Virginia. (Def. Mot. 3.) The Court takes the applications in turn.

### A.  Defendant's February 1, 2017 Arrest and Questioning

---

[1] The Court notes that although Defendant submitted an Affidavit supporting the motion to suppress, the Affidavit is deficient on its face. The submitted Affidavit is unsigned and does not indicate that it was sworn to before an appropriate official.  (*See* Def. Aff. 2.)

Following the interception of the packages at the John F. Kennedy Airport, federal investigators prompted a controlled delivery of the packages at the Middletown Postal Office. At the postal office, federal investigators replaced the contents of a package with a filler. Defendant was then prompted that his package arrived. Defendant went to the postal office, retrieved the package, and was then detained by federal and local law enforcement agents. The agents transported Defendant to the Middletown police station where they read his *Miranda* rights and questioned him.

Defendant argues that the law enforcement agent's actions constituted an unconstitutional seizure, thereby tainting any evidence derived from the subsequent questioning at the police station.

The Fourth Amendment to the United States Constitution protects citizens' "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The general contours of a search and seizure under the Fourth Amendment are well-defined. A search occurs when "'the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *United States v. Lambis*, 197 F. Supp. 3d 606, 609 (S.D.N.Y. 2016) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)). A seizure of a person occurs when, in the absence of a formal arrest, "a 'reasonable person would have believed that he was not free to leave.'" *Williams v. City of New York*, 16 Civ. 4315 (JGK), 2017 WL 4158903, at *4 (S.D.N.Y. Sept. 14, 2017) (quoting INS v. Delgado, 466 U.S. 210, 215 (1984). An arrest occurs when "an individual is restrained and his freedom of movement is restricted, and thus [t]he pertinent inquiry is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Cruz v. City of New York*, 232 F. Supp. 3d 438, 455 (S.D.N.Y. 2017) (citation and internal quotations omitted). "A warrantless arrest is

unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *United States v. Watson*, 423 U.S. 411, 417 (1976)). "An officer has probable cause to arrest where he is in possession of 'reasonably trustworthy information [concerning] facts and circumstances sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *United States v. Pabon*, 871 F.3d 164, 174 (2d Cir. 2017) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)). The Fourth Amendment's reasonableness standard invokes a "'careful balancing of governmental and private interests.'" *Harrell v. City of New York*, 138 F. Supp. 3d 479, 488 (S.D.N.Y. 2015) (quoting *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992)).

Although the probable cause standard is an objective one, it is also fluid and contextual, requiring a court to "examine the totality of the circumstances of a given arrest." *Delossantos*, 536 F.3d at 159; *see Jaegly v. Couch*, 439 F.3d 149, 153–54 (2d Cir. 2006). "In determining whether probable cause existed, this Court must consider the information available to law enforcement officers at the time of arrest." *United Sates v. McDow*, 206 F. Supp. 3d 829, 844 (S.D.N.Y. 2016).

In determining whether a suspect is in custody during questioning, Courts undertake a two-step inquiry. The first step asks "whether a reasonable person would have thought he was free to leave." *United States v. Molina*, 368 F. Supp. 2d 308, 311 (S.D.N.Y. 2005) (citation and internal quotations omitted). The second step asks "whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* The in custody determination is a "'holistic one in

which the nature and context of the questions asked, together with the nature and degree of the restraints placed on the person questioned, are relevant.'" *United States v. Casanova*, No. 11 Cr. 562(RJS), 2012 WL 760308, at *3 (S.D.N.Y. March 8, 20120) (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)).

"Absent a [*Miranda*] warning, the prosecution may not use a statement elicited by the police during a custodial interrogation" *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) (citing *Miranda v. Arizona*, 384 U.S. 436, 448–50 (1966)). A custodial interrogation occurs when a person "'is subjected to either express questioning or its functional equivalent' and his statements are 'the product of words or actions on the part of the police' that 'were reasonably likely to elicit an incriminating response'" *Familetti*, 878 F.3d at 57 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). If a Defendant is subjected to a custodial interrogation and invokes their right to counsel, the interrogating agents must cease their questioning immediately. *United States v. Gonzalez*, 764 F.3d 159, 165 (2d Cir. 2014) (noting that once *Miranda* rights have been invoked, "interrogation must stop and the invocation must be 'scrupulously honored'" (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975))).

Defendant argues that the federal and local law enforcement agents temporarily detained him with something less than probable cause. That investigative detention "crossed the line and became an arrest" triggering the heightened protections of the Fourth Amendment. (Def. Mot. 7–8.) The Government seemingly agrees that law enforcement agents did not merely stop Defendant for an investigative detention. Indeed, the Government argues that law enforcement agents arrested Defendant based on probable cause and interrogated him following a reading of his *Miranda* rights. (*See* Gov't Opp.11.)

Under the totality of the circumstances, law enforcement agents had probable cause to arrest[2] the Defendant outside of the post office on February 1, 2017. By the time of Defendant's arrest, federal agents intercepted a package originating from Hong Kong at the John F. Kennedy Airport. (Cellphone Warrant Aff. ¶¶ 8–9.) Following the interception of the packages, a field test performed on the contents therein indicated the presence of a controlled substance. (*Id.* ¶ 9(b).)[3] Further, the packages were addressed to the Defendant, who then called the post office to confirm their arrival and later retrieved a package from the post office. (*Id.* ¶¶ 10–13.). Under these circumstances, the law enforcement agents had probable cause to believe that the Defendant received controlled substances in the mail, therefore sanctioning the subsequent arrest.[4]

Although probable cause existed for the arrest, the excerpt of the transcript of the subsequent custodial interrogation provided to the Court raises concerns warranting a

---

[2] The Government concedes that the agents arrested Plaintiff as a matter of law. (Gov't Opp. 11 ("Under the totality of these circumstances, the defendant's arrest outside the Middletown post office was plainly lawful).").

[3] The Affidavit mistakenly identified the controlled substance in the package as fentanyl. A laboratory report eventually revealed that the package contained another controlled substance known as 4-ANPP. (Mirvis Aff., Ex. 5, Amended Laboratory Report 1.)

[4] Defendant also argues that the Government conceded, and that a Magistrate Judge found, that the agents lacked probable cause to arrest Defendant on February 1, 2017, during Defendant's bail hearing. This argument, however, is misguided. The Government's argument at the bail hearing was not a concession, nor did the Magistrate Judge independently find that the officers lacked probable cause to arrest Defendant. The Government intimated that "if [the agents] had probable cause to arrest him, they would have done so." (Mirvis Aff., Ex. 3, Transcript of Bail Hearing, March 31, 2017, at 12:23–25.) Later in the hearing, during the Defendant's argument, the Magistrate Judge echoed the Government's prior argument by noting "in order to get a search warrant, there must have been probable cause, which [the Government] has indicated they didn't have at that point." (*Id.* 19:10–12.) The Magistrate's statement during the bail hearing did not constitute a finding of fact or of law based on the entire record, nor did the Government make a concession.

suppression hearing.[5] Following the arrest, the law enforcement agents placed Defendant in handcuffs and transported Defendant in a police vehicle to the Middletown police station. (Def. Mot. 4.) At the station, the agents read Defendant his *Miranda* rights, and Defendant signed and initialed the warnings. Law enforcement agents then proceed to ask him for his phone number. During the conversation, Defendant purportedly asked for an attorney on two occasions.[6] After being asked for his phone number, and given his *Miranda* warnings, Defendant stated "invariably I have to ask for an attorney, I'm sorry, and I'm going to be arrested now?" (Def. Mot. 4.) Ruggieri told Defendant that he was not under arrest, but rather, was being detained. An HSI agent then asked for Defendant's cellphone number again, and Defendant obliged. Ruggieri then asked to search his phone, and Defendant agreed to let the agents search it. (*Id.* at 5.) Defendant told Ruggieri that the phone was a Samsung Galaxy S5 and confirmed his phone number yet again. Ruggieri provided a form for Defendant to consent to the search of his phone. Before signing it, Defendant asked if he could speak "to an attorney about this?" (*Id.*) Ruggieri replied that he did not have to consent. The remainder of the transcript was omitted by Defense counsel.

---

[5] Although a suppression hearing "'ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question'" *United States v. Nelson*, 193 F. App'x 47, 48 (2d Cir. 2006) (summ. order) (quoting *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)), here the Court is confronted with a situation in which a deficient record precludes the Court from making relevant findings of fact or law. The Government and Defense repeatedly rely on their unsworn statements made in their memoranda of law. "These attorney allegations cannot provide the Court with a basis for making a finding of fact." *United States v. Marquez*, 367 F. Supp. 2d 600, 603 (SD.N.Y. 2005). Therefore, the Court exercises its discretion and orders a suppression hearing in conformity with this Opinion. *See United States v. Andino*, 343 F. App'x 714, 716 (2d Cir. 2009) (noting that denials of a Defendant's request for a suppression hearing are reviewed for abuse of discretion).

[6] Defense counsel did not attach a copy of the transcript for this Court's review.

Here, it is unclear whether the agent's violated Defendant' right to counsel. Defendant was purportedly handcuffed, placed in a patrol car, transported to the police station, required to hand over his keys and wallet to officers, and read his *Miranda* rights. Under these circumstances, it is unclear if a reasonable person may not have believed that they were free to leave. *See United States v. Polanco*, No. 10 CR 627(RPP), 2011 WL 240140, at *7 (S.D.N.Y. Jan. 19, 2011) ("Although Officer Bakraqi told the Defendant he was being detained and that he was not under arrest, handcuffing has been 'generally recognized as a hallmark of formal arrest.'" (quoting *United States v. Newton*, 369 F.3d. 659, 676 (2d Cir. 2004))). Accordingly, if Defendant was subjected to a custodial interrogation and invoked his right to counsel, the agents would have been required to end their questioning immediately. *Gonzalez*, 764 F.3d at 165 (noting that once *Miranda* rights have been invoked, "interrogation must stop and the invocation must be 'scrupulously honored'" (quoting *Mosley*, 423 U.S. at 104)). Instead, the agents seemingly attempted to assuage Defendant's concerns by indicating that he was not under arrest. Although the officers told Defendant that he was not under arrest, the fact that Defendant was handcuffed, transported to the police station, and had his personal belongings confiscated at the police station, indicate that he may not have been free to leave, and was subjected to a custodial interrogation.

Therefore, the Court finds it necessary to hold a suppression hearing concerning the question of whether or not the agent's violated Defendant's right to counsel—thus possibly requiring suppression of certain statements—when, during the course of the February 1, 2017 interview, Defendant purportedly requested counsel on two occasions.[7]

---

[7] Defendant additionally asks this Court to suppress all of the information gathered during the February 1 interview. The Court, however, cannot make such a determination based on the record before it. Defendant merely provided a small, unofficial excerpt of the interview that

In any event, the Government posits that the exclusionary rule would not apply to some statements because the agents were in possession of some of the information disclosed by Defendant during the February 1 interview—namely his phone number and home address—prior to the arrest. *See Wong Sun v. United States*, 371 U.S. 471, 487 (1963) (noting that "the exclusionary rule has no application" when the government learns "of the evidence from an independent source.") (internal quotation marks omitted); *United States v. Vilar*, 530 F. Supp. 2d 616, 632 (S.D.N.Y. 2008) ("'When the challenged evidence has an independent source,' such evidence is not subject to the exclusionary rule because the "'exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'" (quoting *Murray v. United States*, 487 U.S. 533, 537 (1988))).

Here, the record is clear that Defendant provided the phone's contact call number when he first called the Middletown post office on January 31, 2017, to inquire about the status of the intercepted package. (Cellphone Warrant Aff. ¶ 11.) A post office employee called the number provided by Defendant and left a voicemail stating that the package was available for pick up. (*Id.* ¶ 12.) The Defendant called the post office to confirm that he would retrieve the package. (*Id.*) The record is also clear that the USPS Fulfillment Center had an active account on file registered to "Emeka Okparaeke" with his Middletown address as the address on file. (Gov't Opp., Ex. C, Aff. In Supp. of App. for Search and Seizure Warrant ("Residence Warrant Aff.") ¶ 22(a).) According to the Center's records, multiple stamp orders were placed on the account for amounts ranging between $75.75 and $7,599.25 worth of stamps. (*Id.* ¶ 22(b).) The stamp orders

occurred on that day, which the Court described above. Without more, the Court cannot ascertain what information was given to the agents and if any of the information violated Defendant's rights. Therefore, any statements that Defense counsel seeks suppression of should be placed on the record at the hearing.

were placed through the USPS website from an Internet Protocol address which was registered to "Emeka Okparaeke" at the Middletown address. (*Id.* ¶¶ 22(d)–23.) The officers knew, at a minimum, that Defendant purchased and sent thousands of dollars' worth of stamps to that address. Consequently, Defendant's motion to suppress the cell phone number and home address provided to the agents on February 1, 2017 is denied.

### B. Suppression of Cellphone Search Warrant

Defendant next argues that any evidence derived from the search of his cellphone pursuant to a search warrant should be suppressed because the warrant affidavit relied on the call number and the physical description of the cellphone provided to the agents on February 1. (Def. Mot. 14.) Defendant further argues that the warrant affidavit made a "clear and deliberate misrepresentation of material fact" when Ruggieri swore that the two intercepted packages contained fentanyl, when the lab reports show that the substance was actually 4-ANPP,a scheduled drug, and Acrylfentanly, which was not a scheduled drug at the time of the affidavit. (Def. Mot. 15.)

The Court finds that a suppression hearing is necessary for the determination of whether or not the evidence produced from the cellphone search warrant would have been inevitably discovered.

### i. Inevitable Discovery Doctrine

The inevitable discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). The doctrine "is available only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006). The inevitable discovery doctrine

requires the "district court to determine, 'viewing affairs as they existed at the instant before the unlawful search occurred, what would have happened had the unlawful search never occurred.'" *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (quoting *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992)).The Government "bears the burden of proving inevitable discovery by a preponderance of the evidence." *Id.* Proof of inevitable discovery "'involves no speculative elements but focuses on *demonstrated historical facts capable of ready verification or impeachment*.'" *Id.* (quoting *Eng*, 971 F.2d at 859).

The Government asserts that law enforcement would have inevitably recovered the evidence from Defendant's cellphone pursuant to a search warrant even if the Defendant had not been interviewed on February 1, 2017. (Gov't Opp. 21.)

The Government suggests, and the Court agrees, that it must prove four "contingencies" by a preponderance of the evidence. First, the Government needs sufficient probable cause to obtain a search warrant for the cellphone. Second, the Government needs to acquire sufficient information regarding the cellphone to satisfy the particularity requirement of a search warrant. Third, the Government needs to show that they would have been able to make the application for the search warrant before the evidence on the cellphone would have been destroyed. Finally, the Government needs to show that law enforcement would have subpoenaed the device information from the cellphone's carrier and sought the search warrant. (*Id.* at 21–23,)

Here, it is clear that law enforcement would have generated sufficient probable cause to obtain a search and seizure warrant for the cellphone. By the time of Defendant's arrest, law enforcement agents identified Defendant's cellphone number when he called the post office to inquire about the status of his package. (Cellphone Aff. ¶ 11.) Law enforcement agents were also aware that Defendant used his cellphone, on at least two occasions, in connection with the

intercepted packages when he called the post office. (*Id.* ¶¶ 11–12.) Further, based on the agent's experience and training, cellphones typically contain evidence pertaining to drug trafficking. (Cellphone Aff. ¶ 19.) In sum, law enforcement had probable cause to believe that Defendant used the phone in connection with the delivery of controlled substances, and would likely contain evidence of the suspected criminal activity. *United States v. Gatto*, 17–cr–0686 (LAK), 2018 WL 2465379, at *5 (S.D.N.Y. June 1, 2018).

Further, the Court has a high level of confidence that law enforcement would have sought a search warrant. First, the complexity of the investigation, which involved a multi-year collaborative effort between various federal agencies and a local state police department, would have incentivized the agents to subpoena Sprint had the agents not observed the brand and model of Defendant's cellphone at the February 1, 2017 interview. Second, law enforcement agents had probable cause to believe that the Defendant was using his cellphone in connection with the deliveries of controlled substances. Accordingly, their training and experiences dictated that the phone would likely contain evidence of the suspected criminal activity. (*See e.g.*, Cellphone Warrant Aff. ¶ 19.) An important next step in their investigation would have been to get a warrant for the cellphone—something that they, in fact, did. *C.f. Vilar*, 729 F.3d at 84 ("Indeed, we can be confident that this sequence is what would have happened, because it did happen.").

Under this record, however, the Court does not have a high level of confidence, nor has the Government proven by the preponderance of the evidence, that law enforcement would have gathered sufficient descriptive information to satisfy the warrant particularity requirement. As previously noted, the agents acquired Defendant's phone number when he called the post office concerning the arrival of his package. (Cellphone Warrant Aff. ¶ 11.) The Government, however, provides no evidence as to how they would have acquired any descriptive information

concerning the cellphone in satisfaction of the particularity requirement. The Government notes that in early February, 2017, a detective with the Fairfax County Police Department ("FCPD") ran the Defendant's cellphone number through a law enforcement database. The search revealed Sprint as the phone's service provider. (Gov't Opp. 22.) The FCPD detective then purportedly served Sprint with an order requiring the disclosure of subscriber information to the FCPD. Sprint disclosed identifying information such as the device's International Mobile Subscriber Identity ("IMSI"), the Mobile Station Identification Number (MSID"), and the Electronic Serial Number ("ESN"). Although this information would have likely provided sufficient descriptive detail to satisfy the particularity requirement, the Government provides no evidence showing that this in fact occurred.[8]

Finally, the Government posits that the speed at which Sprint produced the information in response to the FCPD subpoena proves, by the preponderance of the evidence, that the agents would have obtained the device's unique numerical identifiers before any destruction of the evidence occurred. Purportedly, Sprint produced the IMSI, MSID, and ESN numerical identifiers to the FCPD within three days of the subpoena being served. Had the federal law enforcement agents similarly subpoenaed Sprint on the day of the February 1 arrest, or even the following day, the Government argues, they would have received the identification numbers before the day they executed the cellphone warrant on February 7, 2018. Be that as it may, the Government again failed to provide any evidentiary support for these propositions.

Therefore, the Court cannot find that there is a "high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred."

---

[8] It bears noting that the Government did provide a copy of the Fairfax County warrant and supporting affidavit. (Gov't Opp., Ex. A.) However, there is nothing in the record regarding the results of the search.

*Heath*, 455 F.3d at 55. The Court finds it necessary, however, to address the evidentiary support of the inevitable discovery doctrine at the suppression hearing.

### ii.     False or Misleading Statements

Defendant also argues that Ruggieri offered "deliberate misrepresentation of a material fact" in the Cellphone Warrant Affidavit. (Def. Mot. 15.) Specifically, Defendant posits that Ruggieri swore that the package intercepted at the airport contained fentanyl, a schedule 2 substance, when the lab reports show that the substance actually contained 4-ANPP and Acrylfentanyl. (*Id.*) Given this misrepresentation, Defendant argues, this Court should "strike the misrepresentation from the affidavit" and find that the affidavit "clearly lacks probable cause" without it. (*Id.*)

It is well settled that there is a presumption of validity with respect to affidavits supporting a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In limited circumstances, "'a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the resulting search or seizure.'" *United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) (quoting *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005)). "One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). In order to trigger an evidentiary hearing concerning the alleged deliberate or reckless false or misleading information, a Defendant "must make a substantial preliminary showing that: (1) the claimed inaccuracies or omissions [in the affidavit] are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *Mandell*, 710 F. Supp. 2d at 372 (citation and internal quotations omitted). For

purposes of the first prong, a person acts with "reckless disregard for the truth" when "the affiant at least had reason to seriously doubt the truth of the allegations." *Id.* at 374 (citation and internal quotations omitted).

Defendant's application is denied because he does not make the substantial preliminary showing that Ruggieri's statement, although incorrect, was made either "knowingly and intentionally" or with "reckless disregard for the truth." *Mandell*, 710 F. Supp. 2d at 372. Defendant asks this court to infer that Ruggieri's statement was a clear and deliberate misrepresentation because he stated that the packages contained fentanyl instead of 4-ANPP (a scheduled drug) and Acrylfentanyl. Defendant's argument is misplaced. Although it is true that Ruggieri misstated the contents of the packages (*Compare* Cellphone Warrant Aff. ¶ 9(b) *with* Mirvis Aff., Ex. 5, Amended Laboratory Report 1.), there is nothing in the record, nor does Defendant provide a substantive reason, indicating that the discrepancy was the result of a deliberate falsehood or reckless disregard for the truth. Indeed, to warrant an evidentiary hearing, Defendant must make more than a conclusory attack on the affidavit. *United States v. Gayle*, No. 08 Cr 1244, 2009 WL 4667093, at *5 (S.D.N.Y. Dec. 8, 2009) (quoting *Franks*, 438 U.S. at 171). The allegations of deliberate falsehood or of reckless disregard for the truth must be accompanied by an offer of proof. *Id.* Here, the inference Defendant asks the Court to draw, without any evidentiary support, is unwarranted. Therefore, a *Franks* hearing is inappropriate with respect to the Cellphone Warrant.

### C.  Suppression of Evidence Recovered from 43 Envelopes

Defendant argues that the Court should suppress the 43 envelopes USPS set aside from the New Hampton, New York Post Office because the warrantless seizure of the envelopes was unreasonable. (Def. Mot. 35.) The Government posits that the Defendant abandoned the

envelopes and that, in any event, the warrantless seizure of the envelopes was not unreasonable. (Gov't Opp. 59.)

i.    <u>Abandonment</u>

The Fourth Amendment acknowledges a person's continued privacy interests in items placed in the mail. Indeed, a "sender or addressee of mail has a reasonable expectation of privacy in it because sealed mail is historically private." *United States v. Barrios*, No. 95 Cr. 524 (LLS), 1995 WL 728440, at *3 (S.D.N.Y. Dec. 8, 1995). It is well settled, however, that "'a warrantless seizure of property that has been abandoned does not violate the Fourth Amendment.'" *United States v. Davis*, 624 F.3d 508, 510 (2d Cir. 2010) (quoting *United States v. Springer*, 946 F.2d 1012, 1017 (2d Cir. 1991)). Seizures of abandoned property do not violate the Fourth Amendment because when "a person voluntarily abandons property [] he forfeits any reasonable expectation of privacy that he might have had in the property." *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990). "Abandonment is a factual determination that turns on the intent of the defendant, based upon all the relevant circumstances relevant to the seized property." *United States v. Aquino*, No. 09 CR 555(HB), 2009 WL 3208877, at *4 (S.D.N.Y. Oct. 7, 2009) (citing *Lee*, 916 F.2d at 818).

Here, the Government argues that Defendant abandoned the 43 USPS envelopes. Specifically, the Government posits that two days after Defendant dropped off the 43 envelopes, Postal Inspector William Lampey called the Defendant by telephone and inquired if the Defendant had recently mailed numerous Priority Mail envelopes by placing them in a USPS collection box outside a local post office. (Gov't Opp. 60.) The Defendant purportedly replied that he had in fact done so, but when Inspector Lampey asked the Defendant about the contents of the envelopes, Defendant purportedly declined to answer the question, denied the mailings,

and informed the Inspector that he had the wrong number. (*Id.*) Following that conversation and a subsequent investigation, the Postal Inspection Service determined that the 43 envelopes were non-mailable items, segregated them from the mail stream, and designated them for destructions. (*Id.* 61.)

Although these assertions, if true, would likely support a finding of abandonment, none of the facts are supported by the record. The Government does not indicate, nor does the Court see, where the record supports that such a conversation in fact took place.

The one fact that is supported by the record, however, is that the return address on the envelopes was not Defendant's known address. The return address was for an entity called "Middletown Sweets" which does not exist at the return address. (Packages Warrant Aff. ¶ 15(b).) Although this return address did not match any of Defendant's known addresses, there is nothing in the record indicating that Defendant could not have retrieved the packages at that location. Indeed, abandonment requires intentionality, and this Court refuses to infer such intentionality from Defendant having sent the package to an address that did not match his known addresses or because the named addressee did not exist. Under these circumstances, the Court has insufficient information to determine if Defendant had a legitimate privacy interest in the envelopes had they reached the return destination. Nevertheless, a suppression hearing is not warranted on this issue because the warrantless seizure was reasonable under the Fourth Amendment.

ii.     Reasonableness of Warrantless Seizure

Defendant argues that the length of the warrantless seizure was unreasonable under these circumstances. The Court disagrees.

Warrantless seizures are per se unreasonable under the Fourth Amendment. *Rudaj*, 390 F. Supp. 2d at 402. A warrantless seizure, however, may nonetheless be reasonable and valid if it meets "one of the recognized exceptions to the [F]ourth [A]mendment's warrant requirement." *Harrell*, 138 F. Supp. 3d at 489 (quoting *United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015)). Indeed, "'[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the [Supreme] Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.'" *United States v. Martin*, 157 F.3d 46, 53 (2d Cir. 1998) (citing *United States v. Place*, 462 U.S. 696, 701 (1983)).

Although definitions of probable cause vary, "'[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that [the] belief of guilt must be particularized with respect to the person [or property] to be searched or seized.'" *Dinler v. City of New York*, No. 04 Civ. 7921(RJS)(JCF), 2012 WL 4513352, at *3 (S.D.N.Y. Sept. 30, 2012) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Generally, probable cause is established when the "'totality-of-the-circumstances indicate a probability of criminal activity.'" *United States v. Urena*, No. 15cr0140 (DLC), 2015 WL 5729724, at *2 (S.D.N.Y. Sept. 30, 2015) (quoting *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999)). Probable cause for seizure of property exists when "'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime.'" *United States v. Herron*, 18 F. Supp. 3d 214, 224 (E.D.N.Y. 2014) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

Where, as here, a warrantless seizure is followed by a delay in securing a search warrant, Court's must conclude whether such delay is constitutionally unreasonable. When determining the reasonableness of a delay in seeking and attaining a valid search warrant following a warrantless seizure, a Court must look at various factors "including the length of time for which the individual was deprived of her or his property, any diminished interest in the property that the individual may have had, and whether the seizure affected the individual's liberty interests." *United States v. Howe*, 545 F. App'x. 64, 65–66 (2d Cir. 2013) (summ. order); *United States v. Mathews*, 18-CR-124 (JPO), 2018 WL 2277839, at \*3 (S.D.N.Y. May 17, 2018). Courts then analyze the government's interest in seizing the property in question and balances the competing interests. *Howe*, 545 F. App'x. at 66 (citing *Martin*, 157 F.3d at 54; *Illinois v. McArthur*, 531 U.S. 326, 331 (2001) ).

Here, the agents had sufficient probable cause for the warrantless seizure. USPS flagged the Defendant as a suspicious customer after postal workers observed him depositing large volume of mail in collection bins at the front of post offices around Middletown, New York, on multiple occasions. (Packages Warrant Aff. ¶¶ 12(a)–12(b).) Law enforcement agents, based on their training and experience, knew that people who used the USPS to mail contraband typically did so by depositing their mail in the collection bins in front of the post office because there are typically no security cameras there. (*Id.* ¶ 12(c).) USPS employees also observed Defendant purchasing bulk quantities of priority mail stamps. (*Id.* ¶ 12(d).) Further, Defendant appeared to deposit the packages by using latex-dipped gloves—a tactic commonly used by people shipping contraband in order to avoid detection. (*Id.* ¶¶ 12(b)–12(c).) Finally, the packages displayed the same return address as the packages sent to the FCPD officers by Fentmaster. (*Id.* ¶¶ 15(b), 16(c).) Under the totality of the circumstances, law enforcement agents had probable cause to

believe criminal activity was afoot, namely, that the Defendant was sending controlled substances through the mail.

Next, a recognized exception to the warrant requirement applies. *Martin*, 157 F.3d at 53. Here, not seizing the envelopes would have risked the loss or destruction of suspected contraband. *Id.* First, there was a danger that the suspected contraband in the envelopes would be either consumed, distributed, or discarded by the recipient. Second, there was a fear that the envelopes would be destroyed because USPIS workers had already deemed the envelopes inappropriate to enter the mail stream and had segregated them for destruction. Therefore, exigent circumstances justified the warrantless seizure of the envelopes.

Finally, the agents' delay in securing a warrant for the search and seizure of the envelopes was reasonable. In determining the reasonableness of the delay, the Court must look at various factors "including the length of time for which the individual was deprived of her or his property, any diminished interest in the property that the individual may have had, and whether the seizure affected the individual's liberty interests." *Howe*, 545 F. App'x. at 65–66; *Mathews*, 2018 WL 2277839, at *3. Courts then analyze the government's interest in seizing the property in question and balances the competing interests. *Howe*, 545 F. App'x at 66 (citing *Martin*, 157 F.3d at 54; *Illinois v. McArthur*, 531 U.S. 326 (2001)).

Here, the competing interests weigh in favor of the Government's delay. Defendant first dropped off the envelopes at the post office on November 7, 2016. (Gov't Opp. 59; Def. Mot. 35.) The investigating agents, however, did not find out about the envelopes until March 1, 2017, when Inspector Chery informed Inspector Ruggieri that the 43 envelopes may be related to his investigation of Defendant. (*See* Gov't Opp. 66; Packages Warrant Aff. ¶¶ 6(j)–6(k).) Inspector

Ruggieri then obtained the search and seizure warrant for the 43 envelopes on April 12, 2017—42 days after the March 1, 2017 seizure. (Gov't Opp. 61.)

A 42-day delay in securing a search and seizure warrant, without any other facts, would likely be unreasonable. Here, however, Defendant's possessory interest was diminished by sending the package through USPS. *Martin*, 157 F.3d at 54 (noting that when Defendant relinquished control of the subject property to a third party, namely UPS, "seizure is necessarily less intrusive."). Moreover, seizure of these envelopes did not restrain Defendant's liberty interest. *See Okparaeka*, 2018 WL 3323822, at *7.

Further, the government had a substantial interest in seizing the property in question. Law enforcement agents had probable cause to believe that Defendant was sending controlled substances through the mail. As previously noted, USPS workers flagged Defendant's recent activity as suspicious. (*See* Packages Warrant Aff. ¶ 12(a).) That same suspicious activity resembled that of people typically found to be sending controlled substances in the mail. (*Id.* ¶ 12(c).). Further, the return address on the envelopes was the same as the return address on the packages sent by Fentmaster to a FCPD officer who purchased controlled substances on the dark web. . (*Id.* ¶¶ 15(b), 16(c).)  Therefore, the agents had an interest in seizing what they had probable cause to believe were envelopes containing controlled substances. It is also of import that law enforcement agents did not stand idly by during the 42-day delay. The agents diligently investigated the case by conducting surveillance of the Defendant, executing a search warrant at his New Jersey and Middletown residences, arranging laboratory testing of suspected controlled substances recovered from Defendant's New Jersey residence, and interviewing employees of USPS stores, among other activities. (*See e.g.*, Gov't Opp. 69.)

Balancing the competing interests in this case, a 42-day delay in securing a search and seizure warrant was not unreasonable under the circumstances.

### D.  The GPS Warrant

Defendant next moves to suppress evidence derived from the Sprint GPS Warrant issued to Detective Nickolas of the FCPD. This Court, however, denied the same arguments raised in the instant motion in the Opinion dated July 5, 2018, and found no deficiencies in the issued warrant. *Okparaeka*, 2018 WL 3323822, at *8–10. The Court sees no reason why it should revisit its Opinion, nor does Defendant provide one. Therefore, Defendant's application is denied.[9]

### <u>CONCLUSION</u>

For the foregoing reasons, the Defendant's motion to suppress evidence is DENIED in part. The parties are directed to appear at the previously scheduled status conference on September 5, 2018, at 1:00 p.m.

The parties are also directed to appear for a suppression hearing on Wednesday, October 10, 2018 at 10:30 a.m. at the Charles L. Brieant United States Courthouse, 300 Quarropas Street, White Plains, NY 10601, Courtroom 218. The suppression hearing will be limited to the following issues: (1) whether agents violated Defendant's right to counsel at the February 1, 2017

---

[9] The Court notes that Defendant appears to raise a new argument in this motion, namely that Detective Nickolas did not "provide facts to establish that there was any connection between" the cellphone number provided to the Judge and the Defendant. The application for the search warrant, however, does include such facts. Detective Nickolas affirmed that the "person associated with the search warrant and target number, Chukwuemeka Okparaeke, is a suspect in the above referenced crimes and is believed to be in possession of a cellular device with the assigned number" provided. (GPS Warrant, Application for Sealing of Aff. and Search Warrant 1.)

interview; (2) the extent and nature of the statements made to agents during the February 1 interview; and (3) whether the search of Defendant's cell phone falls under the inevitable discovery doctrine.

The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 58.

Dated:  August 21, 2018
        White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge