# EXHIBIT A

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Final draft of dismissal motion
DATE: 02/12/2018 06:37:18 PM


I. Preliminary Statement.

The defendant, Chukwuemeka Okparaeke respectfully submits to the court a motion to dismiss counts 2 and 3 of an indictment handed down by a Grand Jury on April 12th 2017 because they fail to state an offense.

II. Introduction

The defendant was arrested pursuant to a criminal complaint on March 20th 2017 for conspiracy to distribute narcotics. He was indicted on April 12th 2017 on 3 counts alleging he conspired to distribute and possess with intent to distibute, attempted to import and distributed and possessed with intent to distribute various controlled substances and controlled substance analogues.

III. Argument

A. Counts 2 and 3, the various statutes and definitions

Count 2 of the indictment states, "the defendant, unlawfully did attempt to import into the United States from any place outside thereof a controlled substance... in violation of Title 21, United States Code, Sections 952(a), 960(a)(1), and 963...The controlled substance... was 100 grams and more... of acrylfentanyl, a controlled substance analogue... in violation of Title 21, United States Code, Section 960(b)(1)(F).

Title 21, section 952(a) states, "Controlled substance in Schedule I or II and narcotic drugs in Schedule III, IV and IV of title II; exceptions. It shall be unlawful to import into the customs territory of the United States of America... any controlled substance in Schedule I or II of title II, or any narcotic drug in Schedule III, IV or IV of title II..."

The term "controlled substance" is defined in section 802(6) of Title 21 as "a drug or other substance or immediate precursor in schedule I, II, III, IV or V."

The title II referenced in 952(a) refers to the Controlled Substance Act (CSA), codified at 21 U.S.C. Section 801. "In 1970, Congress enacted the Comprehensive Drug abuse prevention and Control Act. Title II of the Act, knowns as the CSA addresses drug control as administed by the Attorney General. Title III concerns import and export of controlled substances." United States v. Muse, 2007 U.S. Dist LEXIS 4601 (2nd Cir. 2007)

In the indictment, the compound (acrylfentanyl) is referred to as a controlled substance analogue. "The Analogue Act defines a "controlled substance analogue" as any substance "the chemical structure of which is substantially similar to [that] of a controlled substance in schedule I or II"(the chemical structure element), and "which has [an actual, claimed, or intended] stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than [that] of a controlled substance in schedule I or II" (the physiological effect element) 21 U.S.C. Section 802(32)(a)." United States v. McFadden, No. 13-4349 (4th Cir. Appeals 2016).

Under the Analogue Act, controlled substance analogues are treated as schedule I substances for purpuses of federal law if they are intended for human consumption 21 U.S.C. Section 813.

Section 952(a) references schedule I and II of title II. The original drug schedules are found in 21 U.S.C. Section 812, but the up -to-date schedule is kept in the Code of Federal Regulations, specifically section 1308 of title 21.

B. Count 2 is clearly legally insufficient and must be dismissed

The bar to dismiss an indictment is a high one because, "...an indictment need provide the defendant only a plain, concise and definite written statement of the essential facts constituting the offense charged." United States v. Post, 950 F.Supp. 2d 519 (2nd Cir. 2013). It is clear from reading the statute that governs count 2 that it only applies to any controlled substance in schedule I or II of title II and narcotic controlled substances of schedule III, IV and IV of title II. The compound that count 2 is centered around is acrylfentanyl, which didn't become a controlled substance till months after the offense and indictment.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

----------------------------------------------------------------------------------------------------

The indictment is clearly legally insufficient because it alleges a controlled substance violation surrounding a substance that wasn't scheduled. Even, assuming for the sake of argument, that particular statutes could encompass compounds not listed on the schedules, it would still be defective because it fails to set forth all the requsite elements of a controlled substance analogue offense  and an indictment, "must set forth elements of the offense to ensure that a defendant is charged only with the facts found by a Grand Jury," Russel v. United States, 359 U.S. 749. Nowhere on the indictment's 2nd count are 21 U.S.C. section 813's requirement for intention of human consumption.

C. Section 952(a) does not apply to controlled substance analogues

Congress intended 952(a) to apply to controlled substances only. This clear from any reading of the statute. "Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute... statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose. Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where a court typically finds a narrow interpretation appropriate.... Federal crimes are solely creatures of statute. A court declines to stretch or update statury words of plain and ordinary meaning..." United States v. Aleynikov, 676 F.3d 71 (2nd Cir. Appeals 2012).

In Aleynikov, the 2nd Circuit Court of Appeals, overturned a conviction after dismissing an indictment. It is clear that the court has dictated district courts only allow prosecution within the confines of a statute. It is clear that Congress wanted importation, attempted importation and conspiracy to import to be unlawful for substances that were already scheduled. Any other measures would create disparate results. For example, a police officer can arrest an importer of cocaine without violating due process rights because cocaine is expressly illegal. An arrest of someone attempting to import something that isn't illegal but defined as an analogue under 21 U.S.C. section 802(32)(A) would clearly violate the consitution because compounds defined as controlled substance analogues are not illegal under federal law merely for possession, manufacture or distribution.

D. The Analogue Act was targeted at distibutors and manufacturors, not at importers.

When crafting legislation that would become the Controlled Substance Analogue Enforcement Act of 1986, Congress clearly intended to prevent distribution of newly created drugs, not yet listed on the schedules but that have similar effects on teh human body. See United States v. Klecker, 348 F.3d 69 (4th Cir. Appeals 2003).

The Supreme Court came to the same conclusion; "In addressing the treatment of controlled substance analogues under federal law, one must look to the Controlled Substance Act, which, as relevant here makes it "unlawful for any person knowingly...to distribute...a controlled substance. The Controlled Substance Analogue Enforcement Act of 1986 extends the framework of the Controlled Substance Act to analogous substances."McFadden v. United States. 192 LED2D 260 2015.

Courts in the Southern District of New York have also come to the same conclusion. "Moreover, undertaking its own review of the legislative history, it concluded that "clearly, the targets of the statute were... ill-intentioned manufactorers and distributors of drugs that, when altered in their chemical structure resembled those that already been schedule." United States v. Roberts, 2001 U.S. Dist LEXIS 20577 (2nd. Cir 2001). "The purpose of the Analogue Statute can be gleaned from a closer examination of the legislative history, which in turn sheds light on the congressional intent. When the Senate version of the Analogue Statute was originally conceived, the stated purpose was "to prohibit persons who specifically set out to manufacture or distribute drugs which are substantially similar to the most dangerous controlled substances..."S. Rep. No. 99-196, at 5(1985).

"The analogue statute is directed at underground chemists who tinker with the molecular structure of controlled substances to create new drugs that are not scheduled." United States v. Forbes, 806 F.Supp.232 (10th Cir. 1992).

When the Third Circuit Court of Appeals examined the same legislation they concluded that, "The object of the Controlled Substance Analogue Enforcement Act of 1986 is to prevent underground chemists from producing slightly modified drugs...to make illegal the production of designer drugs...that otherwise would escape the reach of the drug laws...The Analogue Act's purpose is to make illegal the production of designer drugs and other chemical variants of listed controlled substances that otherwise would escape the reach of the drug laws. This was the goal-the only goal- announced by legislatiors during the debate on the House and Senate versions of the bill that became the Analogue Act. See, e.g., 131 Cong. Rec. 19114 (1985) (Statement of Sen. Thurmond)("This proposal will prevent underground chemists from producing dangerous drugs...);131 Cong Rec. 27311(1985) (Statement of Sen. D'Amato) (stating that the Analogue Act "closes the loophole in present law that allows the creation and distribution of deadly new drugs..."); 131 Cong. Rec. 32950 (1985) (statement of Rep. Lungren)("The focus of this proposal is clearly to impact on the designer drug phenomena by making it illegal for clandestine chemists to manufacture and distribute these substances." It is clear from the legislative record presented in United States v. Hodge, 321 F.3d 429, (3rd

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------------------------------------

Cir. Appeals 2002), that Congress never intended this legislation to prevent importation or their attempted importation.

E. Count 3 is legally insufficient.

Count 3, like count 2, is centered around acrylfentanyl. Count 3 of Okparaeke's indictment states, "From in or about January 2017...to February 2017...the defendant, intentionally and knowingly attempted to distributed and possess with intent to distribute...100 grams and more of acrylfentanyl. No where on the count does it allege that this was done with intent for human consumption. Since the controlled substance alleged to have been distributed wasn't a controlled substance, count 3 should be dismissed because it fails to state an offense. "Although the government is not required to set forth its entire case in the indictment, "if the specific facts" that are alleged "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation," the indictment fails to state an offense. United States v. Panarella, 277 F.3d 678 (3rd Cir. Appeals 2002).

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere; Okparaeke, Iveoma; Okparaeke, Okoro
SUBJECT: Attorney-Client Communications
DATE: 08/02/2018 12:56:26 PM


Fruit of The Poisonous Tree

Okparaeke moves the Court to suppress the fruits of the illegal GPS warrant issued to M.A. Nikolas. Okparaeke seeks the exclusionary benefit to suppress:

1. GPS data generated by SPRINT
2. Nikolas's testimony about surveiling Okparaeke on March 7 2017
3. Nikolas's testimony about March 7 2017 investigation at Harrison New Jersey Post Office
4. Evidence derived from trash pull done on March 7 2017 outside Okparaeke's Kearny NJ premises
5. Evidence derived from search of 344 Kearny Ave, #8 on March 20 2017
6. Evidence derived from search of 644 Silverlake Scotchtown Road Apt 15h on March 20 2017
7. Evidence derived from search and seizure of Okparaeke's 2009 Honda Accord on March 20 2017
8. Evidence derived from warrantless seizures conducted after Okparaeke's arrest
9. Evidence derived from April 12 2017 search warrant issued to Brad Ruggeri

Fairfax County detective M.A. Nikolas applied for a GPS warrant on February 24 2017. The GPS warrant allowed for tracking the GPS data pertaining to Okparaeke's cell phone for 30 days. (Def. First Mot. to Suppress, Exh. 2("GPS Warrant"), ECF No. 28) Most relevant here, the data from the GPS warrant revealed Okparaeke's location in New Jersey, where Nikolas surveilled Okparaeke, did a trash pull and investigated packages dropped off at a post office. (Gov't Sur-Reply to Def. Reply Mem of Law ("Gov't Sur-Reply")2, ECF No. 55) Using the evidence gathered by Nikolas, law enforcement arrested Okparaeke on March 20 2017 and engaged in various searches and seizures. Okparaeke moves the court to make inadmissible all of this evidence because the aforementioned evidence derived from Nikolas's illegal GPS tracking of Okparaeke.

The exclusionary rule bars from trial evidence that is obtained during or as a direct result of an unconstitutional seizure. Mapp v. Ohio, 367 U.S. 643 (1961). Evidence that flows from the initial illgality is considered "fruit of the posionous tree" and is subject to the exclusionary rule. See Wong Sun v. United States, 371 U.S. 471, 481-486 (1963). As the Supreme Court has recently observed, "the exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure," as well as evidence later discovered and found to be a derivative of an illegality, the so called fruit of the poisonous tree." Utah v. Strieff, 136 S.Ct., 2056, 2061 (2016).

The government in its response failed to state, via the preponderance of the evidence, that the aforementioned evidence would have been inevitably discovered or that they had an independent source for this information. Instead, the government said the aforementioned evidence was attenuated from the illegal GPS warrant. In determining whether the attenuation doctrine is applicable, courts consider the "temporal proximity" of the unlawful conduct and the discovery of the evidence, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04 (1975). Okparaeke will address all of these arguments in turn.

A. Temporal Proximity favors suppression

Temporal proximity weighs strongly in favor of suppression. In evaluating this factor, the pertinent question is whether there was sufficeint intervening time "to break the chain of illegality." United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987); Courts decline [] to find that this factor favors attenuation unless 'substantial time' elapses." Strieff 195 L. Ed. 2d 400 (2016). Here Nikolas GPS tracked Okparaeke's phone from February 24 2017 till March 2017. The trash pull, surviellance and post office investigation occurred on March 7 2017 and the searches of Okparaeke's premises and car occurred on March 20 2017. Based on these facts, Okparaeke finds the "chain of illegality" was not broken by a passage of time because Okparaeke's phone was still being tracked while the contested evidence was collected.

Okparaeke's reasoning in regards to temporal proximity is comparable to that of the Honorable William H. Pauley III in United States v. Lambis. In Lambis, the Court suppressed the fruits of a search done after the defendant consented to a search of his bedroom. In Lambis, the DEA used a stingray to ascertain which apartment a particular cell phone was located. This was done without a warrant. After the specific apartment was found, the DEA asked for consent to search Lambis's bedroom. The Court suppressed the search because the consent was within a few hours of the cessation of the illegal phone tracking. The Court also found, "...a surreptitious Fourth Amendment violation should reasonably extend the time necessary to dissipate the taint.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------------------------

Because neither Lambis or his father were aware of the DEA's use of the cell-site simulator, the DEA could have taken their time in securing consent without much risk that Lambis would dispense of contraband." 197 F. Supp. 3d 606, 613 (2016).

This facts in Lambis are comparable to the instant case. The evidence derived was obtained while Okparaeke's phone was still being tracked. Since there was no passage of time the temporal proximity factors weighs heavily toward suppression.

B. The Purpose and flagrancy of the official misconduct points towards suppression

The third factor of the attenuation doctrine - the purpose and flagrancy of the challenged law enforcement conduct - weighs towards suppression. The Second Circuit has approvingly noted that its "sister circuits have held that purposeful and flagrant police misconduct exists where '(1) the imporiery of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." United States v. Murphy, 703 F.3d 182, 192 (2d Cir. 2012)

The first factor of this two factor test for purposeful and flagrant police misconduct points toward suppression because M.A. Nikolas had to have known that the warrant affidavit utlized to GPS track Okparaeke was not supported by probable cause and that executing a warrant predicated on purposeful misstatements and omissions violated Okparaeke's Fourth Amendment rights. There is no question that a warrant affidavit predicated on conclusory allegations violates Fourth Amendment rights. See United States v. Rutherford, 71 F. Supp. 3d 386, 393 ("To uphold the execution of a search warrant merely upon the assertion of an officer... would be to legitmize the sort of unmediated police invasions...that the Fourth Amendment was adopted to prevent...The reckless or negligent conduct of the officers here is the type of conduct that can, and should be, deterred by the application of the exclusionary rule.") The warrant affidavit to track Okparaeke's phone does not state how Nikolas discovered the phone number, what its connection Okparaeke was, and what its connection to crime was. (Nikolas Aff. 4) Nikolas's affidavit could also be described as being bare bones because it was predicated on "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability and basis of knowledge." United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir. 1996).

In regards to the affidavit's lack of nexus, the impropriety is obvious. There is no question that probable cause requires a nexus among the thing to be searched, the things to be seizued, the suspect, and the crime. See Messerschmidt v. Millender, 565 U.S. 535, 546 (2012); see also Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 307 (1967)("of course, law enforcement must demonstrate "a nexus...between the item to be seized and criminal behavior.").

Nikolas, a detective with 13 years of law enforcement experience knew that the GPS tracking warrant affidavit failed to establish even the most remote nexus between Okparaeke and the phone. He also knew that his conclusory allegations were insufficient to establish probable cause. He still decided to execute the warrant instead of augment the faulty warrant afidavit. This trampling of Okparaeke's Fourth Ammendment rights was obvious.

The second factor of this two factor test for purposeful and flagrant police misconduct points toward suppression because M.A. Nikolas's impropriety was clearly investigatory. Nikolas utilized the illegal warrant to track Okparaeke's phone and utilized the information to surveil Okparaeke. This is clearly investigatory. Nikolas traveled from Virginia to New Jersey for this sole purpose.

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney-Client Communications
DATE: 08/06/2018 07:39:43 AM


Intervening Circumstances

When addressing the intervening circumstances of the attenuation doctrine courts must determine, "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 487-88. The lack of intervening circumstances counsels for suppression.

The evidence that Okparaeke wants to suppress are the direct evidence derived from the GPS warrant issued to M.A. Nikolas. The direct evidence includes evidence, both physical and testimonial, from the investigation and surveillance done on March 7 2017 on Kearny Ave New Jersey and at the Harrison New Jersey post office. There is no question that the GPS warrant was the "but-for" cause of the discovery of Okparaeke's location and this challenged evidence. See Hudson v. Michigan, 547 U.S. 586, 591 (2006)("But-for causality is only necessary not a sufficient cause for suppression" and "exclusion may not be premised on the mere fact that a constitutional violation was a 'but for' cause of obtaining evidence.").

The Government failed, completely, to establish via the preponderance of the evidence that there was an intervening circumstance between the issuance of the GPS warrant and the discovery of Okparaeke's location, trash pull, surveillance, and investigation at the Harrison New Jersey post office. The Government's position is that the evidence recovered on March 7 2017 attenuates the search of 344 Kearny Ave #8; this misses, or at least avoids, the fact that the evidence recovered March 7 2017 was the direct result of the illegal GPS warrant.

In support of the Government's erroneous position, the Government cited various cases that are irrelevant to the instant matter. First, the Government cites Mosby v. Senkowski, 470 F.3d 515, 522-23 (2d Cir. 2006). In Mosby, the Second Circuit addressed intervening circumstances that attenuated an illegal arrest and confession. (Id. at 522.) In that case, hours elapsed between an illegal arrest and confession. The appellant in Mosby was also given Miranda warnings. The Court ruled against suppression because, "Suppressing Mosby's confession would be unlikely to deter future police misconduct since the police -- at the time they entered 46 Costar to make a routine drug arrest -- could not have anticipated the fortuitous chain of events that ultimately connected Mosby to the homicides."(Id. at 523.) This is unrelated to the instant case. Okparaeke was never administered Miranda warnings and Nikolas was clearly investigating Okparaeke.

The Government also cited United States v. Bellamy, 592 F. Supp. 2d 308 (S.D.N.Y. 2009). In Bellamy, the court denied Bellamy's motion for suppressing a firearm found after an illegal stop because Bellamy "shouldered" one of the officers attempting to search him. The court ruled that since the gun was found subsequent to Bellamy's assault on officers the gun was admissible because the assault was an intervening circumstance that purged the taint of the illegal stop. This is not disputive in the instant case because Nikolas was never attacked by Okparaeke.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere; Okparaeke, Iveoma; Okparaeke, Okoro
SUBJECT: GPS Tracking Suppression Motion
DATE: 07/10/2018 08:43:14 AM


Okparaeke moves the Court to suppress the fruits of the GPS Warrant issued to M.A. Nikolas of the Fairfax County Police Department. After Nikolas obtained this warrant Nikolas was able to ascertain Okparaeke's location in New Jersey, surveil Okparaeke, do a trash pull, and investigate packages dropped off by him at a nearby United States Postal Service location.

Okparaeke moves the Court to suppress:

1. GPS data generated by Sprint
2. Testimony from Nikolas about surveiling Okparaeke on March 7 2017
3. Testimony from Nikolas about investigations done at the Harrison NJ post office.
4. Evidence derived from Nikolas's trash pull on March 7 2017
5. Evidence derived from the search of 344 Kearny Ave #8, Kearny NJ on March 20 2017
6. Evidence derived from the search and seizure of Okparaeke car on March 20 2017
7. Evidence derived from the search of Okparaeke's Middletown NY apartment
8. Evidence derived from the search and seizure of packages delivered to Okparaeke's Wappinger Falls NY UPS mailbox
9. Evidence derived from the search and seizure of mail and packages delivered to Okparaeke's address in Middletown NY
10. Evidence derived from a search warrant issued by Judge Davison on April 12 2017

Okparaeke moves the court to suppress this evidence because the warrant utilized to ascertain his location was supported by an application that no police officer could reasonably relied upon.

A. The affidavit failed to establish a nexus between Okparaeke and the phone number to be tracked.

M.A. Nikolas, a Fairfax County Police Department detective was issued a warrant that allowed him to track a phone with the number 908-596-0661. The number is mentioned once on the affidavit. (GPS Warrant, Aff. in Supp. of a Search Warrant (" Nik. Aff.")2.). Nikolas does not address how he came to know about this phone number and at no point did Nikolas provide facts to establish there was any connection between this phone number and Okparaeke or the crime that Okparaeke was purported to have been committing.

Comparable circumstances have resulted in suppression of evidence derived from GPS tracking a phone. In United States v. Moore, 2015 WL 8779926 (D. Minn. 2015) the Court suppressed the fruits of a phone tracking warrant because the warrant affidavit was so lacking in indicia of probable cause that it was objectively unreasonable to believe in its existence. The affiant, Deputy Williams wrote, "Your Affiant has learned that 'Hood' is currently using the cellular # identified as 952-xxx-xxxx to conduct narcotics trafficking." The Court suppressed the evidence gathered as a result of this warrant because it, "...provides nothing but conclusory statements regarding the relationship among the 952 phone, Hood, and the narcotics trafficking, it fails to "create a fair probability" that tracking the 952 Phone will lead to evidence of narcotics trafficking by Hood... Moreover, the lack of evidence-and the affidavit's deficiency- is obvious. Accordingly, Deputy Williams's belief in the existence of probable cause based on the affidavit was "entirely unreasonable" and the Leon Good Faith Exception doesn't apply." (Id.).

Like Deputy Williams, Nikolas failed to provide facts to support his allegation that the suspect was connected to the phone number. Nikolas's conclusion that, "...the records collected from Sprint as well as the disclosure of real-time location data, will aid in the location and what investigation of Chukwuemeka Okparaeke." (Nik. Aff. 5.), was utterly conclusory and could not have been used to establish probable cause.

Probable cause, under the Fourth Amendment, requires that a nexus be demonstrated between the items sought and the "particular place" to be searched. This protects against the issuance of general warrants, instruments reviled by the Founders who recalled their use by crown officials "to search where they pleased." Stanford v. State of Texas, 379 U.S. 476, 481 (1965). The warrant issued to M.A. Nikolas was clearly a general warrant because it failed to create any nexus between the phone to be tracked in real time and Okparaeke or any crime.

The issue of nexus and how it relates to probable cause is an issue that has been addressed by various courts. In United States v. Dutton, 509 Fed Appx. 815 (10th Cir. 2013), the 10th Circuit reversed the district court's decision denying Dutton's motion for suppression. "The fatal flaw in the search warrant here is that the supporting affidavit does not connect the place to be searched-the storage unit-with the defendant." This is comparable to the instant case; at no point does Nikolas connect the

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

-------------------------------------------------------------------------------------------------

thing subject to search, a phone with a specific phone number, to Okparaeke or to a crime. The decision in Dutton reaffirmed the holding that for good faith to exist, there must be some factual basis connecting the place to be searched to the suspect or suspected criminal activity. When this connection is absent, the affidavit and resulting warrant are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." United States v. Leon, 468 U.S. 923 (1984).

In cases in which courts have found search warrant affidavits to be lacking, such affidavits clearly "failed to link the suspect to the location to be searched..." United States v. Savoy, 889 F.Supp.2d 78, 90 (D.D.C. 2012). The Eighth Circuit confronted a similar situation in United States v. Herron, 215 F.3d 812, (8th Cir. 2000). The Court found, "Mr. Herron was never seen at the location where the marijuana was discovered...We do not think that a reasonable officer would believe that these facts established probable cause to search the Herron residence." The Ninth Circuit also found that a lack of nexus between the place to be searched and the suspect or criminal activity makes a warrant lacking indicia of probable cause. See United States v.Howe 848 F.2d at 139 (9th Cir. 1988).

In sum, the information included in the affidavit so inadequately articulated any connection between Okparaeke and the phone # to be tracked, and so thoroughly failed to provide a basis for that evidence of the purported drug distribution would be found by tracking Okparaeke's phone, that "any official belief in the existence of probable cause was "entirely unreasonable." Because Nikolas should have know that the affidavit failed to establish probable cause, the fruits of this search warrant should be suppressed.

B. The warrant affidavit was "Bare Bones"

Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause. See e.g. Spinelli v. United States, 393 U.S. 410, 418 (1969); Gates, 462 U.S. at 241. An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inference and conclusions; it is these facts that form the central basis of the probable cause determination. United States v. Ventresca, 380 U.S. 102, 108-09 (1965); Giordenello v. United States, 357 U.S. 480, 486 (1958);("The commissioner must judge for himself that the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime.")

When viewed in the totality of the circumstance, the affidavit here fails to provide a sufficient basis for probable cause. The affidavit in question is supported by allegations with nary a fact to support them.

First, the affidavit describes Nikolas's allegation that he had communicated with Okparaeke via the internet and that Okparaeke had offered to sell him drugs.( Nik. Aff. 4.). This is entirely conclusory. How does Nikolas know he spoke to Okparaeke via the internet? Were the communicating on a platform like Facebook, where Okparaeke was using his real name? Did Nikolas subpoena the platform that was utilized and determine the IP address was Okparaeke's? Nikolas provided not a single background fact to support this allegation and he could not conceivably have been used to support probable cause.

Nikolas next says that he brought Schedule 1 drugs from Okparaeke and that Okparaeke sent the drugs via the United States Postal Service ("USPS"). Again, this is entirely conclusory. Nikolas didn't detail a field test or lab test to give him a reason for believing that it was a Schedule 1 drug. Nikolas failed to say the drugs had a particular look or smell, that he, with 13 years of experience, could tell was indicative of controlled substances. Okparaeke would like the Court to notice how Nikolas provided no background details of these drug transactions. Did Nikolas meet Okparaeke in person and transact? Did they do the sales online? Nikolas provided nary a fact to support this allegation.

Nikolas concludes that multiple Schedule 1 drug packages entering the United States were identified because of "open source statements". This statement is vague to the point of being nonsensical. Nikolas failed to state how he knew they were drug packages, how he knew they were destined for Okparaeke, and how he knew Okparaeke made open source statements.

Nikolas's claim that Okparaeke lives and works in the geographical area from where the packages originated was also without support. Nikolas didn't tell Judge Azcarate how he knew where Okparaeke lived and how he knew the origin of the packages. Did Nikolas look at a DMV database to determine where Okparaeke lived? Did a confidential informant tell Nikolas about Okparaeke's location?

Nikolas also claimed that Okparaeke had a USPS account. Again, this is entirely conclusory. How does Nikolas know that Okparaeke has an USPS account? Nikolas didn't detail calling the USPS to inquire about an account in Okparaeke's name. He didn't detail how a CI told him that Okparaeke bought stamps online.

Nikolas concludes the substantive portion of his affidavit with an allegation of Okparaeke's maintenance of a "virtual currency

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

-------------------------------------------------------------------------------------------------

account. Nikolas never told Judge Azcarate about how he came to know about this account and how he knew the funds came from illicit sources. He also didn't say anything about how he knew Okparaeke operated on this supposed Underground Market. All he had to offer were conclusory statements.

C. Good Faith Exception

The Court in Leon identified four situations that per se fail to satisfy the good faith exception. In these situations, "the officer will have no reasonable grounds for believing that the warrant was properly issued." 468 U.S. at 922-92. The third situation, which we also refer to as a "bare-bones" affidavit applies in this case. The phrase "bare-bones" affidavit entered the legal lexicon in Illinois v. Gates,462 U.S. 213 (1983), which referenced the entirely conclusory affidavits in Nathanson v. United States, 290 U.S. 41 (1933) and Aguilar v. Texas, 378 U.S. 108 (1964).  Leon also used the term "bare bones" affidavit to describe an affidavit predicated on conclusory allegations. Moreover, in explaining the bare bones affidavit situation in particular, the Court in Leon stated, "[n]or would an officer manifest objective good faith in relying on a warrant based on affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923 (1984). This language makes it clear that when the affidavit itself lacks indicia of probable cause, simply looking at the affidavit in support of a search warrant would be sufficient to alert any reasonable officer that probable cause does not exist. Reliance upon a bare bones affidavit never reasonable.

First, at no point on the affidavit did Nikolas attempt to connect the phone number to Okparaeke. At the time the affidavit was prepared, the law was clear that the affidavit in support of a search warrant must, via factual circumstances, draw a nexus among the item subject to seizure, the thing to be searched, the crime and the suspect. See Messerschmidt v. Millender, 132 S.Ct. 1235, 1249-50 (2012). Nikolas did not connect the phone to be tracked to Okparaeke and thus it was objectively unreasonable for Nikolas to have believed the four corners of the affidavit in question was supported by the necessary probable cause.

Second, Nikolas's affidavit is not supported by a single fact. At the time of the application for search warrant, the law was clear the a warrant had to be supported by facts and not just conclusory allegations. Knowing this, Nikolas still decided to apply for a warrant utilizing nothing but averments devoid of even the barest kernel of factoid or circumstances. He failed to state how he knew Okparaeke had spoken to him via the internet. He failed to state how he knew that Okparaeke sent him drugs. He failed to state how knew Okparaeke had a "virtual currency account". He failed to state how he came upon Okparaeke's "known" handwriting samples.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

----------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere; Okparaeke, Iveoma; Okparaeke, Okoro
SUBJECT: Gps warrant suppression part 2
DATE: 07/10/2018 08:44:20 AM


He failed to state how he knew where Okparaeke lived and worked. He failed to state how he knew Okparaeke had a virtual currency account. He failed to state how he knew Okparaeke bought stamps. The Supreme Court has spoken; when an affidavit is as bare of fact as this one the court has only one option: exclusion.

An analysis of the totality of the circumstances establishes that reliance on this phone tracking warrant for 908-596-0661 was entirely unreasonable.

For the aforementioned reasons, Okparaeke respectfully requests the court to suppress all direct and indirect evidence procured as a result of this illegal warrant, or alternatively, to have an evidentiary hearing.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere
SUBJECT: Attorney-Client Communications
DATE: 03/21/2018 12:47:36 PM


A. The Samsung Galaxy S5 Warrant affidavit failed to establish Probable Cause that Okparaeke was distributing narcotics

On page 7 of his affidavit in support of searching and seizing Okparaeke's phone, Ruggeri claims, "... I respectfully submit there is probable cause to believe that Okparaeke is engaged in the Subject Offenses, and the evidence of this criminal activity is likely to be found on the Subject Device." The "Subject Offenses" were violations of section 841 and 846 of Title 21 (conspiracy to distribute and possess with intent to distribute 1 kilogram or more of fentanyl). The terms conspiracy and distribute are well defined in case law and the United States Code Service. "Conspiracy itself has been defined as an agreement or concert of action." United States v. Aloi, 511 F.2D 585 (2d Cir. 1974). The term distribute is defined in the USCS as, "... to deliver... a controlled substance or a listed chemical."

Ruggeri failed to establish that there was probable cause that Okparaeke was engaged in a conspiracy to distribute narcotics. "Probable cause is a compilation of facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." Michigan v. Defillipo, 443 U.S. 31 (1979). "The burden of establishing probable cause rests with the police, who must establish that there was a quantum of evidence which amounted to more than a rumor or suspicion, or even a strong reason to suspect." Travis v. Village of Dobbs Ferry, 355 F.Supp.2d 740, (2d Cir. 2005). Ruggeri failed to provide any evidence that Okparaeke was engaged in the distribution of narcotics, possession of narcotics with the intent to distribute, and a narcotics conspiracy. The affidavit details the interception of a substance that tested postive for fentanyl, a controlled delivery of the package and an interview of Okparaeke. The interview only gleaned the fact that Okparaeke used Privnote to learn about the package, that Okparaeke never met the individual who arranged for the packages shipment, and that Okparaeke routinely sent packages to an address in Ohio. It was objectively unreasonable for Ruggeri to think this added up to evidence that Okparaeke was engaged in a drug conspiracy. Ruggeri didn't have a controlled buy or any surveillance of Okparaeke engaging in drug sales. Ruggeri didn't have a cooperating coconspirator or a confidential informant claiming Okparaeke was engaged in drug dealing. On page 7 of the affidavit, Ruggeri claims, "...based on my training and experience, I am aware that like individuals engaged in any other kind of activity, individuals who engage in narcotics trafficking store records... on electronic devices such as the Subject Device." This may be true but is irrelevant in regards to Okparaeke because Ruggeri had no facts or circumstances to establish that Okparaeke was engaged in narcotics trafficking. The colloquial definition of "narcotics trafficking" is the buying of drugs from wholesale sellers and redistributing them for a profit. Courts have deemed cell phones "tools of the trade" of drug dealing but again, there were no facts and circumstances to lead Ruggeri to believe that Okparaeke was narcotics trafficking. There was no evidence that Okparaeke knew the box contained a controlled substance. Ruggeri did not present Judge Davison with evidence that Okparaeke acted in a suspicious manner (e.g. running from the police for example) that would be indicative of the fact that Okparaeke knew the package contained drugs. Ruggeri's belief that Okparaeke was engaged in the subject offenses was based on pure suspicion and not on the facts and circumstances required by the Supreme Court. See e.g. Illinois v. Gates.

B. There was no nexus between Okparaeke's phone and narcotics trafficking

Ruggeri's warrant to search Okparaeke's phone failed to provide any nexus between Okparaeke's phone and the drug distribution alleged to be occurring by Ruggeri. The affidavit to search Okparaeke's phone mentions that Okparaeke was called by the Middletown post office and Okparaeke had the phone near him when he was interviewed by federal agents. Ruggeri also stated that based on training and experience, Okparaeke's phone could access the internet. Never, on the affidavit, did Ruggeri connect the phone to the supposed narcotics trafficking via direct evidence. Ruggeri could have connected Okparaeke's phone to the crime without direct evidence because, "a showing of a sufficient nexus between the alleged criminal activities and the premises to be searched 'does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." United States v. Singh, 390 F.3D 168 (2d Cir. 2004). In relation to the phone, Ruggeri only referenced his training and experience to give Judge Davison the golden nugget of wisdom that Okparaeke's phone could access the internet. Every single phone sold in the United States since the introduction of the Iphone in 2007 has had the ability to access the internet as a standard feature; Ruggeri never told Judge Davison that Okparaeke accessed Privnote on his phone. Privnote could have been accessed from Okparaeke's desktop computer, his laptop computer, his tablet, his phone, and even his car dashboard. Ruggeri never explained why the phone's ability to access the internet would reveal evidence of the Subject Offenses. On page 6 of the affidavit Ruggeri writes, "During the interview of OKPARAEKE... OKPARAEKE had the subject device on or near his person." Okparaeke's possession of a mobile phone did not create a fair probability that a search of Okparaeke's phone would reveal evidence of a crime because cell phone use and ownership is near

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

-------------------------------------------------------------------------------------------------------

universal. The Supreme Court in Riley v. California, 134 S.Ct. 2473, made note of the hundreds of millions of mobile phones owned by Americans, "...more than 90% of American adults... own a cell phone... According to one poll... nearly three-quarters of smart phone users report being within five feet of their phones most of the time." There must be a "nexus between the items sought and the particular place to be searched." United States v. Clark, 638 F.3d 89 (2d Cir. 2010). Ruggeri's claim that Okparaeke's phone was near him and observation that the factory that produced it endowed it with internet browsing ability was insufficient to establish probable cause because, "Probable cause exists when there is a "fair probability that the premises will yield the objects specified in the search warrant." United States v. Muhammad, 520 F. Appx 31 (2d Cir. 2013).

C. The Good Faith Exception doesn't apply

The lack of probable cause doesn't end the inquiry. When a warrant is not supported by probable cause a reviewing court must consider whether or not the police officers executing the warrant acted reasonably.

In United States v. Herron, the Eighth Circuit held that the good-faith exception does not save a search warrant where the supporting affidavit provided no evidence of illegal activity at the address searched. United States v. Herron, 215 F.3d 812 (8th Cir. 2003). Other circuits courts have found police reliance on warrants entirely unreasonable where the supporting affidavits failed to demonstrate a nexus between the suspected criminal activity and the place to be searched. See e.g. United States v. Brown, 828 F.3d 375 (6th Cir. 2016)(concluding the district court erred in denying a motion to suppress and that reliance on the warrant was entirely unreasonable where the affidavit did not draw a "plausible connection to the residence" to be searched); United States v. Underwood, 725 F.3d 1076 (9th Cir. 2013)(affirming district court's suppression and concluding that the Leon exception did not apply where the affidavit provided "no factual basis for the conclusion that drug trafficking evidence would be found at [the defendant's] home."; United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005)(finding the Leon exception inapplicable where the affidavit lacked a "factual basis connecting the place to be searched to the defendant or suspected criminal activity" so that reliance on the warrant "was entirely unreasonable"); United States v. Laughton, 409 F.3d 744, (6th Cir. 2005)(reversing a district court decision based on the Leon exception were there was no "modicum of evidence, however slight, to connect the criminal activity to the place to be searched"). Like the aforementioned cases, Ruggeri failed to connect Okparaeke's phone to any criminal activity with direct evidence or by inference. Unlike the aforementioned cases, Ruggeri also failed to link Okparaeke to the crime for which evidence was being searched for. Ruggeri's belief that evidence of drug conspiracy would be found on Okparaeke's phone was based on pure suspicion because he had no facts or circumstances that Okparaeke had conjoined with another person to violate the narcotics laws of the United States, or facts or circumstances that Okparaeke was selling drugs.

As a direct result of the deficiency, the Good Faith Exception set forth in Leon does not apply. The warrant affidavit, which failed to provide facts and circumstances that Okparaeke was involved in drug trafficking and failed to connect Okparaeke's phone to the drug trafficking was "so lacking in indicia of probable cause that it was objectively unreasonable to believe in it's existence." United States v. Leon, 468 U.S. 897 (1984).

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney-Client Communications
DATE: 03/07/2018 06:23:57 PM


I. Evidence derived from the illegal seizure of Okparaeke's mail and packages should be suppressed

A. Introduction

Subsequent to the arrest of the defendant on March 20th 2017, United States Postal Inspection Service inspector Brad Ruggeri seized, without a warrant, various pieces of mail and packages sent to Okparaeke's Middletown New York residence, packages delivered to a UPS store mailbox registered to Okparaeke, and mail and packages that were at the Middletown New York post office. All of the seizures happened on March 23rd 2017 through the March 30th 2017.

Ruggeri eventually got a warrant on April 12th 2017 to search and seize the packages.

Okparaeke moves to suppress any and all evidence derived from these seizures because Ruggeri violated Okparaeke's Fourth Amendment rights by seizing his items without a warrant.

B. Discussion

The Fourth Amendment protects the rights of the people "to be secure in their person, houses, papers and effects, against unreasonable searches and seizures." U.S. Const., Amend IV

There is no question that Ruggeri seized Okparaeke's mail and packages. A seizure of property occurs for the purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interest in that property. See Soldal v. Cook County, Ill., 506 U.S. 56, 61 (1992). Ruggeri, seized Okparaeke's mail and packages the instant he took them into his custody. There is also no question that these seizures were without a warrant. Ruggeri was eventually issued a warrant by a federal judge on April 12th 2017 to search and seize the packages that were already seized in March 2017.

This ilegal seizure tainted the evidence derived from the April 12th 2017 search warrant. As the Supreme Court has recently observed, "the exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure," as well as "evidence later discovered and found to be derivative of an illegality, the so called "fruit of the poisonous tree." Utah v. Strieff 136 S.Ct. 2056 (2016). The evidence derived from these packages should be suppressed because, "The deterence interest that lies behind the exclusionary rule weigh strongly here. The police should know that there are exclusionary consequences when they engage in conduct that any reasonable law enforcement officer would know is a violation of the Fourth Amendment." United States v. Robertson, 239 F.Supp.3d 426, (2nd Cir. 2017). In Robertson, the court ordered the suppression of the fruits of a search warrant for a safe. The safe had been removed from an apartment without a warrant. The court ruled that the exigent circumstances exception to the warrant requirement didn't apply and that the plain view exception to the warrant requirement didn't apply. The police in this case claimed the safe was seized for safe keeping for two days. The court in Robertson found that the two day delay between getting the seizure and the search warrant was much more than necessary. In the instant case, the delay between getting a warrant for the various seizures that Ruggeri made was at least 12 days and as much as 19 days. There is no question Ruggeri could have gotten a warrant that allowed him, for a time period, to seize packages delivered to Okparaeke's residence and Wappinger Falls New York UPS store mailbox. Instead, Ruggeri decided to violate Okparaeke's Fourth Amendment right and seize Okparaeke's mail and packages without any judicial approval.

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere
SUBJECT: Attorney Client Communications
DATE: 02/22/2018 07:17:13 AM


I. Okparaeke is entitled to a Franks Hearing for the Sprint GPS warrant

On February 24th 2017, M.A. Nikolas was issued a warrant to GPS track the defendant in real time for 30 days. Without this warrant M.A. Nikolas, a detective for the Fairfax County Police Department, would have been unable to ascertain the defendant's location in New Jersey. The government has conceded this fact by not showing that it was inevitable for M.A. Nikolas or other law enforcement officers to have found Okparaeke in Kearny New Jersey or that M.A. Nikolas and law enforcement officers had an independent source of this information.

The defendant asks the court to grant him a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 171 (1978). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." United States v. Awadallah, 349 F.3D 42, 64 (2d Cir. 2003). The defendant must show via preponderance of the evidence that there were intentional misstatements or omissions in the search warrant affidavit and those misstatements were material. For a  misstatement or omission to be material it be must be necessary to the issuing judge's probable cause determination. The misstatement must be made with a reckless disregard for the truth. See United States v. Canfield, 212 F.3d 713,717 (2d Cir. 2000).

A. Nikolas showed a reckless disregard for the truth

In the first paragraph of page four of the GPS affidavit, Nikolas under oath and affirmation, told Judge Azcarate, "Your Affiant made contact with a suspect known as Chukwuemeka Okparaeke via the internet who offered to distribute schedule I drugs (18.2-248) into Fairfax County via the United States Postal Service (USPS). Over these months Your Affiant made multiple purchases of schedule I drugs from this suspect. Each time the suspect sent the drugs it was through the USPS..." In the third paragraph, M.A. Nikolas said, "The suspect has purchased thousands of Dollars in stamps during the time period Your Affiant has been purchasing drugs from him." This is the only criminal conduct mentioned in the 12 sentence long fourth page. While the defense in its pretrial motion and response to the government's opposition has argued that this warrant is so lacking in indicia of probable cause that it was objectively unreasonable to rely upon it, Okparaeke would also like to argue that the Affiant mislead the Judge Azcarate. First, at no point in time did Okparaeke communicate with Nikolas via the internet or any other medium. Okparaeke did not call, text, write letters, etc. with Nikolas. Nikolas's claim that he corresponded with Okparaeke via the internet is entirely conclusory and also reckless. Nikolas didn't email, instant message, video chat via skype, etc. with Okparaeke. This is without a doubt a reckless misstatement that showed a disregard for the truth.

Nikolas claims that he bought drugs from Okparaeke were also reckless because at no point in time did Nikolas exchange money for drugs with Okparaeke. These alleged "purchases from Okparaeke" are well documented in the Rule 16 material provided by the government. First, M.A. Nikolas logged on to a now defunct underground website which required the Tor Browser. He then uploaded bitcoins to the AlphaBay bitcoin address. Nikolas then went to the sales page of the vendor named Fentmaster. He purchased varying quantities of furanylfentanyl and U47700 from this vendor. When he ordered he encrypted his address with the vendors PGP key so that only the vendor could decrypt it to view. Then Nikolas clicked buy. The narcotics came in the mail. This was a completely passive process where Nikolas had not a scintilla of contact with Okparaeke; if any neutral and detached magistrate had known what Nikolas meant by his conslusory statement that he "bought" drugs from Okparaeke he or she would have never issued the warrant. Nikolas never contacted AlphaBay to inquire about the IP address Fentmaster was using so he could subpoena the provider of that IP address for subscriber information. Nikolas never got DNA or fingerprints from the packages that could be directly tied to Okparaeke. Nikolas never sent Okparaeke a traceable payment like check, money order, credit card payment, etc.. Nikolas never had even a scintilla of contact with Okparaeke. His statement that he bought drugs from Okparaeke was without a shadow of a doubt reckless.

B. The misstatements were material

Nikolas's misstatements were not only reckless, they were material. The affidavit to track Okparaeke was completely and utterly bare bones. While the affidavit is 6 pages, the substantive portion that isn't boiler plate is one 12 sentence page. Without the aforementioned reckless misstatements there would have been no way Judge Azcarate would have issued the warrant. Okparaeke invites the court to read the Nikolas affidavit without the reckless misstatements so they can come to their own conclusion.

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere
SUBJECT: Attorney-Client Communications
DATE: 03/27/2018 06:33:06 PM


Fruits of the search of Okparaeke's internet browsing history should be suppressed

In Okparaeke's first pretrial motion, Okparaeke moved to suppress the fruits of the search of the internet browsing history from his Samsung Galaxy S5 seized on February 7th 2017.

The scope of the search warrant was:

1. Evidence concerning the identity of the owner(s) or user(s) of the Subject Device;
2. Evidence concerning the identity or location of, and communications with, co-conspirators;
3. Records (including financial and postal records), calendar, and scheduling information related to the Subject Offenses; and
4. Photographs and videos related to teh Subject Offenses

The government, in its opposition to Okparaeke's motion argued that internet browsing history did not establish a nexus between the Subject Device and Okparaeke. Nowhere in the browsing history is a connection made between the Samsung Galxy S5 and Okparaeke. The government next called Okparaeke's browsing history a record. Ruggeri on the affidavit described records as, "logs of online "chats" with co-conspirators; email correspondance;  and contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts.... Individuals engaged in criminal activity often store such records in order to, among other things, (1) keep track of co-conspirators' contact information; (2) track information pertaining to expected shipments or deliveries of narcotics; and (3) keep an accounting of illegal proceeds..." Furthermore, Ruggeri defined chat as, "any kind of communication over the Internet that offers real-time transmission of text messages from sender to receiver...This feature distinguishes chatting from other text-based online communications such as Internet forums and email." Internet browsing history and the discussion forums Okparaeke frequented are clearly outside the scope of the warrant. Ruggeri when describing a record didn't use the phrases internet browsing history and internet forum and distinguished internet chats from forums like Reddit.com. Courts should look directly to the text of the search warrant to determine the permissible scope of an authorized search. See Groh v. Ramirez, 540 U.S. 551 (2004). "In determining the permissible scope of a search that has been authorized by a search warrant... we must look to the place that the magistrate judge who issued the warrant intended to be searched..." United States v. Voustianiouk 685 F.3d 206 (2d Cir. 2012). Internet browsing history went unmentioned and it is clear from the affidavit and attachment that internet browsing history was distinguished explicitly from chats and records.

Even if Ruggeri exceeded the scope of the warrant, courts may address if the evidence found may be admissible under the Good Faith Exception. When assessing whether evidence found outside the scope of the warrant should be admitted, the question the court must ask is: "Would a reasonable police officer have believed that this was within the scope of the warrant?" The government cannot rely on this exception because Ruggeri knew that the first search warrant didn't authorize a search of his browsing history because he explicitly included it on Attachment A of the April 12 search warrant to search Okparaeke's phone that was seized incident to his arrest.  In the affidavit of the April 12th warrant, Ruggeri wrote, "I have learned from the cellphone's browsing history that OKPARAEKE frequently visited the website Reddit.com, which among other things allows users to post comments and engage in discussion forums." Knowing that Okparaeke routinely visited Reddit.com on his first phone, Ruggeri explicitly included browsing history on Attachment A. The defense can only infer by the explicit inclusion of browsing history that Ruggeri knew that internet browsing history wasn't a record or "evidence concerning the identity of the user(s) or owner(s) of the Subject Device. It was unreasonable for Ruggeri to exceed the scope of the warrant and search Okparaeke's Reddit.com posts when he explicitly excluded forums on the affidavit. A reasonable police officer would have done what Ruggeri did on his second warrant application and include internet browsing history specifically. Ruggeri flouted the particularity requirement and engaged in a general search of Okparaeke's phone when the Honorable Judge Davison only permitted a limited search.

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney-Client Communications
DATE: 03/27/2018 06:40:49 PM


Okparaeke is entitled to suppression of the November Packages

In the government's response to Okparaeke's first pretrial motion the government alleged Okparaeke didn't establish standing because Okparaeke's affidavit was conclusory. In response to this, Okparaeke submitted a new affidavit establishing standing over these packages, the packages delivered to his home subsequent to his arrest, and the pacakges delivered to a UPS store in Wappinger Falls NY.

The government also alleged Okparaeke had abandoned the packages. At no point in time was Okparaeke contacted by United States Postal Inspection Service Inspectors. M.A. Nikolas received a court order for a Okparaeke's toll records. On November 9th, the day that Okparaeke was supposedly called by USPIS, Okparaeke communicated twice with a Red Lobster and once (for only 34 seconds) with a phone number from Michigan. The government's contention is clearly false; at no point in time did Okparaeke abandon the contested packages.

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney-Client Communications
DATE: 03/10/2018 09:11:37 PM

Hello Mr. Mirvis,

Please add to the last motion, " An alternative basis for suppressing the evidence derived from Ruggeri's illegal seizures of Okparaeke's mail and packages is that these seizures were the indirect result and derivative evidence of Nikolas's GPS warrant. Without the illegal GPS warrant, Nikolas would not have found Okparaeke's Kearny Avenue premise. There would have been no March 20th 2017 search of this location."

Thanks,

Emeka Okparaeke

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere
SUBJECT: Attorney-Client Communications
DATE: 03/20/2018 08:54:33 AM


Ruggeri's search of Okparaeke's Internet Browsing History was not in Good Faith

In Okparaeke's first pretrial motion, Okparaeke moved to suppress the fruits of the search of the internet browsing history from his Samsung Galaxy S5 seized on February 7th 2017.

The scope of the search warrant was set forth on an attachment as:

1. Evidence concerning the identity of the owner(s) or user(s) of the Subject Device;
2. Evidence concerning the identity or location of, and communications with, co-conspirators;
3. Records (including financial and postal records), calendar, and scheduling information related to the Subject Offenses; and
4. Photographs and videos related to the Subject Offenses

The government in its opposition to Okparaeke's motion argued that Okparaeke's browing history fell into categories (1) and (3). In Okparaeke's response to the government's opposition, Okparaeke argued that the internet browsing history did not establish a nexus between Okparaeke and the Subject device (and thus wasn't in category 1) and clearly wasn't any type of record because the Affiant described records as logs of online chats, email correspondence, contact information, telephone numbers, email addresses, account names and handles for instant messaging and social media accounts. Courts should look "directly to the text of the search warrant to determine the permissible scope of an authorized search." United States v. Bershchansky, 788 F.3d 102 (2d Cir. 2014). "In determining the permissible scope of a search that been authorized by a search warrant... we must look to the place that the magistrate judge who issued the warrant intended to be searched..." United States v. Voustianiouk, 685 F.3d 206 (2d Cir. 2012). The court should look directly to the text of the search warrant to determine the permissible scope of an authorized search. See Groh v. Ramirez, 540 U.S. 551 (2004).

Even if Ruggeri exceeded the scope of the warrant, the court may address if the evidence found as may be admissible under the Good Faith Exception. In the instant case, the Government cannot rely on this exception because Ruggeri knew that the first search warrant did not allow for a seach of internet browsing history because he explicitly included internet browsing history on Attachment A of the April 12th search warrant to search Okparaeke's phone which was seized incident to his arrest and various packages Ruggeri seized without a warrant. Internet browsing history is not included on the Attachment A of the warrant issued by Judge Davison on February 7th 2017. In the affidavit of the April 12th warrant, Ruggeri wrote, "I have learned from the cellphone's browsing history that OKPARAEKE frequently visited the website Reddit.com, which, among other things allows users to post comments and engage in discussion forums." Knowing that Okparaeke routinely visited Reddit.com on his first phone, Ruggeri explicitly included internet browsing history in the packages warrant so he could lawfully search for posts to Reddit.com and other discussion forums so he could build a stronger case against Okparaeke. Okparaeke can only infer from the inclusion if internet browsing history on the second warrant, Ruggeri knew that internet browsing history is not a record or evidence concerning the identity of the user(s) or owner(s) of the subject device. Ruggeri, knowing that the first search warrant was just to search and seize videos, pictures, messages, email, etc. acted unreasonably when he searched Okparaeke's Samsung Galaxy S5 for internet browsing history.

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney Client Communications
DATE: 02/18/2018 03:27:16 PM

Hello Mr. Mirvis,

Here is a better response to the government's position that the Reddit posts were within the scope of the warrant.

In the government's response, they argued that Okparaeke's reddit posts fell well within the scope of the search warrant for his phone. In regards to "1. Evidence Concerning the identity of the owners or users of the subject device" the government alleges that the story contains numerous autobiographical references to Okparaeke as a "former doctor turned darknet drug trafficker." Nowhere on the story is it written that Okparaeke owns a cell phone with the number 908-596-0661. The story is mum in regards to who owns the Samsung Galaxy S5.

The government nexts asks the court to consider the story a record. This is odd because Attachement A says "3. Records (including financial and postal records), calendar and scheduling."

The government contention that this could conceivably include fiction stories is fantastical at best. On the search warrant affidavit, Ruggieri writes, "such records can include, for example, logs of online "chats" with co-conspirators; email correspondence; and contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts... such records in order to... (1) keep track of co-conspirators contact information; (2) track information pertaining to expected shipments or deliveries of narcotics; and (3) keep an accounting of illegal proceeds for purposes of, among other things, dividing proceeds with co-conspirators." It would be inapposite of any definition of the word record to consider a fiction story as a record of anything. The story obviously has no dates, times, shipping numbers, payments, etc. that could have been utilized to further a narcotics conspiracy. Also, the story includes police officers on the payroll of drug dealers, a co-conspirator (Okparaeke has no co-conspirator), etc..

Thanks,

Emeka Okparaeke

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney Client Communications
DATE: 02/21/2018 09:21:45 AM


A. The warrant to search Okparaeke's phone was not supported by probable cause

On February 3rd 2017, Ruggeri was issued a search warrant to search Okparaeke's Samsung Galaxy S5 for evidence of "violations of Title 21, United States Code Sections 846 and 841(b)(1)(A)(conspiracy to distribute and possess with intent to distribute 1 kilogram or more of fentanyl).

The probable cause justifying the search of Okparaeke's phone was succintly stated by the Affiant as, "I am aware the Subject Device has internet browsing capabilites through which an internet-based application such as Privnotes could be used." Ruggieri's reference to Privnote came from, "Okparaeke stated that he had received a message through Privnote, which is an internet-based messaging service that allows users to send encrypted messages, which self-destruct upon being read." (page 6 of affidavit). Essentially, Ruggeri's reason for believing that a search and seizure of Okparaeke's phone would reveal evidence of a Conspiracy to distribute and Possess with intent to distribute narcotics was the fact that it could access the internet. At no point on the affidavit did Ruggeri connect the phone to any crime. The impetus of the search was Privnote, an internet based application capable of being accessed from any internet connected desktop computer, laptop computer, tablet computer, smartphone, and smartwatch. Ruggeri failed to tell Davison if Okparaeke accessed Privnote from his own computer at home, a work computer, friend's tablet at a cafe, etc..

The lack of nexus between the phone and subject crimes was so apparent that it was objectively unreasonable for Ruggeri to believe that the four corners of the affidavit had even the most bare scintilla of probable cause. "All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." United States v. Falso, 544 F.3d 100,122 (2d Cir. Appeals 2008). The defense would like the court to look at a recent Second Circuit district court case, United States v. Rickard, 2012 U.S. Dist LEXIS 193437 (2d Cir. 2012). In Rickard, the court ordered suppression of evidence because the Affiant failed to link the thing to be searched with criminal activity. "In the instant case, the record reflects no information connecting the illegal activity to the place to be searched... A reasonably objective police officer should have known that more was needed to establish probable cause." Like the affiant in Rickard, Ruggeri failed completely to connect the object of the search warrant to criminal acts. The Tenth Circuit of Appeals has also found that a warrant that fails to connect the thing to be searched to a crime is "so lacking in indicia of probable cause that it is objectively unreasonable to believe in its existence." United States v. Leon, 468 U.S. 897 (1984). In United States v. Cordova, 792 F.3d 1220, (10th Cir. Appeals 2015), the court affirmed the district court's suppression order because the warrant affidavit failed to sufficiently link criminal activity with a domicile subject to search. "Given the sparse connection between Cordova's current home and ongoing or recent criminal activity, we conclude officers acted unreasonably..."

The warrant to search Okparaeke's phone failed completely to establish probable cause for the subject offense, Conspiracy to distribute and possess with intent to distribute 1 kilogram of fentanyl. "Conspiracy itself has been defined as an agreement or concert of action." United States v. Aloi, 511 F.2d 585 (2d Cir. Appeals 1974). Nowhere on the warrant affidavit does Ruggeri mention Okparaeke working with others to distribute narcotics. The affidavit doesn't mention narcotics transactions, trafficking, sales, etc.. The warrant affidavit fails completely to create a colorable argument that there was an intent to sell the fentanyl let alone a conspiracy to do so. "Evidence of drug use or mere possession cannot be used to prove that the defendant possessed...a drug with intent to distribute because the relationship between the two are so attenuated." United States v. Underwood, 725 F.3d 1076 (9th Cir. Appeals 2012). The defense would like the court to compare this affidavit to the affidavit in Underwood. In Underwood, the Ninth Circuit Court of Appeals affirmed the suppression of 33 kilograms of cocaine and $417,000.00 in cash because the warrant lacked indicia of probable cause. Like Ruggeri, the affiant in Underwood failed to create a nexus between the thing to be searched and narcotics distribution. Ruggeri's conclusions about those distributing drugs- which was based exclusively on Ruggeri's opinion were foundationless as to Okparaeke. Hence they could not be used to support a finding of a fair probability that drug distribution would be found on Okparaeke's phone.

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

----------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney-Client Communications
DATE: 02/11/2018 11:51:11 AM


Reddit posts were made from his home IP address; (4) recovered evidence from trash the defendant disposed of outside his Kearny drug premises...; and (5) collected evidence regarding 79 envelopes that the defendant had dropped off at a Harrison New Jersey post office nearby his Kearny drug premises..."

First, the government attempts to mislead the court by saying (4) and (5) are intervening circumstances when they are really the fruits of the contested GPS warrant. To remind the court, M.A. Nikolas would never have been able to ascertain the defendant's location without this GPS warrant. The government has given nary any indication that it was inevitable that they would discover Okparaeke's Kearny premise or that they had another source of this information (the inevitable discovery doctrines and the independent source doctrines, respectfully). Without this GPS warrant, Nikolas would not have been able to travel from Fairfax County Virginia to Kearny New Jersey to surveil Okparaeke, go through his trash and go to the post office he had just left. These are without question fruits of the GPS warrant and not intervening circumstances. Without this information, 344 Kearny Ave, #8 would not have been searched subsequent to Okparaeke's arrest on March 20th. "In applying the attentuation doctrine, the Supreme Court has long instructed courts to consider three factors to determine whether evidence should be suppressed as a result of prior police illegality... (citing Brown v. Illinois, 422 U.S. 590, 95 (1975)). These three factors - known as the Brown factors - include; (1)" the temporal proximity between the unconstitutional conduct and the discovery of evidence followed the unconstitutional conduct (2) "the presence of intervening circumstances", and (3)" the purpose and flagrancy of the misconduct..." United States v. Robertson, 239 F.Supp.3d 426 (2nd Cir. 2017). To include evidence gathered as a direct result of the Sprint GPS warrant as also an intervening circumstance inapposite of every federal court that has examined this issue.

The other three tidbits gathered didn't intervene in between the GPS warrant and the discovery of Okparaeke's location. The defense questions the government's contention that 43 packages mailed in Middletown New York on November 8th 2016 could have attenuated the taint of a GPS warrant issued February 24th 2017 when a warrant wasn't issued till April 12th 2017 to open the packages. The defense also questions the contention that subpoena returns that show that Okparaeke posted to Reddit from his home in Middletown New York could have justified a search in Kearny NJ. Since Okparaeke's online activity isn't criminal in upon itself (unlike downloading or distributing child pornography) this couldn't conceivably have attenuated the taint of the Sprint GPS warrant. In a last ditch effort to save the fruits of the Sprint GPS warrant, the government says that Mr. Nikolas bought drugs from Okparaeke on AlphaBay. First, Nikolas never emailed, called, texted, etc. Okparaeke. There was no direct communication where Okparaeke revealed his identity to Nikolas. For an intervening circumstance to truly attentuate the taint of a contested search or seizure it must break the causal chain. The governments assertion that this broke the causal link is objectively incorrect.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------

FROM: 78867054
TO:
SUBJECT: Motion to suppress "Sprint GPS Warrant" part 1
DATE: 10/19/2017 12:31:53 PM

I. INTRODUCTION AND BACKGROUND

Defendant Chukwuemeka Okparaeke seeks to file a motion and suppress any direct and indirect evidence gathered as a result of the Real Time Location Data warrant issued to M.A. Nikolas on February 24 2017.

Defendant Chukwuemeka Okparaeke was indicted, in April 2017, on 3 counts alleging he distributed, attempted to import and conspired to distribute various controlled substances and controlled substance analogs.

The Real Time Location Data warrant was issued to a Fairfax County detective so that he could turn the defendant's cell phone into a tracking device. The affidavit supporting the warrant is a bare bones affidavit because it contains only "suspicions, beliefs or conclusions without providing some underlying factual circumstances regarding veracity, reliability and basis of knowledge." US v. Laughton 409 F.3d, 748-49 (6th Cir. 2005).

The defendant alleges that without this illegal warrant, the detective from Virginia would have been unable to locate him on March 7th 2017 and create probable cause to arrest him. The defendant contends the warrant was issued illegally and any testimony about observations and any subsequent search warrants are "fruits of the poisonous tree" and are there for subject to exclusion.

The defendant also alleges that the warrant was issued after the detective mislead the county judge and the county judge was acting as a rubber stamp for the police.

II. STANDARD OF REVIEW

The defendant asserts a 4th Amendment right in his real-time location data. The defendant owned the cell phone tracked by the Fairfax county detective and had the phone number in question for more than a decade. If asked to do so, he will furnish the court with an affidavit stating as much.

On two occasions in 2016, the 2nd Circuit Court of Appeals ruled that there was a reasonable expectation of privacy in real time location data being emitted from a mobile phone. In US v. Carabello, 831 F.3d 95 (1/27/16), the 2nd Circuit Court of Appeals ruled that exigent circumstances allowed for warrantless access to a phone's real time location data because the police were hunting for the killer of a woman and were worried about additional violence. In US v. Gilliam, 842 F.3d 801, (9/29/16) the court ruled that exigent circumstances in regards to rescuing a young girl from the violence of interstate sex trafficking allowed for warrantless GPS tracking of the suspect's phone: "Exigent circumstances justified GPS tracking of defendant's cell phone without a warrant where, based on discussion with the foster mother, social worker, and biological mother mother, law enforcement officers had a substantial basis to believe the defendant was engaged in prostituting a missing child across state lines... The government assumes for purposes of this appeal that cell phone users have a reasonable expectation of privacy in [location] information under the 4th Amendment... We make the same assumption."

When addressing the sufficiency of an affidavit, "All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." US v. Falso, 9/24/07, 2nd Cir. Appeals. Add citation

III. Discussion

The defendant argues that the affidavit was insufficient to provide a substantial basis for the magistrate judge to find probable cause to issue the warrant because it was the type of affidavit described in US v. Leon, 468 US 897, 1984, as a bare bones affidavit.

First and foremost, the affidavit fails to establish a nexus between the phone number to be GPS tracked in real time, 908-596-0661 and the suspect. The phone number is mentioned only once on the affidavit on the first boiler plate page. Nowhere on the six page affidavit does M.A. Nikolas mention any connection between this phone number and the defendant. Does the suspect own a phone with this phone number? Does he subscribe to the phone provider with this number? Does one of his compatriots or cosconspirators use a phone with this number? How did the affiant come to find out about this number? Any number of questions arise from the warrant affidavit's complete absence of nexus between the suspect and the phone number.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

-------------------------------------------------------------------------------------------------

This lack of nexus cripples the affidavit: 'to qualify for the good faith exception," "there must be some factual basis connecting the place to be searched to the defendant or suspected criminal activity. When this connection is wholly absent, the affidavit and resulting warrant are so lacking in indicia of probable cause" as to render official belief in its existence entirely unreasonable." US v. Gonzales 399 F.3d 1225 (3/1/05). "There appear to be few cases granting motions to suppress on the basis of the third exception of Leon (that the affidavit was so lacking as to render reliance entirely unreasonable). However, the causes appear to include situations where, for example, the affidavit failed to link the suspect to the location to be searched..." US v. Savoy 889 F.Supp.2d 78 (9/5/12).

Appellate courts have routinely suppressed evidence when the evidence was found subsequent to a warrant issued without a nexus between the defendant and the thing to be searched. In US v. Dutton, 509 Fed Appx. 815 (10th Cir. Appeals, 2/6/13), the appellate court suppressed the fruits of a search: "the fatal flaw in the search warrant here is that supporting affidavit does not connect the place to be searched... with the defendant... Here too there needed to be some "factual basis connecting the place to be searched to the defendant or suspected criminal activity. Because such a factual basis was missing, there was not a "minimal nexus between the place to be searched and the suspected criminal activity."

The 2nd Circuit has also reached the same conclusion that evidence must be suppressed when a warrant affidavit fails to create a nexus between the suspect and thing to be searched. In US v. Rickard, 2012 US Dist LEXIS 193437, the court ruled: "the search warrant in this case was not based upon probable cause. Probable cause under the 4th amendment, requires a nexus be demonstrated between the items sought and the place to be searched...Here, the police failed to make any connection between the person known as "A", the individual who allegedly sold the CI crack cocaine and the premises to be searched.

Second, the warrant in question is supported by an entirely conclusory affidavit that failed to provide any factual basis for the judicial officer to determine the presence of probable cause. In Giodenello v. US, 1958, (citation omitted) the Supreme Court ruled, "The commissioner must judge for himself the persuasiveness of the facts relied on by complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that person whose arrest is sought has committed a crime." In Illinois v. Gates, 1983, (citation omitted), the Supreme Court reaffirmed that conclusory affidavits were insufficient to establish probable cause, "it does not suffice to provide, "a mere conclusory statement that gives the [factfinder] virtually no basis at all for making a judgment regarding probable cause."

Wholly conclusory affidavits have been condemned and their rubber stamping by lazy judicial officers reviled. In 2014, a court in the Second Circuit suppressed evidence because the affidavit was based on conclusory assertions, "To uphold the execution of a search warrant merely upon the assertion of an officer..would be to legitimize the sort of unmediated police invasions of homes that the fourth amendment was adopted to prevent... the reckless or negligent conduct of the officers here is the type of conduct that can, and should be deterred by application of the exclusionary rule." 71 F.Supp.3d 386, US v. Rutherford (2nd Cir. 12/2/14)

The suspected criminal activity of the suspect is limited to the first paragraph of M.A. Nikolas's affidavit: "Your affiant made contact with a suspect known as Chukwuemeka Okparaeke via the internet who offered to distribute Schedule 1 drugs (18.2-248) into Fairfax County via the United States Postal Service (USPS). Over these months Your Affiant made multiple purchases of Schedule 1 drugs from the suspect. Each time the suspect sent the drugs it was through the USPS... " These are nothing but conclusory allegations devoid of any factual basis. First, how does the detective know that the suspect was the one he communicated with online? Did he subpoena the online platform that the communications went through to see IP addresses and then subpoena the internet service provider of that IP address? Was the online profile used for communications in the name of the suspect? How does he know he is purchasing anything from the suspect? Did he send the suspect a check? Cash in an envelope? Gold? Etc..? How does he know the "drugs" were sent by the suspect? Did he surveil the suspect to determine this? How does he know the drugs he received are schedule 1 drugs? Did he do a field test or did he send them to a lab for testing? The affidavit is entirely conclusory and, "Conclusions of the affidavit unsupported by underlying facts cannot be used to establish probable cause." US v. Cervantes 703 F.3d 1135, 1139-40 (9th Cir. 2012)

The detective makes a handful of other allegations and fails to provide a factual basis for nary a one. In the second paragraph the detective claims that, "Through open source statement by the suspect, Your Affiant was able to identify multiple schedule 1 drug packages entering the United States destined for the suspect." and "The handwriting on the labels was consistent with the unique handwriting of the suspect." What is the factual basis of any of this? What is an open source statement and how does he know that the suspect made one? How does he know the suspect was receiving Schedule 1 drug packages? Did he do a field test or lab test on these packages? What is the basis for him concluding that the handwriting of the suspect was consistent with the defendant's? Is he a trained expert in handwriting analysis? What are the known handwriting samples of the suspect and how did he come to possess them?

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------

The detective than alleges the suspect has a USPS account which he has used to purchase thousands of dollars worth of stamps. How does he know this? This is an entirely conclusory assertion without nary a fact to back it up. To conclude his entirely conclusory affidavit, he alleges the existence of a "virtual currency account" and says the suspect is using this account to launder funds. What are the factual circumstances for this accusation? What is a virtual currency account? Which company maintains it? Is the suspect's name on the account? His social security number? How does he know these funds are coming from "underground websites"? What is his basis of knowledge?

These conclusory assertions have been found to have the same weight as anonymous tips: 'In US v. Thomas, we noted that a conclusory allegation by law enforcement that a particular house was a suspected narcotics stash house, was entitled to little (if any)" weight in determining whether officers had satisfied the lower reasonable suspicion standard required to stop a vehicle leaving the house. 211 F.3d 1186 9th Cir. 2000. We explained that the conclusory allegation, without any foundational facts, was akin to an anonymous tip, and consequently, was entitled to little weight...Here as in Thomas, Hankel's statements amount to nothing more than conclusory assertions. Hankel failed to provide any underlying facts as to why he, or any other officers, suspected the house was "a narcotics stash location." While Hankel's training and experience are to be considered "it is incumbent upon the arresting or searching officer to explain the nature of his expertise or experience and how it bears upon the facts which prompted the officer to arrest or search.'

The defendant hopes the court to look to a recent case that involved the suppression of evidence gathered as a result of a cell site location information warrant. In US v. Williams 2016 161 F.Supp 3d 846 the court suppressed the fruits of this warrant because the affidavit in support of the warrant failed to provide indicia of probable cause. Like the aforementioned case, M.A. Nikolas fails to give any reason why he thinks searching the phone's location data would reveal evidence of a crime. The Williams court derided the affidavit as an affidavit devoid of probable cause because: "There is nothing in the affidavit indicating A.Gilton had previously been involved in crimes similar to the one being investigated (or any crimes at all). Nor is there an opinion from an investigating officer stating that, based on his or her experience in similar cases, he or she believed that evidence of the homicide would be found in A. Gilton's cell phone data. Sergeant Watts did not state, for example, based on

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------------------------

FROM: 78867054
TO:
SUBJECT: Motion to suppress "Sprint GPS Warrant" part 2
DATE: 10/19/2017 12:30:01 PM

his training or experience with other cases involving the killing of a minor's boyfriend, he believed that evidence of the killing would be found in the minor's relative cell phone data. Rather he stated that "based on [his] investigation, there appears to be probable cause..." Nikolas claims that the affidavit shows probable cause that GPS tracking the phone number in question will lead to the investigation and location of the suspect yet fails to create any nexus between the phone number and the suspect and fails to provide a single factual circumstance proving criminal conduct on his behalf.

IV Conclusion

The defendant moves to suppress evidence gathered as a direct or indirect result of the Sprint Real Time Location Data warrant. Specifically he seeks to suppress:

1. Any and all testimony from Detective M.A. Nikolas about observations made on Kearny Ave one March 7th 2017, the March 7th 2017 trash pull and observations at the Harrison NJ post office.

2. The March 20th 2017 search of 344 Kearny Ave, Unit #8

3. The March 20th 2017 search and seizure of a White 2009 Honda Accord with a license plate of HAV 7230

4. The April 12th 2017 search of packages with the return address Middletown Sweets...

5. The March 20th 2017 search of 644 Silverlake-Scotchtown Road, Apt 15h

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney Client Communications
DATE: 02/20/2018 01:56:58 PM


I. Okparaeke is entitled to suppression of all the evidence found at 344 Kearny Ave, #8

In the government's opposition, the government claimed that Okparaeke wasn't entitled to the exclusion of evidence found at 344 Kearny Ave because it was far too attenuated from the cellphone search warrant and GPS warrant. Okparaeke seeks suppression because, "As the primary judicial remedy for detering Fourth Amendment violations, the exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relelvant here, "evidence later discovered and found to be derivative of an illegality." Segura v United States 468 U.S. 796. The defense seeks to suppress: 1) Observations made by the M.A. Nikolas on March 7th 2017; 2) Trash pull done by M.A. Nikolas on March 7th 2017; 3) Observations at Harrison New Jersey Post Office; 4) March 20th 2017 search of 344 Kearny Ave

These seizures are in no way related to the Samsung Galaxy S5 warrant executed on February 7th 2017. Nikolas could have not found Okparaeke in Kearny NJ without the use of GPS technology. In the governments response to Okparaeke's motion for suppression, the government failed to provide facts to establish via preponderance of the evidence that it was inevitable that Nikolas would have found Okparaeke's location or that they had an independent source of this information (the inevitable discovery doctrine and the independent source doctrines).

A. Time did not attenuate the findings at 344 Kearny Ave, #8

"The Supreme Court has identified three factors that guide the attenuation analysis: (1)"the temporal proximity" between the unconstitutional conduct and the discovery of evidence; (2) "the presence of intervening circumstances'; and (3) "the purpose and flagrancy of the official misconduct." Utah v. Strieff, 136 S. Ct 2056 (2016)

The government argued that the findings at 344 Kearny Ave #8 were attenuated by temporal proximity. This is false because the GPS warrant allowed for continous 30 day location monitoring. The warrant was issued February 24th 2017 and returned March 23rd 2017. The search happened on March 20th 2017. The government has utterly failed to show that temporal proximity attenuated the search of 344 Kearny Ave #8 by the preponderance of the evidence.

B. Intervening Circumstances don't attenuate the search of 344 Kearny Ave #8

In a last ditch attempt, the government identifies five intervening circumstances that attenuate the link between the illegal Sprint GPS warrant and its indirect fruit, the search of 344 Kearny Ave #8. The government cites Utah v. Strieff to support their position. In Strieff, the Supreme Court held that the discovery of an outstanding arrest warrant attenuated an illegal detention sufficiently to dissipate the taint. "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." In support of their contention the government mentioned 5 intervening circumstances.... (please add these Mr. Mirvis). First, 4) and 5) are not intervening circumstances but are fruits of the illegal search warrant. Mr. Nikolas would not have been able to ascertain Okparaeke's location in Kearny New Jersey without the Sprint GPS warrant. There would have been no trash pull, surveillance, etc. without this warrant. These are the direct fruits of this ilegal warrant.

The government alleges, "intervening circumstances frustrate a direct causal link between the challenged warrants and the Kearny search warrant." (Government page 50). The remaining three intervening circumstances had nothing to do with searching 344 Kearny Ave, #8. The defense scratches its head at the contention that 43 packages dropped off at a post office in Orange County New York in November 2016 could have attenuated a March 2017 search in Kearny New Jersey when the packages were unopened till April 2017. The defense also questions whether noncriminal Reddit posts being posted from a Middletown New York apartment could have attenuated a search 70 miles away when the posts were noncriminal (unlike posting child pornography). It is also an open question whether or not Ruggieri and investigating officers knew that these posts were made in Okparaeke's Middletown domicile; on the criminal complaint issued March 17th 2017, Ruggieri never mentions an IP address. He examined Okparaeke's Facebook and DMV records to make his case that Okparaeke was the person posting. This fact was also unmentioned during the bail hearing when The Honorable Margeret Smith asked the government if they were sure if Okparaeke had made these posts.

The last intervening circumstance mentioned by the government are purchases made from Fentmaster on Alphabay, a now defunct Darknet Market. The government asks the court to consider these online orders as significant to dissipate the taint of

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------------------------------

the illegal GPS warrant. These orders didn't involve the Kearny premise in anyway, shape or form. Nikolas didn't mail a letter of cash to Okparaeke at this premises. An IP address wasn't identified that linked back to this premise. Nikolas simply clicked purchase on his computer.

C. The final factor in the attenuation analysis points toward suppress

The last factor of the attenuation doctrine "the purpose and flagrancy of the official misconduct" points in the favor of the defense. M.A. Nikolas showed a reckless disregard for the truth when he told Judge Azcarate that he communicated via the internet with Okparaeke to discuss narcotics distribution in Fairfax County Virginia. He also mislead via omission when he told Judge Azcarate that he had bought drugs from Okparaeke. The government has proffered not even a scintilla of evidence that Nikolas emailed, texted, skyped, etc. Okparaeke at any time. The discovery is bereft of even the scantest communication between Okparaeke and Nikolas. This is not negligence by Mr. Nikolas but a sheer attempt to mislead a neutral magistrate. Nikolas said he bought drugs from Okparaeke. He never sent Okparaeke cash, gold, etc. via the mail in exchange for drugs. He never went to an Ebay page maintained by Okparaeke or an Amazon page maintained by Okparaeke to make a purchase. He never contacted Okparaeke by any one of the litany of social media platforms to arrange a purchase. What Nikolas did was open the Tor browser and log in to a particular underground website. He then uploaded bitcoins to the wallet maintained by the website. He placed an order after including an address encrypted with the vendors key. This could not be conceivably described as buying anything from Okparaeke. Fentmaster, the moniker Okparaeke is alleged to have used on this underground website isn't used in the affidavit at all. At the time, Nikolas had a weak case based on mere suspicion. He had no fingerprints or DNA of Okparaeke on the packages. The stamps were untraceable and the return addresses were unlinked to Okparaeke. There is no way that he could have told Judge Azcarate in good faith that he was buying anything from Okparaeke. "The exclusionary rule exists to deter police misconduct." Davis v. United States, 564 U.S. 229 (2011). "The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterence, that is, when it is purposeful or flagrant." Strieff.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney-Client Communications
DATE: 02/11/2018 11:51:06 AM


I. Nikolas could not have relied upon the Sprint GPS warrant in Good Faith

In the government's response to Okparaeke's motion to suppress, the government argues that there was sufficient indicia of probable cause and if there wasn't, the warrant was supported by the requisite facts to prevent it from being described as a Bare-Bones Affidavit.

The fruits of this search warrant are the: (1) Observations made by M.A. Nikolas on Kearny Avenue on March 7th 2017, (2) March 7th 2017 trash pull, (3) Observations made by Nikolas at the Harrison New Jersey post office, (4) March 20th 2017 search of 344 Kearny Ave, (5) Search and seizure of a 2009 Honda Accord, (6) March 20th 2017 search of 644 Silverlake Scotchtown Road, #15h

It would have been impossible for M.A. Nikolas to ascertain Okparaeke's location without this warrant and these fruits should be excluded because they are the direct result of an illegal warrant.

A. The Sprint GPS warrant affidavit failed to create the requisite nexus between the phone number and Okparaeke

In the opposition to Okparaeke's motion, the government states, "Nor is there any question in the GPS affidavit that the cell phone for which real time location data is sought belongs to the defendant..." (Government opposition page 37). The phone number is on page 2 of the GPS affidavit, "...demanding Sprint,... shall forthwith furnish agents of the Fairfax County Police Department electronic communications records and assistance, pertaining to cellular/wireless phone number 908-596-0661...Based on the facts adduced in this affidavit, there is probable cause to believe the requested data will provide for the location and investigation into Chukwuemeka..." (GPS affidavit page 2). This is the only time that the number is mentioned; at no point does Nikolas provide facts that would have provided a nexus between the phone number and Okparaeke.

Okparaeke would like the court to compare and contrast the Nikolas affidavit to the affidavit for GPS tracking submitted by Deputy Williams in the case United States v. Moore, 2015 U.S. Dist LEXIS 167606 (8th Cir. 2015). In that case, the court suppressed the fruits of a phone tracking warrant because the affidavit was wanting in probable cause. On the affidavit, the affiant wrote, "Your Affiant has learned that 'Hood' is currently using the cellular # identified as 952-xxx-xxxx to conduct narcotics trafficking. Your affiant believes 'Hood' uses it to facilitate narcotics trafficking." The court ruled that the evidence gathered as a result of the execution of this warrant because it, "provides nothing but conclusory statements regarding the relationship among the 952 Phone, Hood, and the narcotics trafficking, it fails to "create a fair probability" that tracking the 952 Phone will lead to evidence of narcotics trafficking by Hood... Moreover, the lack of evidence-and the affidavit's deficiency- is obvious. Accordingly, Deputy Williams's belief in the existence of probable cause based on the affidavit was "entirely unreasonable," and Leons' Good Faith Exception doesn't apply."

Unlike M.A. Nikolas, Deputy Williams at least made a conclusory allegation that the suspect was in some shape and form related to the suspect and narcotics trafficking. Nikolas's affidavit is magnitudes weaker than the aforementioned affidavit because he failed to connect the phone number to Okparaeke via even the most scant allegation. If Judge Azcarate were operating above a constitutionally impermissible rubber-stamp he/she would have asked, "what is the significance of this number", or "how did you come to find out about it"?

Time in and time out, federal courts have found that a nexus between a phone number and suspect or crime is required for warrants to track phones in real time. "After reviewing the March 11 Donovan affidavit, the court concludes that the affidavit provided, under traditional probable cause analysis, a sufficient basis for the magistrate judge to find probable cause to issue the warrant...the court finds that under the prevailing probable cause standard, a substantial basis existed to find probable cause that Carlos Powell was a drug dealer and that tracking his cell phone would lead to evidence of a crime." United States v. Powell, 943 F.Supp.2d 759 (6th Cir. 2013). "In the context of a ping warrant, the place to be searched is the subject phone, and the item to be seized is location data...considered three factors in concluding that the GPS monitoring of a cell phone was supported by probable cause: the existence of criminal activity, a link between the person whose phone was to be tracked and that criminal activity, and whether location information would likely reveal evidence of the crime... As to the nexus between the Samsung Galaxy and the defendant, the affidavit's representations that the defendant provided the Samsung Galaxy number to his probation officer and answered the phone in response to a ruse call are sufficient to establish that it was likely that he would be carrying the phone..." United States v. Christian, 2017 U.S. Dist LEXIS 80251 (4th Cir. 2017). "These facts demonstrate that

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------

Defendant was the user of the target cell phone and was involved in a DTO [drug trafficking organization] under investigation. Nothing more was needed to obtain the information sought by the government."United States v. Myles, 2016 U.S. Dist LEXIS 55328. It is clear from reading the various cases that address this technology that courts require there to be factual circumstances that link the phone to be tracked via GPS technology to the suspect. When this connection is lacking the Good Faith Exception doesn't apply.

B. The warrant affidavit was Bare-Bones

In the government's opposition, the government alleges that, the affiant made multiple purchases of controlled substances from a suspect over the internet who shipped the drugs to the affiant through USPS and that the suspect has been identified as Chukwuemeka Okparaeke." Nikolas did not offer Judge Azcarate factual circumstances that would have provided a substantial basis that Okparaeke was involved in the distribution of drugs. He simply alleged, " Your Affiant made contact with a suspect known as Chukwuemeka Okparaeke via the internet who offered to distribute schedule I drugs... into Fairfax County via the United States Postal Service. Over these months Your Affiant made multiple purchases of schedule I drugs from this suspect. Each time the suspect sent the drugs it was through the USPS..." (GPS affidavit page 4). In United States v. Rutherford, a court in the 2nd Circuit suppressed the fruits of a search because the Affiant only offered the judge a conclusory allegation that a gun was "illegally" held. "The warrant and application contained no facts that the judge could have interpreted in reaching a reasoned conclusion that the guns alleged to be in the apartment were unlawfully possessed. The warrant thus indicated that the issuing judge had abandoned her judicial role insofar as she relied on Officer Fernandez's conclusory assertion..." United v. Rutherford, 71 F.Suppt.3d 386 (2nd Cir. 2014). Like in the Affiant in Rutherford, Nikolas offered nothing but allegations that he bought schedule I drugs from Okparaeke. First, how does he know he spoke to Okparaeke on the internet? Did he subpoena the web platform for the IP address of a specific user, subpoena the internet provider of that IP address and discover this IP address belonged to Okparaeke? How does he know that they are Schedule I drugs? Are they drugs like marijuana that have a particular look and smell that he, with his decade of experience, could tell was indicative of a controlled substance? Or did he send it to a lab for testing? How did he know that Okparaeke mailed the package? Did he surveil Okparaeke and watch him go to the post office? Did he send Okparaeke money and then trace the money to Okparaeke's account?

The government then alleges that Nikolas provided the judges with these facts, (i) a comparison of the handwritten drug package labels with a handwritten drug package labels with a handwriting sample from the defendant,(ii) the fact that the defendant lived and worked in the geographic area from which the drug packages were sent, (iii) the fact that packages containing controlled substance had entered the country destined for the defendant,(iv) the fact that the defendant maintained an online account with USPS.,(v) the fact that the...and (vi) the fact virtual currency was moving from AlphaBay - the site through which undercover purchases were made - to a virtual currency account maintained in the defendant's name.

First, Nikolas never told Judge Azcarate the factual circumstances behind his claim that, "Your Affiant was able to compare known handwriting samples from the suspect to the packages Your Affiant received with handwritten labels. The handwriting on the labels was consisted with the unique handwriting of the suspect" (GPS affidavit page 4) What is this handwriting sample? How did he come to view the handwriting sample?  He failed to provide the underlying facts behind his conclusion and, "Conclusions of the affidavit unsupported by underlying facts cannot be used to establish probable cause." United States v. Cervantes, 703 F.3d, 1135, 1139-40 (9th Cir. 2012).

Second, Nikolas didn't provide Judge Azcarate with the facts supporting his allegation that Okparaeke lived and worked in the area from which packages came from. He simply says, "Your Affiant confirmed that the suspect lives and works in the geographical area from where the packages originated." What is his basis of knowledge for the whereabouts of Mr. Okparaeke's employment and home?  How does he know where the packages came from?  All the judge had was Nikolas's word and "In other words a "bare-bones" affidavit amounts to a "take my word for it affidavit" that states only the affiant's belief that probable cause existed." United States v. Young, 2010 U.S. Dist LEXIS 15103.

Third, the government alleges the affiant told the judicial officer, "the fact that packages containing controlled substance had entered the country destined for the defendant." What Nikolas actually wrote was, "Through open source statements by the suspect, Your Affiant was able to identify multiple schedule I drug packages entering the United States for the suspect." These are not facts but just more allegations from Nikolas. What is an open-source statement? How does he know the defendant made it? How did he identify multiple schedule 1 drug packages entering the United States for Okparaeke? Did he field test them or send them to a lab for confirmation? This, "conclusory statement without more do not provide a substantial basis for finding probable cause." United States v. Orozco, 2004 U.S. Dist LEXIS 2886 ( 7th Cir 2004).

Contrary to the lie spewed by the government, Nikolas never mentioned AlphaBay or a virtual currency account with Okparaeke's name on it. He said, "Through a virtual currency account maintained by the suspect, Your Affiant learned that the suspect is engaged in the movement of funds in and out of the online marketplace where is operating the business of

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------

distributing drugs." How does he know its Okparaeke's account? He never told Judge Azcarate that Okparaeke's name or social security number was on the account.  Time in and time out, bare bones affidavits akin to this one have spelled doom for the fruits of the search because, "Issuing a warrant supported by mere conclusory statements that gives the magistrate virtually no basis at all for making a judgment regarding probable cause would be contrary to rights secured by the 4th Amendment." United States v. Cordero-Rosario, 786 F.3d 64 (1st Cir. Appeals 2015)

C. The fruits of the GPS warrant should be suppressed because they are not attenuated by temporal proximity.

In the government's opposition, they allege that the 4 week period between the issuance of the phone tracking warrant issuance and the search at Kearny Ave attenuates the fruits. Okparaeke objects to this clear attempt to mislead the court. The Sprint GPS warrant allowed for continuous GPS monitoring of Okparaeke for 30 days subsequent to its issuance. The discovery of its fruits were well within this time period and thus aren't attenuated by temporal proximity.

D. The fruits of the GPS warrant should be suppressed because they are not attenuated by intervening circumstances.

In their last attempt to save the fruits of the Sprint GPS warrant, the government "identifies" 5 intervening circumstances that generated probable cause for the search of 344 Kearny Ave, #8, "(1) learned about the 43 packages and gathered evidence... (2) made multiple undercover purchases of controlled substances from the defendant on Alphabay, (3) obtained subpoena returns from Time Warner Cable and

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony; Okparaeke, Ebere; Okparaeke, Iveoma; Okparaeke, Okoro
SUBJECT: Attorney-Client Communications
DATE: 07/14/2018 08:07:34 PM


I. Okparaeke is entitled to a Franks Hearing.

On February 24 2017, M.A. Nikolas applied for and was issued a warrant to GPS track Okparaeke's phone. Without this warrant, it would have been impossible for law enforcement to have ascertained his location in New Jersey (Gov't Sur-Reply to Def. Reply Mem. of Law ("Gov't Sur-Reply")2, ECF No. 55)

Okparaeke respectfully requests that the Court grant him a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 171 (1978). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search and seizure." United States v. Awadollah, 349 F.3d 42, 64 (2d Cir. 2003). The defendant must show via the preponderance of the evidence that there were intentional misstatements or omissions in the search warrant affidavit and those intentional misstatements or omissions in the search warrant affidavit were material. For a misstatement or omission to be material it must be necessary for the issuing judges probable cause determination. The misstatement must be made with a reckless disregard for the truth. See United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000).

A. Nikolas showed an intentional reckless disregard for the truth

Nikolas told Judge Azcarate, "Your Affiant made contact with a suspect known as Chukwuemeka Okparaeke via the internet who offered to distribute Schedule I drugs (18.2-248) into Fairfax County via the United States Postal Service (USPS)."(Nik. Aff. 4.) This statement was not only conclusory (Nikolas did not state any facts) it was also an intentional misstatement. At no point in time did Nikolas communicate with Okparaeke via the internet, or any other medium, to discuss drugs or any other topic for that matter. Okparaeke has exhaustively examined the Rule 16 material and has not observed a single one of these alleged communications between Okparaeke and Nikolas for one simple reason: they never occurred. There is no question that this statement was made with a reckless disregard for the truth and was intentional.

Nikolas also showed an immense disregard for the truth when he stated, "Over these months Your Affiant made multiple purchases of schedule I drgus from this suspect... Your Affiant has been purchasing drugs from him." (Nik. Aff. 4.). At no point in time did Nikolas exchange money for drugs with Okparaeke. Nikolas's purported purchases of narcotics from Okparaeke were Bitcoin for drug transactions on the darknet. The website at issue was called Alphabay. Darknet websites are online marketplaces utilized for the sale of various things. The websites can only be accessed via the The Onion Router (TOR) a software program originally developed by the United States Navy. This program allows users to browse the internet anonymously through a process of encryption and decryption between numerous peer-to-peer connections. The fact that these purchases are occuring on the Alphabay and that Okparaeke and Nikolas never interacted is completely and utterly unmentioned by Nikolas for one reason: he wanted to mislead the judge.

By the time Nikolas applied for the GPS warrant, Nikolas had made 6 orders from a particular vendor called fentmaster. The orders were always delivered via the USPS. The packages' postage was paid for via untraceable stamps. There were never fingerprints or DNA recovered from any of the packages.

The order placed on October 27 2016 was for one gram of furanylfentanyl. The price was $35.00 and the shipping fee was $8.00. Nikolas used the recepient address: Mike Murray, P.O Box 220568, Chantilly, Virginia 20153. The order was received October 31 2016. The return address was: Orthopedic Institute 411 Hackensack Ave, Englewood, New Jersey 07631. To make this order Nikolas logged on to Alphabay via the TOR browser. He added Bitcoins to the Alphabay site wallet. He placed an order for one gram of furanylfentanyl from fentmaster. The Bitcoins placed in the Alphabay site wallet were then placed into escrow, awaitng for successful completion of the order. When the order was completed, Nikolas released the funds to fentmaster. At no point in time did Nikolas contact Okparaeke via any method to discuss this transaction. At no point in time did Okparaeke tell Nikolas a specific Bitcoin address to send a certain number of Bitcoins to complete the transaction. There is no interaction between Okparaeke and Nikolas.

The order placed on November 7 2016 was for five grams of fentanyl. The price was $167.00 and the shipping fee was $24.00 for express shipping. The package was received on November 9 2016. Nikolas used the recepient address: Mike Murray, P.O. Box 220568, Chantilly, Virginia 20153. The return address was: Middletown Sweets, 110 Crystal Run Road, Middletown, New York 10941. To make this order Nikolas logged on to Alphabay via the TOR browser. He added Bitcoins to the Alphabay site

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

-------------------------------------------------------------------------------------------------

wallet. He placed an order for five grams of fentanyl from fentmaster. The Bitcoins placed in the Alphabay site wallet were placed into escrow, awaiting for successful completion of the order. When the order was completed, Nikolas released the funds to fentmaster. At no point in time did Nikolas contact Okparaeke via any method to discuss this transaction. At no point in time did Okparaeke tell Nikolas a specific Bitcoin address to send a certain number of Bitcoins to complete the transaction. There is no interaction between Okparaeke and Nikolas.

The order placed on November 25 2016 was for five grams of fentanyl. The price was $167.00 and the shipping fee was $8.00. The package was received on November 29 2016. Nikolas used the recepient address: Mike Murray, P.O. Box 220568, Chantilly, Virginia 20153. The return address was: J.J., 208 E Main St, Port Jervis, New York 12771. To make this order Nikolas logged on to Alphabay via the TOR browser. He added Bitcoins to the Alphabay site wallet. He placed an order for five grams of fentanyl from fentmaster. The Bitcoins placed in the Alphabay site wallet were placed into escrow, awaiting for successful completion of the order. When the order was completed, Nikolas released the funds to fentmaster. At no point in time did Nikolas contact Okparaeke via any method to discuss this transaction. At no point in time did Okparaeke tell Nikolas a specific Bitcoin address to send a certain number of Bitcoins to complete the transaction. There is no interaction between Okparaeke and Nikolas.

The order placed on December 5 2016 was for five grams of fentanyl. The price was $167.00 and the shipping fee was for $24.00 for express shipping. The order was received on December 7 2016. Nikolas used the recepient address: Mike Murray, P.O. Box 220568, Chantilly, Virginia 20153. The return address was: J Smith, 4400 US 9, Freehold New Jersey 07728. To make this order Nikolas logged on to Alphabay via the TOR browser. He added Bitcoins to the Alphabay site wallet. He placed an order for five grams of fentanyl from fentmaster. The Bitcoins placed in the Alphabay site wallet were placed into escrow, awaiting for successful completion of the order. When the order was completed, Nikolas released the funds to fentmaster. At no point in time did Nikolas contact Okparaeke via any method to discuss this transaction. At no point in time did Okparaeke tell Nikolas a specific Bitcoin address to send a certain number of Bitcoins to complete the transaction. There is no interaction between Okparaeke and Nikolas.

The order placed on December 11 2016 was for five grams of fentanyl. The price was $167.00 and the shipping fee was for $24.00 for express shipping. The order was received on December 14 2016. Nikolas used the recepient address: Mike Murray, P.O. Box 220568, Chantilly, VIrginia 20153. The return address was: Demetry Philips, 177 N Dean St, Englewood, New Jersey 07631. To make this order Nikolas logged on to Alphabay via the TOR browser. He added Bitcoins to the Alphabay site wallet. He placed an order for five grams of fentanyl from fentmaster. The Bitcoins placed in the Alphabay site wallet were placed into escrow awaiting for successful completion of the order. When the order was completed, Nikolas released the funds to fentmaster. At no point in time did Nikolas contact Okparaeke via any method to discuss this transaction. At no point in time did Okparaeke tell Nikolas a specific Bitcoin address to send a certain number of Bitcoins to complete this transaction. There is no interaction between Okparaeke and Nikolas.

The order placed on January 10 2016 was for five grams of fentnayl. The price was $167.00 and the shipping fee was for $8.00. The order was received on January 13 2016. Nikolas used the recepient address: Mike Murray, P.O. Box 220568, Chantilly, Virginia 20153. The return address was Jake Willis, 1 Kaylay Court, Newburgh, New York 12550. To make this order Nikolas logged on to Alphabay via the TOR browser. He added Bitcoins to the Alphabay site wallet. He placed an order for five grams of fentanyl from fentmaster. The Bitcoins placed in the Alphabay site wallet were placed into escrow awating for successful completion of the order. When the order was completed, Nikolas released the funds to fentmaster. At no point in time did Nikolas contact Okparaeke via any method to discuss this transaction. At no point to did Okparaeke tell Nikolas a specific Bitcoin address to send a certain number of Bitcoins to complete this transaction. There is no interaction between Okparaeke and Nikolas.

There is no question that Nikolas showed a reckless disregard for the truth when he told Judge Azcarate that he exchanged money for drugs with Okparaeke. Nikolas never interacted with Okparaeke in person. Nikolas never communicated via any means to discuss drug transactions. Nikolas never, at any point, exchanged money for drugs with Okparaeke. Nikolas fallacious allegation was intentional and reckless.

B. The misstatements were material.

There is no question that these misstatements were material to the probable cause determination of Judge Azcarate. The warrant affidavit to track Okparaeke's phone was six pages long but the substantive portion (actually describing a crime) was one 12 sentence long page. Without the statements made with a reckless disregard for the truth, all that remain are conclusory allegations that Okparaeke had a "virtual currency account", Okparaeke bought lots of stamps, Okparaeke lived in the area from which the packages originated, etc.. (Nik. Aff. 4.)

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------

Therefore, Okparaeke respectfully requests a Franks Hearing or a pre-Franks Hearing.

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

---------------------------------------------------------------------------------------------

FROM: 78867054
TO: Mirvis, Tony
SUBJECT: Attorney-Client Communications
DATE: 07/25/2018 11:23:44 AM


I. The GPS Warrant issued to M.A. Nikolas was not supported by probable cause

A. There wasn't a nexus among Okparaeke, the phone, and drug distribution

The GPS warrant affidavit failed to establish a nexus among Okparaeke, the drug distribution, and the cell phone. Nikolas mentions the phone number on one of the boiler plate pages (GPS Warrant, Aff. in supp of a Search Warrant ("Nikolas Aff.")2.) Nikolas states, "Based on the facts requested data will provide for the location and investigation into Chukwuemeka Okparaeke..." and "Based upon the aforementioned facts, your Affiant believes that the records collected from Sprint as well as the disclosure of real-time location data, will aid in the application and investigation of Chukwuemeka Okparaeke and it is believed by your Affiant that the disclosure of location-based services, will allow law enforcement to monitor Chukwuemeka Okparaeke's criminal activities..." (Id at 5.) Nikolas did not detail how he came to learn about this specific phone. Nikolas did not even allege that Okparaeke owned it or it was in some way shape and form connected to the purported crimes being committed by Okparaeke.

There must be a, "...a nexus between the items sought and the particular place to be searched." United States v. Clark, 638 F.3d 89, 91 (2d Cir. 2010). The place to searched in this case was a phone with the number 908-596-0661 (Okparaeke's phone). "In the context of a ping warrant, the place to be searched is the subject phone, and the items to be seized is location data. Therefore, the nexus requirement is satisfied by an inference that the subject phone will be a source of location information regarding criminal activity." United States v. Christain, 2017 U.S. Dist LEXIS 80251 (4th Cir. 2017). There was no fair probability that tracking a phone with the number 908-596-0661 would reveal evidence of a drug distribution without any foundational facts about the phone number.

In United States v. Williams, the Court suppressed the fruits of a phone tracking warrant because the affiant did not establish facts that established a probability that evidence of a crime would be found by tracking a particular phone. "There is nothing in the affidavit indicating that A. Gilton had previously been involved in crimes similar to the one being invnestigated (or any crimes at all). Nor is there an opinion from an investigating officer stating that, based on his or her experience in similar cases, he or she believed that evidence of the killing would be found in the minor's relative's cell phone data. Rather, he stated that "based on [his] investigation, there appears to be probable cause to beleive that the cell phone numbers provided will tend to show [sic] has possible first hand knowledge of those persons responsible for the shooting of the [sic] Calvin Sneed... and that the results of the [search and seizure] could possibly lead to the proper identity and the whereabouts of additional person associated with this crime." 161 F. Supp. 3d 846, 852-53 (9th Cir. 2016). Like Nikolas, the affiant in Williams failed to give the judicial officer any facts that would have lead him to believe that evidence of a crime would be found by tracking a phone. Like the affiant in Williams, Nikolas does not give a reason why evidence of drug distribution would be found by tracking a particular phone.

B. The warrant affidavit was Bare Bones

An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely upon it is known as a "bare bones" affidavit. A bare bones affidavit in turn, is commonly defined as one that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge. Put more simply, a bare bones affidavit is a conclusory affidavit, one that asserts only the affiant's beliefs.

The prototypical examples of bare bones affidavits come from Nathanson v. United States, 290 U.S. 41 (1933), and Aguilar v. Texas, 378 U.S. 108 (1964). In Nathanson, the affiant stated under oath that, "he has cause to suspect and does believe that "liquor illegally brought into the United States is now deposited and contained within the premises" belonging to the defendant." 290 U.S. at 44. In Aguilar, the affiant stated that he "received reliable information from a credible person and do believe that heroin, marijuana, barbiturates, and other narcotics and narcotics paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." 378 U.S. at 109. These affidavits are wholly inadequate-what we would call "bare bones" nowadays-because they presented "a mere affirmation of suspicion and belief without any statement of inadequate supporting facts." Nathanson, 290 U.S. at 46; Aguilar, 378 U.S. 113-14

There is no question that the affidavit submitted by Nikolas was unsupported by underlying facts. Nikolas first states. "Your Affiant made contact with Chukwuemeka Okparaeke via the internet who offered to distribute schedule 1 drugs (18.2-248) into Fairfax County via the United States Postal Service (USPS). (Nikolas Aff. 4.) This statement is without factual support. Nikolas

TRULINCS 78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

-----------------------------------------------------------------------------------------------------

did not detail a court order administed to a web platform and using the information to determine it was Okparaeke he was speaking to. All Nikolas had was an allegation that Okparaeke spoke to him via the internet.

Nikolas next states, "Each time the suspect sent the drugs..." (Nikolas Aff. 4.) Again, this is conclusory and could not have been used to establish probable cause. Nikolas provided no underlying facts to conclude that Okparaeke sent him drugs. Nikolas failed to detail a field test or lab test that would have given him some reason for believing that Okparaeke sent him drugs. Nikolas doesn't provide any facts or circumstances to lead him to believe that Okparaeke was the one who sent him these purported drugs. Nikolas next states, "Through open source statements by the suspect, Your Affiant was able to identify multiple schedule 1 drug packages entering the United States." This statement is vague to the point of being nonsensical. What is an open-source statement? What were the open-source statements? How does he know that Okparaeke made them? How does he know multiple schedule 1 drug packages were destined for Okparaeke?

Nikolas than states that he was able to compare "Known" handwriting samples of Okparaeke's to the drug packages he received. Nikolas just stated his suspicion that Okparaeke's "Known" handwriting samples matched drug packages without even the most remote factual basis. Nikolas doesn't state anything to lead him or the issuing judicial officer to believe he ever possessed a "known" handwriting sample of Okparaeke's. Nikolas did not detail doing a trash pull outside Okparaeke's residence and getting handwriting samples. Nikolas did not detail getting a school essay or driver's application of Okparaeke's. This claim is utterly conclusory and without facts violate Okparaeke's Fourth Amendment right. See Nathanson 290 U.S. at 41 ("the issuance of a warrant... based upon an affidavit of suspicion and belief...without a statement of facts and circumstances from which the issuing officer can find probable cause therefore violates the Fourth Amendment.)

Nikolas concludes his entirely conclusory affidavit with various conclusory statements. "Your affiant confirmed that the suspect lives and works in the geographical area from where the packages originated. In addition the suspect maintains an account with the USPS to purchase stamps online. The suspect has purchased thousands of Dollars in stamps... Through a virtual currency account maintained by the suspect, Your Affiant learned that the suspect is engaged in the movement of funds in and out of tmarketplacearkedplace where he is operating the business of distributing drugs". (Nikolas Aff. 4) These claims all violated Okparaeke's Fourh Amendment right because they were made without any factual basis. Nikolas did not detail following Okparaeke and finding his home and place of work. Nikolas did not detail utilizing a law enforcement database to find out where Okparaeke lived. All Nikolas had were his suspicion. Nikolas did not tell Judge Azcarate how he knew Okparaeke had a USPS account and bought thousands of dollars in stamps. Did Nikolas call the USPS or United States Postal Inspection Service to inquire if Okparaeke had an account. Nikolas's last statement is vague to the point of being nonsensical. He just alleges that Okparaeke has a virtual currency account without presenting any facts or circumstances.

C. The Good Faith Exception does not apply

The lack of probable cause doesn't end the inquiry. The Supreme Court, in United States v. Leon identified four situations that fail to satisfy the good faith exception. The third situation, which is also referred to as a "bare bones" affidavit, applies in this case. Leon used the term "bare bones" affidavit to descrive affidavits predicated on conclusory allegations. The Court in Leons states, "[n]or would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923 (1984).

First, at the time of the issuance of the warrant, the law was clear that a search warrant affidavit must draw a nexus among the thing to be searched, the things to be seized, the crime and the suspect. See Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978)("[t]he critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought." Nikolas did not establish facts and circumstances to connect the phone to be tracked to a crime or to Okparaeke.

The execution of a warrant that fails to connect the thing to be searched to the suspect is objectively unreasonable. In United States v. Herron, 215 F.3d 812 (8th Cir. 2003) the Eighth Circuit held that the Good Faith Exception did not apply when the supporting affidavit provided no evidence of illegal activity at the address searched. Other circuit courts have found police reliance on warrants entirely unreasonable where the supporting affidavit failed to demonstrate a nexus between the suspected criminal activity and the place to be searched. See United States v. Brown, 828 F.3d 375 (6th Cir. 2016)(concluding the district court erred in denying a motion to suppress and the reliance on the warrant was entirely unreasonalbe where the affidavit did not draw a "plausible connection to the residence" to be searched); United States v. Underwood, 725 F.3d 1076 (9th Cir. 2013)(affirming district court's suppression and concluding that the Leon exception did not apply where the affidavit provided "no factual basis for the conclusion that drug trafficking evidence would be found at [the defendant's] home.") United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005)(finding the Leon exception inapplicable where the affidavit lacked a "factual basis connecting the place to be searched to the defendant or suspected criminal activity" so that reliance on the warrant "was entirely unreasonable"); United States v. Laughton, 409 F.3d 744 (6th Cir. 2005)(reversing a district court decision based on the

TRULINCS  78867054 - OKPAPAEKE, CHUKWUEMEKA - Unit: BRO-J-A

--------------------------------------------------------------------------------------------------------

Leon exception where there was no "modicum of evidence, however slight, to connect the criminal activity to the place to be searched").

Second, the Supreme Court has spoken: a warrant affidavit must be predicated on facts and circumstances. The "totality of circumstances must present the magistrate with sufficient information to allow that official to make the necessary determinations; his action cannot be a mere ratification of the bare conclusions of others." Illinois v. Gates, 462 U.S. 213, 239 (1983); See also Clark, 638 at 97 (2011)(conclusory allegation that the defendant had "full control" of a multi-unit apartment building was insufficient without facutal support to establish the probability that the defendant had full control of the building.)

Knowing this, Nikolas still decided to apply for a warrant with an affidavit that consisted of conclusory allegations. Nikolas's affidavit did not have a single fact and thus its execution was entirely unreasonable.

Therefore, Okparaeke respectfully requests that the Court grant Okparaeke motion for suppression be granted or hold an evidentiary hearing.