U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 23, 2021

**BY ECF**

The Honorable Nelson S. Román
United States District Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

      Re: **United States v. Chukwuemeka Okparaeke, a/k/a "Emeka"**,
            **S4 17 Cr. 225 (NSR)**

Dear Judge Román:

      Defendant Chukwuemeka Okparaeke, a/k/a "Emeka" trafficked massive quantities of dangerous drugs through the dark web. As part of his criminal scheme, Okparaeke imported kilograms of fentanyl analogues and other synthetic opioids from overseas, broke them down into smaller quantities, advertised them for sale through a darknet website, and shipped them to users throughout the United States via the U.S. Postal Service, making postal carriers unwitting participants in his crimes. The defendant's criminal business was extremely lucrative, bringing him cryptocurrency proceeds worth millions of dollars. But, as the defendant, a former medical student, knew, his personal enrichment came at the expense of others, who were exposed to significant risk of addiction, overdose, and death from the illegal substances the defendant was trafficking. In at least one known case, the defendant's criminal actions resulted in the overdose death of an 18-year-old man, who died after consuming the highly potent synthetic opioid U-47700 that the defendant sold to him.

      For the reasons set forth below, given the extraordinarily serious and aggravated nature of the defendant's crimes, including that his narcotics trafficking caused at least one death, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 210 to 262 months in prison is appropriate and necessary to serve the purposes of sentencing in this case.

    I.    **Offense Conduct**

          Okparaeke's Importation and Distribution of Narcotics through the Dark Web

      As detailed in the Presentence Investigation Report ("PSR"), from at least July 2016 through March 2017, Okparaeke imported kilogram quantities of controlled substance analogues and Schedule I and II synthetic opioids—including acryl fentanyl, furanyl fentanyl, U-47700, and

4-ANPP—from Hong Kong and China into the United States. (PSR ¶ 11). To transact with customers and coordinate his narcotics sales, Okparaeke used a darknet website called AlphaBay Marketplace ("AlphaBay"), a now-inactive online black marketplace for contraband. AlphaBay was accessible only through The Onion Router (Tor), a special software program that encrypts internet traffic to mask users' identities.

Okparaeke operated as a vendor on AlphaBay under the name "Fentmaster." (PSR ¶ 11). As part of his narcotics business, Okparaeke used AlphaBay to advertise and sell the drugs he imported to customers throughout the United States. (*Id.* ¶ 12). Using fictitious return addresses, he mailed the drugs to customers nationwide through the U.S. Postal Service ("USPS"). Between July 2016 and March 2017, Okparaeke completed more than 7,000 sales of fentanyl analogues and other synthetic opioids through his Fentmaster vendor page on AlphaBay. (*Id.*).

Okparaeke used extensive measures to conceal his identity, including software to encrypt his internet traffic and communications sent from his cellphone. (PSR ¶ 13). Okparaeke published numerous online posts under various usernames on the website Reddit.com ("Reddit"), in which he, among other things, boasted about his exploits as a darknet drug trafficker, discussed his drug trafficking techniques, offered advice to other drug dealers, and published a short story describing his criminal activities and his strategies for evading law enforcement (the "Short Story"). (*Id.*). Okparaeke, who attended medical school before he began selling synthetic opioids on AlphaBay, understood that the substances he was selling were extremely dangerous and could lead to death if consumed.

Over the course of the investigation, law enforcement intercepted packages with fentanyl analogues and synthetic opioids shipped to Okparaeke from abroad. (PSR ¶¶ 14-15). Between January and February 2017, law enforcement intercepted and seized three packages, each containing over a kilogram of a substance and each addressed to the defendant from Hong Kong. Confirmatory laboratory testing on the substances from two of the three packages determined that each contained both 4-ANPP and acryl fentanyl. (*Id.*). After intercepting the first two packages, law enforcement replaced them with sham packages designed to mimic their weight and density as part of a controlled delivery. On January 31, 2017, Okparaeke called the Middletown post office to inquire about one of the packages and, the next day, claimed both sham packages at the post office. (PSR ¶ 14). During an interview by law enforcement after the controlled delivery, Okparaeke falsely denied knowing the contents of the packages and was advised by law enforcement that the packages contained dangerous contraband. Notwithstanding this encounter with law enforcement, Okparaeke continued his lucrative criminal business.

Over the course of the investigation, law enforcement made multiple controlled purchases from Fentmaster and conducted surveillance of Okparaeke as he fulfilled orders made to Fentmaster. (PSR ¶ 16). Shortly after the controlled delivery, Okparaeke began renting an apartment in Kearny, New Jersey, which he used as a base of operations from which to continue his drug-trafficking activities. On the day of Okparaeke's arrest in March 2017, law enforcement searched the Kearny drug stash premises pursuant to a search warrant. During the search, law enforcement seized more than 10 kilograms of U-47700, acryl fentanyl, and furanyl fentanyl, as well as a quantity of 4-ANPP and approximately 82 mailing envelopes containing smaller amounts of those substances that Okparaeke had packaged for distribution to his customers. (*Id.*).

### Overdose Death Caused by Okparaeke

Okparaeke's drug trafficking resulted in the death of Tim Teklinski, an 18-year-old who lived with his mother in Vancouver, Washington. (PSR ¶¶ 18-19). In early November 2016, Okparaeke sold three grams of U-47700 to Teklinski in an AlphaBay transaction. (PSR ¶ 18). Teklinski received the drugs in the mail, used them, and died in a U-47700 overdose on November 10, 2016. (*See id.*). When Teklinski's mother came home that day, she found her son lying on the bed in his bedroom unconscious and not breathing. (*Id.* ¶ 19). When she tried to administer CPR, Teklinski vomited bile. After unsuccessful life support measures, Teklinski was pronounced dead. An autopsy confirmed that he had died from U-47700 intoxication. (*Id.*).

To put the magnitude of the defendant's crimes in perspective, Teklinski's death was caused by the defendant's sale of just three grams of U-47700. As he has now admitted, the defendant is responsible for trafficking, among other synthetic opioids, 6.957 *kilograms* of U-47700 as part of his criminal business. (PSR ¶ 17).

### Okparaeke's False Statements to Law Enforcement

Okparaeke's drug trafficking on AlphaBay generated illicit proceeds totaling at least 680.60963624 Bitcoins, which are worth millions of dollars.[1] (PSR ¶ 17). In or about September 2020, the U.S. Attorney's Office learned that the approximately 680 Bitcoins, which were the subject of the forfeiture allegation in the then-pending Indictment, had been transferred to a new bitcoin address in November 2019. (PSR ¶ 20). On September 15, 2020, during a meeting with representatives of the U.S. Attorney's Office for the Southern District of New York, Okparaeke falsely stated that the approximately 680 Bitcoins were no longer in his possession and control, and that a third party had stolen the Bitcoins through hacking and other unauthorized access to Okparaeke's electronic accounts. (*Id.*). Okparaeke subsequently surrendered the approximately 680 Bitcoins to the U.S. Postal Inspection Service and agreed to forfeit those proceeds as part of his plea agreement. The Government will be requesting that the Court enter a final order of forfeiture with respect to these criminal proceeds.

### Okparaeke's Guilty Plea and the PSR

On October 15, 2020, Okparaeke pleaded guilty before Judge Davison to three counts set forth in the S4 Information: distributing and possessing with intent to distribute U-47700, a controlled substance analogue of AH-7921, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 813, 841(a)(1), and 841(b)(1)(C) (Count One); importing and attempting to import 100 grams and more of acryl fentanyl, in violation of Title 21, United States Code, Sections 813, 952(a), 960(a)(1), 960(b)(1)(F), and 963 (Count Two); and making materially false statements to the Government, in violation of Title 18, United States Code, Section 1001 (Count Three). On February 4, 2021, this Court accepted Okparaeke's guilty pleas. (Dkt. No. 170).

---

[1] These Bitcoins are now worth more than approximately $21 million based on the current value of Bitcoin.

As part of his plea agreement, Okparaeke admitted that, through the distribution of U-47700 charged in Count One, the defendant caused Teklinski's death in November 2016. Okparaeke also admitted that his offense conduct, including relevant conduct, involved 9.044 kilograms of acryl fentanyl; 1.159 kilograms of furanyl fentanyl; 6.957 kilograms of U-47700; and 12 grams of 4-ANPP. (PSR ¶ 17). In the plea agreement, the parties stipulated that the applicable U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range is 210 to 262 months' imprisonment (the "Stipulated Guidelines Range"), based on a total offense level of 37 and a criminal history category of I, with a mandatory minimum sentence of 120 months' imprisonment. The parties also agreed in the plea agreement that neither party would seek a sentence outside of the Stipulated Guidelines Range.

The Probation Office recommends a sentence of 180 months' imprisonment, "[t]aking into consideration the large quantity of drugs attributable to the defendant and that this offense is directly related to the loss of a life." (PSR at 21).[2]

Okparaeke's Motion to Withdraw his Guilty Pleas

On May 14, 2021, approximately seven months after his guilty pleas, Okparaeke filed a motion seeking to withdraw his guilty pleas to Counts One and Three. (Dkt. No. 175). With respect to Count One, Okparaeke argued that he was legally innocent of Count One because the Drug Enforcement Administration purportedly acted outside of its authority in scheduling AH-7921. With respect to Count Three, notwithstanding his sworn plea allocution, in which he acknowledged telling the U.S. Attorney's Office "that someone hacked into my account and . . . moved the bitcoins," which "wasn't true, your Honor" (Plea Tr. 49), Okparaeke argued that his admissions during the plea allocution purportedly did not provide a sufficient factual basis for the plea. On July 16, 2021, the Court issued an Opinion & Order rejecting these arguments and denying Okparaeke's motion. (Dkt. No. 190).

## II.  Applicable Law

As the Court is well aware, although the Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.

---

[2] In the PSR, the Probation Office calculated a total offense level of 39, which includes an additional enhancement pursuant to U.S.S.G. § 2D1.1(b)(7) for distributing a controlled substance through mass-marketing by means of an interactive computer service. (PSR ¶ 30). The Probation Office's calculation yields a Guidelines range of 262 to 327 months' imprisonment. (PSR at 19). The Government is prepared to answer any factual questions the Court may have regarding the mass-marketing enhancement. In accordance with the plea agreement, however, the Government respectfully requests that the defendant be sentenced within the Stipulated Guidelines Range of 210 to 262 months' imprisonment.

*Id.* at 49. The Guidelines' relevance stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct and promote respect for the law, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities. *Gall*, 552 U.S. at 50 & n.6. If the judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### III.   Discussion

The Government respectfully submits that a sentence within the Stipulated Guidelines Range of 210 to 262 months in prison would appropriately reflect the factors set forth in 18 U.S.C. § 3553, including the need for the sentence to reflect the nature and seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from further crimes of the defendant. Such a sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing in this case.

#### A. The Nature, Circumstances, and Seriousness of the Defendant's Offenses and the Need to Provide Just Punishment and Promote Respect for the Law

The defendant's crimes were extraordinarily serious. Our country is in the midst of an opioid crisis that is claiming scores of lives, devastating families, and crushing communities. Synthetic opioids such as those the defendant was trafficking have fueled this crisis. The Centers for Disease Control and Prevention ("CDC") reports that, "in 2019, more than 36,000 deaths involving synthetic opioids (other than methadone) occurred in the United States, which is more deaths than from any other type of opioid." Synthetic Opioid Overdose Data, *available at* https://www.cdc.gov/drugoverdose/deaths/synthetic/index.html (last visited July 21, 2021). According to the CDC, synthetic opioid-involved deaths accounted for nearly 73% of all opioid-involved deaths in 2019. *Id.* Even in small does, fentanyl and its analogues and other synthetic opioids are highly addictive, dangerous, and deadly—and the defendant, a former medical student, knew that full well when he was importing and selling kilograms of them. Fentanyl analogues, including acryl fentanyl and furanyl fentanyl, are so dangerous that distributing 100

5

*grams* of them triggers a mandatory 10-year sentence under the statutory scheme enacted by Congress. In this case, the defendant imported and trafficked *kilograms* of these dangerous and illegal substances—including more than 9 kilograms of acryl fentanyl and more than a kilogram of furanyl fentanyl—and used the dark web and the U.S. Postal Service to distribute them to his customers for consumption, with no regard for the devastating effects of these drugs. During the charged period, between July 2016 and March 2017, the defendant completed a staggering number of sales of fentanyl analogues and other illegal narcotics—*more than 7,000 sales*—through his Fentmaster vendor page on AlphaBay. This criminal conduct, through which the defendant reaped millions of dollars in profits, endangered an untold numbers of people across the United States—not only the defendant's customers and their families, but also the unwitting postal employees who handled and transported the defendant's packages unaware of the danger that lay inside them. The scope and reach of the defendant's criminal conduct were exceptional.

The manner in which the defendant carried out his crimes is a further aggravating factor in this case. The defendant sold drugs over the dark web, where it is particularly difficult to identify, locate, and apprehend wrongdoers. Indeed, that is the very purpose of criminal dark web marketplaces—to make it difficult for law enforcement to determine who is committing these crimes, and from where. The defendant used extensive measures to conceal his identity and evade detection, including software to encrypt his internet traffic and communications sent from his cellphone. Even after his arrest in this case, the defendant continued to try to deceive law enforcement by moving his criminal cryptocurrency proceeds to a new Bitcoin address and then lying to the Government in an effort to conceal his criminal proceeds and frustrate the Government's forfeiture efforts. These deceptive and sophisticated tactics distinguish Okparaeke from most other drug traffickers and further support a sentence within the Stipulated Guidelines Range.[3]

Finally, the central aggravating factor in this case is that the defendant's criminal actions caused at least one known death: 18-year-old Tim Teklinski died from an overdose after consuming the highly potent synthetic opioid U-47700, which the defendant sold to him through AlphaBay. This was a senseless and preventable death caused by the defendant's decision to line his own pockets by selling dangerous drugs with callous disregard for the health and lives of others.

In sum, a sentence within the Stipulated Guidelines Range is necessary to properly reflect the seriousness of the defendant's offenses and to provide just punishment and promote respect for the law.

---

[3] The Government notes that, as a result of the grouping analysis under the Guidelines, the defendant's conviction on Count Three does not affect the Guidelines range in this case. Nonetheless, the Government submits that the defendant's materially false statements to the Government about his criminal proceeds is an important fact for this Court to consider at sentencing pursuant to Section 3553(a).

B.  **The Defendant's History and Characteristics and the Need to Afford Adequate Deterrence and Protect the Public**

The defendant's history and characteristics further support a sentence within the Stipulated Guidelines Range.  Before he began selling illegal narcotics on the dark web, the defendant completed over two years of medical school.  As former a medical student, the defendant knew that fentanyl and its analogues and other synthetic opioids were extremely dangerous and could lead to death, even when taken in small quantities.  In the Short Story the defendant posted on Reddit under the handle "bmoreproduct1,"[4] he described how addictive fentanyl is—and how lucrative the business is as a result:

> He had first learned about fentanyl abuse as a medical resident in Centre Hospital in Virginia. Patients had come in addicted to fentanyl lollipops and fentanyl patches. Patient upon patient told me how they dwindled their life savings for used patches. The addiction was brutal but obviously very lucrative for the dealers who were on the receiving end of these deals. He easily

In another Reddit post, the defendant referred to a heroin overdose death and noted that the heroin was almost certainly spiked with fentanyl or one of its analogues:

> Confirmed by manager: Josh Samman dead at 28  by Kozemp  in MMA
> [–] bmoreproduct1  17 points 4 months ago
> One fully grown, fit man, could easily die of a cerebral aneurysm especially after concussive blows. But you are right, two men dying so close to one another speaks of heroin overdose. Almost certainly spiked with fentanyl or carfentanil.
> permalink  context  full comments (321)
> view more:  ‹ prev   next ›

In yet another post, the defendant responded to a comment that eleven emergency responders had been treated after being exposed to heroin and fentanyl.  According to the defendant, if the responders had actually been exposed to aerosolized fentanyl, they would be dead:

---

[4] "bmoreproduct1" is Okparaeke's Reddit handle.  Among other things, Okparaeke accessed the "bmoreproduct1" profile using an internet protocol ("IP") address subscribed in his name at his home address.  Moreover, the content of various posts made using this handle contain many facts known to be true of Okparaeke.  In addition, when law enforcement executed a search warrant on Okparaeke's cellphone, the cellphone's browser reflected that Okparaeke had recently visited a Reddit page on which "bmoreproduct1" had written Part 1 of the Short Story.

7

> **PSA / Article**
> So some guy was pressing fake oxys in a motel room and when he got caught he admitted it and said he bought the press and the fentanyl analogue on the darknet
> submitted 6 months ago * (last edited 6 months ago) by [deleted]
> [deleted]
> 72 comments
>
> all 72 comments
> sorted by: best ▼
>
> [+] theseeker01  51 points 6 months ago (2 children)
>
> [−] [deleted]  12 points 6 months ago
> The only reason I can think of him admitting it was so one of the cops didn't accidentally OD himself on some raw fentanyl
> This actually happened today. 11 Hartford emergency responders treated after being exposed to Heroin, Fentanyl
> permalink
>
> [−] bmoreproduct1  10 points 6 months ago
> If they actually were exposed (by that I think they mean aerosolized fentanyl) they would be dead. No ER has the ability to user narcan/intubate 11 people at once. Fentanyl can only be absorbed through the skin when the skin is wet or inhaled when vaporized.
> permalink  parent

      In sum, as a former doctor-in-training, the defendant knew that the substances he was distributing on the black market were dangerous and deadly and yet continued to import kilograms of them, advertise and sell them for human consumption, and ship them to thousands of people across the United States. In fact, he continued to sell them even after law enforcement interviewed him and told him that the packages he came to pick up contained dangerous contraband. The defendant's chilling indifference to human life—and his persistence in criminality despite law enfrocement intervention—underscore his danger to the community and the acute need to protect the public in this case.

      A significant sentence is also necessary to afford both general and specific deterrence. With respect to general deterrence, this Court's sentence should send a clear message to others who are considering distributing fentanyl or other synthetic opioids that such criminal conduct, which destroys lives, will be met with very serious consequences. The dark web compounds the seriousness of this problem: it lowers barriers to entry, reduces the odds of detection, and dramatically expands one's potential customer base.[5] As a result, in the rare instance that a dark web drug trafficker is identified, apprehended, and sentenced, it is important to send a clear message to the public about the seriousness of the crime—and the commensurate seriousness of the penalty.

      Specific deterrence is also an important sentencing consideration in this case. Unlike many defendants who appear before this Court for sentencing, the defendant enjoyed a loving, financially secure childhood and obtained a college degree and even graduate training. Notwithstanding his education, skills, and strong support network, the defendant chose to engage in an extensive criminal drug business. While the defendant now claims that he will not revert to a life of crime when released, the circumstances of his offenses suggest that he would not have stopped this conduct but for his arrest in this case—and indeed, he did not stop at any time until he was caught in March 2017, not even after law enforcement interviewed him and told him that the packages he claimed contained dangerous contraband. He continued his criminal conduct because he was good at it, it made him extremely wealthy, and he believed that he would get

---

[5] For instance, based on AlphaBay's Home Page, it appears that, shortly before the marketplace was shut down in July 2017, there were more than 217,000 "Drugs & Chemicals" being offered for sale.

8

away with it. Indeed, the defendant's Reddit posts suggest that he specifically considered the risk of a successful prosecution and jail time for the types of crimes he was committing. In one post, the defendant commented that analogue laws only apply if "the feds" can prove intent for human consumption:

> **Today I sold my first kilo of fentanyl analog.** by BenzoChems in DarkNetMarkets
> [–] bmoreproduct1  0 points 5 months ago
> None since its not scheduled. Analog laws only apply if the feds can prove that the fentanyl analog (the specific fentanyl analog at that) is being used for human consumption.
> NSFW  permalink  context  full comments (79)

In another post, the defendant wrote that first-time drug offenders get light sentences (three to five years) regardless of the size of their drug-trafficking operation:

> **What would compel someone to lead the police to $1.7 million after they have already plead guilty?** by bmoreproduct1 in DarkNetMarkets
> [–] bmoreproduct1 [S] 5 points 1 month ago
> 3-5 years is the usual sentence for a first time drug offenses; regardless of the size of the operation. I have known of guys who have moved $20 million and got 5 because it was there first offense.
> Why did he fucking give them money?

These posts underscore the acute need for specific deterrence in this case. They suggest that the defendant expressly considered the low chance of a successful criminal prosecution and the potential jail sentence for a first-time drug offender, and made a calculated decision to proceed with his drug-trafficking operation. Put simply, the risk of a few years in jail was not going to stop this defendant from importing and trafficking dangerous drugs through the dark web. The Government respectfully submits that a sentence within the Stipulated Guidelines Range is necessary to deter the defendant committing new crimes, and devising new ways to evade detection, in the future.

## IV.    Defendant's Arguments

In his sentencing submission, the defendant makes several arguments in support of his view that "leniency is reasonable and appropriate." (Def. Mem. at 6, Dkt. No. 191). The Government respectfully submits that these arguments do not support a variance from the Stipulated Guidelines Range.

First, the defendant emphasizes that he is a first-time offender. While it is true that the defendant does not have any prior criminal convictions, that fact is already properly accounted for in the Stipulated Guidelines Range through the defendant's criminal history category. Moreover, this is emphatically not a case where the offense conduct was aberrant or prompted by a lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life. Each time that the defendant imported illegal narcotics to the United States, listed them for sale on AlphaBay, and shipped them in the mail to customers throughout the country, he made a conscious and deliberate choice to commit a crime. Indeed, each of the defendant's more than 7,000 completed transactions on AlphaBay was a separate crime, which he committed methodically and deliberately. And these crimes went on for months and generated significant criminal proceeds. The defendant became a millionaire at the expense of the many lives he placed in danger through his extensive criminal business. This brazen,

repeated conduct warrants a sentence within the Stipulated Guidelines Range, and the defendant's lack of previous criminal convictions does not warrant a variance.

Next, the defendant asserts that he began engaging in "risky, illegal activities" after he suffered an overdose, was hospitalized, and experienced "debilitating depression that prevented him from rejoining school in earnest." (Def. Mem. at 2). The Government does not question that the defendant experienced these challenges, but they do not, either individually or in combination, provide any excuse, justification, or explanation for his decision to import and sell dangerous and deadly drugs. If anything, having experienced an overdose himself, and the harmful consequences that followed, the defendant had firsthand knowledge of the devastation that drugs can wreak on people's lives. Despite this, and despite having a nuanced medical understanding of the harmful effects of synthetic opioids, the defendant chose to engage in a criminal business that lined his pockets while exposing his customers to addiction and, in Teklinski's case, death.

Next, the defendant argues that "[f]ederal courts have sentenced people for similar conduct to drastically less time than the stipulated guidelines." (Def. Mem. at 5). But the cases that the defendant cites are inapposite. In *United States v. Waver*, 754 F. App'x 56 (2d Cir. 2019) (summary order), for example, the defendant pleaded guilty to one furanyl fentanyl transaction; the Guidelines range was 33 to 41 months, and the sentencing court departed upward to 84 months because the transaction resulted in death. Similarly, in *United States v. Hicks-Bailey*, 740 F. App'x 751 (2d Cir. 2018) (summary order), the defendant pleaded guilty to one heroin transaction; the Guidelines range was 15 to 21 months, and the sentencing court departed upward to 96 months because the transaction resulted in death. Unlike in those cases, Okparaeke's offense conduct, including relevant conduct, involved trafficking kilograms of fentanyl analogues and other synthetic opioids through thousands of transactions, including at least one transaction that resulted in death. These crimes warrant a sentence within the Stipulated Guidelines Range. In *United States v. Richard Castro*, 19 cr. 193 (DLC), for example, Judge Cote recently imposed a sentence of 210 months (the low end of the Guidelines range of 210 to 262 months) on a drug trafficker for participating in a conspiracy to distribute fentanyl and fentanyl analogues over the dark web, including on AlphaBay, and for laundering the proceeds of his narcotics trafficking, which totaled more than $4 million. Castro was similarly situated to Okparaeke in many ways, but Okparaeke completed more drug sales, generated more criminal proceeds, and—critically—caused at least one known overdose death, a key aggravating factor that was not present in the *Castro* case.

The defendant also suggests that his sentence should be more lenient because of the harsh conditions of confinement due to the global pandemic. (Def. Mem. at 3). While conditions of imprisonment during the onset of the pandemic were undeniably difficult, given the steep learning curve the entire world faced in figuring out how to respond to the threat of COVID-19, and the need for physical distancing in order to control the spread of the virus, those conditions (which have since changed considerably) do not negate the need for a very significant sentence here. The Government also notes that, based on medical records provided by the Bureau of

Prisons ("BOP"), the defendant was offered the Pfizer vaccine on January 19, 2021, and refused it.[6]

Finally, the defendant submits to this Court that he is now remorseful for his actions. As much as the Government would hope that be so, the defendant's recent effort to withdraw his guilty plea undercuts his claim of sincere remorse. With respect to Count Three in particular, while the defendant now says that he is "regretful for misleading the US Attorney's Office" (Def. Mem. at 4), he argued in his motion to withdraw that he was "legally innocent" of Count Three because he purportedly did not admit to "knowing that the Bitcoins weren't actually stolen via a hack or admit that the Bitcoins were under his dominion." (Dkt. No. 175 at 3). As the Court correctly found, this argument was "blatantly contradicted by the transcript of Defendant's allocution." (Opinion & Order at 7, Dkt. No. 190). While the Government is not opposing credit for acceptance of responsibility under the Guidelines, the Government respectfully submits that the defendant's decision to make spurious arguments in an eleventh-hour effort to withdraw his guilty plea undermines his claims of true remorse for his criminal actions and should be considered by this Court as part of its analysis under Section 3553(a).

## V. Conclusion

In sum, the Government submits that a sentence within the Stipulated Guidelines Range of 210 to 262 months in prison is necessary to properly reflect the seriousness of the defendant's crimes, to afford just punishment, and to meet the other goals of sentencing as set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____
Olga I. Zverovich / Gillian Grossman / Sagar Ravi
Assistant United States Attorneys
Southern District of New York
(212) 637-2514 / 2188 / 2195

cc: Stand-by Counsel (by ECF) and Chukwuemeka Okparaeke (by mail)

---

[6] As noted in the PSR, the defendant also sustained two disciplinary infractions while in custody. Following two hearings, the defendant was disciplined for refusing to obey an order, being insolent to staff members, and being in an authorized area, as well as for giving/accepting money without authorization. (PSR ¶ 8).